Rebecca Plett (VA Bar No. 90988, NC Bar No. 63273)
Lauren Rivard (NY Reg. No. 5308192)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-6316
Washington, DC 20580
(202) 326-3664 / rplett@ftc.gov
(202) 326-2450 / lrivard@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Federal Trade Commission,

       Plaintiff,

    v.

Air Ai Technologies, Inc., also d/b/a Air Ai and Scale 13, a Delaware corporation;

Apex Holdings Group LLC, an Arizona limited liability company;

Apex Scaling LLC, also d/b/a Air AI and Scale 13, an Arizona limited liability company;

Apex 4 Kids LLC, an Arizona limited liability company;

New Life Capital LLC, an Arizona limited liability company;

Onyx Capital LLC, an Arizona limited liability company;

Caleb Matthew Maddix, individually and as an officer of Air Ai Technologies, Inc., Apex Holdings Group LLC, Apex Scaling LLC, Apex 4 Kids LLC, New Life Capital LLC, and Onyx Capital LLC;

Ryan Paul O'Donnell, individually and as an officer of Air Ai Technologies, Inc., Apex Holdings Group LLC, Apex Scaling LLC, Apex 4 Kids LLC, New Life Capital LLC, and Onyx Capital LLC; and

Case No. _____

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENTS, AND OTHER RELIEF**

Thomas Matthew Lancer, individually and
as an officer of Air Ai Technologies, Inc.,

    Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing Sales Rule, ("TSR"), 16 C.F.R. Part 310, and the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule"), 16 C.F.R. Part 437, as amended. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, and the Business Opportunity Rule.

## I.    SUMMARY OF THE CASE

2.    Since at least February 2023, Defendants have deceptively marketed and sold a series of products and services aimed at entrepreneurs and small businesses, cashing in on significant false earnings claims and a guaranteed refund policy, to bilk consumers out of roughly $19 million over the course of only a few years.

3.    Defendants use online and telephone advertising and sales funnels to reach consumers, employing social media advertising campaigns to entice consumers to engage with them over the phone. Once they have consumer contact information, Defendants

persistently call, text, and email consumers and use deceptive and high-pressure sales tactics to sell their products and services.

4.     Defendants' products and services fall into two broad categories. First, Defendants sell business coaching materials and support, coupled with a suite of AI-related business support products called an "Air AI Access Card" membership. Defendants have marketed their flagship product as "conversational AI," allegedly capable of replacing human customer service representatives and, in combination with their coaching and other services, making business owners significant sums of money, for example claiming that some consumers were making a million dollars using Defendants' services or that consumers would earn back tens of thousands of dollars within 30 days.

5.     Second, Defendants sell high-priced licenses permitting consumers to use the conversational AI themselves and market and re-sell the conversational AI technology to other businesses ("License" "Licensing" or "Licensing Business Opportunity"). Some consumers purchasing a License enter the sales funnel looking to purchase just conversational AI technology for their own business use but are then upsold the "opportunity" to make considerably more money – recouping investments of up to $100,000 and then some – by getting a License to resell the technology and get in on the ground floor of this allegedly industry-shifting product.

6.     Consumers purchasing the Air AI Access Card are frequently individuals interested in starting coaching businesses, hoping that Defendants' services will help them start, grow, and scale their business, or entrepreneurs with pre-existing businesses looking to incorporate AI to improve efficiency or expand their endeavors.

7.    Despite Defendants' promises, at best, Defendants offer coaching that does not help consumers start or grow a business, glitchy software that does not perform as advertised, and licenses to resell the same. At worst, Defendants sell consumers a junk suite of services that do not exist or are not consistently available.

8.    Consumers who purchase Air AI Access Cards often cannot get businesses off the ground or bring in the promised profit, and licensees are not able to recoup the money they pay Defendants for the privilege of selling their faulty products.

9.    To induce consumers to purchase these products and services, Defendants offer sweeping full-refund guarantees. These guarantees are the closing salvo of sales pitches and expressly outlined in contracts. Consumers are promised that if they do not make a certain amount of money – typically double or treble their investment within a specified number of months – or if they are not happy with the products for any reason, Defendants will refund the entire purchase price. As a result of these guarantees, consumers enter contracts with Defendants believing that their investment is essentially risk free. Some consumers even take on Defendant-brokered loans from third-party lenders in order to cover the purchase price. But when consumers ask for a refund, Defendants rarely honor their guarantee, often delaying and obfuscating before cutting off communication altogether.

10.    Consumers, many of whom are small business owners, lose as much as $100,000 on their investment and are frequently left in debt after relying on Defendants' false promises of business growth, earnings potential, and refunds.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(1), (c)(2), and 15 U.S.C. § 53(b).

## III.     PLAINTIFF

13.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Business Opportunity Rule, 16 C.F.R. Part 437, which requires sellers to provide disclosure documents and prohibits false or unsubstantiated earnings claims and other prohibited practices. In addition, the FTC enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

## IV.     DEFENDANTS

14.     Defendant Air AI Technologies, Inc. ("Air AI"), also doing business as Air AI, Air.AI and Scale 13, is a Delaware corporation with its principal place of business at 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016. Air AI was previously incorporated in Arizona as Air AI LLC, with its principal place of business at 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016. In 2024, Air AI LLC converted to Air AI Technologies, Inc. Air AI transacts or has transacted business in this District and

throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Air AI has advertised, marketed, distributed, or sold the Air AI Access Card and Licensing to consumers throughout the United States.

15.    Defendant Apex Holdings Group LLC ("Apex Holdings") is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona, with a mailing address listed as 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016. Apex Holdings transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Apex Holdings has advertised, marketed, distributed, or sold the Air AI Access Card and Licensing to consumers throughout the United States. Apex Holdings is the principal and organizer of corporate Defendant Apex Scaling LLC.

16.    Defendant Apex Scaling LLC ("Apex Scaling"), also doing business as Air AI and Scale 13, is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona, with a mailing address listed as 4742 N 24th Street, Suite 300, PMB #111, Phoenix, Arizona 85016. Apex Scaling transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Apex Scaling has advertised, marketed, distributed, or sold the Air Access Card and Licensing to consumers throughout the United States.

17.    Defendant Apex 4 Kids LLC ("Apex 4 Kids") is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona, with a mailing address listed as 4742 N 24th Street, Suite 300, PMB #111, Phoenix, Arizona

85016. Apex 4 Kids transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Apex 4 Kids has advertised, marketed, distributed, or sold the Air AI Access Card and Licensing to consumers throughout the United States.

18.    Defendant New Life Capital LLC ("New Life Capital") is an Arizona limited liability company with its principal place of business at 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016 with a mailing address listed as PO Box 111, Phoenix, Arizona 85016. New Life Capital transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, New Life Capital has advertised, marketed, distributed, or sold the Air AI Access Card and Licensing to consumers throughout the United States.

19.    Defendant Onyx Capital LLC ("Onyx Capital") is an Arizona limited liability company with its principal place of business at 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016 with a mailing address listed as PO Box 111, Phoenix, Arizona 85016. Onyx Capital transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Onyx Capital has advertised, marketed, distributed, or sold the Air AI Access Card and Licensing to consumers throughout the United States.

20.    Defendant Caleb Matthew Maddix ("Defendant Maddix") is a managing member of Air AI, Apex Holdings, Apex Scaling, Apex 4 Kids, New Life Capital, and Onyx Capital ("Corporate Defendants"). At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority

to control, or participated in the acts and practices of advertising, marketing, distributing, or selling the Air AI Access Card and Licensing to consumers throughout the United States, including the acts and practices described in this Complaint.

21.    Defendant Maddix resides in Maricopa County, Arizona, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

22.    Defendant Ryan Paul O'Donnell ("Defendant O'Donnell") is a managing member of the Corporate Defendants. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of advertising, marketing, distributing, or selling the Air AI Access Card and Licensing to consumers throughout the United States, including the acts and practices described in this Complaint.

23.    Defendant O'Donnell resides in Fairfax County, Virginia, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

24.    Defendant Thomas Matthew Lancer ("Defendant Lancer") is a principal of Air AI. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of advertising, marketing, distributing, or selling the Air AI Access Card and Licensing to consumers throughout the United States, including the acts and practices described in this Complaint.

25.    Defendant Lancer resides in Canyon County, Idaho, and in connection with

the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**V.    COMMON ENTERPRISE**

26.    Corporate Defendants have operated as a common enterprise while engaging in the deceptive and unlawful acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, office locations, and commingled funds.

27.    Defendants Maddix and O'Donnell are principals for all six Corporate Defendants and are sole principals for Apex Holdings, Apex 4 Kids, and New Life Capital. They have signatory authority on corporate bank accounts for all Corporate Defendants. Defendants Maddix, O'Donnell and Lancer ("Individual Defendants") are principals of Air AI, and Defendant Lancer has access to corporate credit cards for Air AI and Apex 4 Kids credit card accounts.

28.    All Corporate Defendants have shared at least one address, which they list in articles of incorporation as a principal place of business or mailing address: 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016. This address appears to be a co-working space offering monthly memberships, meeting rooms for reservation, and virtual offices.

29.    Certain Corporate Defendants also share employees. For example, at least one employee listed as a contractor for Air AI received payments from a bank account associated with Apex Scaling, had access to and made payments from a bank account associated with Apex 4 Kids, and had some Apex 4 Kids bank statements mailed to their

home address. Moreover, Apex Holdings and Air AI shared at least a dozen "contractors."

30.    In addition, Corporate Defendants engage in regular transfers of revenue between the common enterprise members, comingling over $23,631,000 between the corporate bank accounts. For example, a bank account for Air AI transferred nearly $14 million to bank accounts for each Corporate Defendant and received funds from bank accounts associated with Apex Holdings, Apex Scaling, New Life Capital, and Onyx Capital.

31.    Because these Corporate Defendants, under the Individual Defendants' direction, have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## VI.    COMMERCE

32.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## VII.    DEFENDANTS' BUSINESS ACTIVITIES

### A. Defendants' Products and Services

33.    Defendants market and sell a set of goods and services (collectively "Services"): (1) a bundle of coaching and business education services, (2) a suite of business support software, and (3) resale Licensing for their software for sale to the public.

34.    Defendants typically refer to the coaching services and business support software collectively as the "Air AI Access Card" (or, sometimes, the "Air AI Program"),

which they sell for prices ranging from $15,000 to $30,000. Licensing, which includes some coaching services, typically costs even more, with prices ranging from $25,000 to $100,000.

35.     Defendants started out selling the Air AI Access Card and related coaching services. But when they were unable to deliver the services they advertised, they also began marketing just the conversational AI (without some of the features included with the Air AI Access Card), as well as the Licensing Business Opportunity.

### i.     Coaching Services

36.     Defendants claim that by using their coaching and other services, consumers will be able to make double or more what they spend purchasing Air AI in as little as three months, upward of tens of thousands of dollars. If not, Defendants promise a full refund. Defendants also claim that consumers have the potential of earning millions.

37.     Defendants assert that Air AI's coaching program, at times referred to as "Scale 13," will help consumers develop and market their own online coaching business.

38.     According to Defendants, their Air AI Access Card and Licensing Business Opportunity each provide access to a number of educational materials and promotional services, including the "Air AI training platform," which encompasses "a library of internal processes and systems for operating and scaling a high-ticket business," "[a]ccess to Air University 2.0, Air's step-by-step guide to building and scaling systems," "live group consulting calls with AIR AI's internal team," "live sales training with Air Ai's sales team for you or your team," and various other marketing and sales resources.

39.    Defendants promise "soup-to-nuts" training and support, such as a large team of dedicated tech representatives for each individual customer through a dedicated messaging platform channel, top-to-bottom support to build consumers' coaching courses, and daily one-on-one coaching with the founders of Air AI.

40.    In reality, Defendants' promised educational materials and support fall significantly short of the claims made in their marketing. Instead of the one-on-one coaching promised, consumers can access only group coaching calls where they have little opportunity to ask questions or receive individualized support. When questions are addressed, the answers do not typically solve problems, forcing consumers to waste their time attending more group calls.

41.    And while Defendants' sales pitch claims consumers will receive coaching and technical assistance in dedicated messaging platform channels, Defendants often do not answer questions in those channels in a timely manner, if at all. As with the group coaching calls, when Defendants do respond, the advice and guidance that is provided frequently does not resolve consumer issues, making it difficult for consumers to use the Services they purchased.

42.    In part because they lacked critical guidance and in part because at least some consumers were required to finish one module before being permitted to view the next, some consumers found it impossible to complete the coaching program, let alone launch a business and bring in the revenue promised within the timeframes outlined in their contracts. There was no way to earn back their investment within three or six months – as promised by their money back guarantees – because it was exceedingly

difficult to progress through the program that quickly, or at all.

        *ii.*      **Software Suite**

43. Defendants' software suite, offered as part of the Air AI Access Card, professes to include four central features: (1) a "[l]ead maximizer and dialing platform" called "Max" that can purportedly autodial phone numbers for Air AI Access Card holders; (2) a "checkout and financing platform" called "Midas," meant to connect the Air AI Access Card holder's future customers with payment and financing options; (3) a purported "[a]nalytics platform and constraint finder" called "Sherlock"; and (4) a conversational AI technology sometimes called "Odin."

44. "Max" is a software platform that automatically dials phone numbers to place outbound calls.

45. "Midas" acts as a checkout platform and loan lead generator and was supposed to match consumers' future customers with loans from third-party lenders.

46. Consumers were also promised access to or first notice upon the release of the "Sherlock" analytics tool, but the feature never materialized.

47. Much of Defendants' advertising focused on the conversational AI technology sometimes called "Odin," claiming it would save consumers time, money, and effort by replacing existing or future sales representatives with AI agents.

48. According to Defendants, their conversational AI technology can "have full on 10-40 minute long phone conversations that sound like a REAL human, with infinite memory, perfect recall, and can autonomously take actions across 5,000 plus applications" and "can do the entire job of a full time agent without having to be trained,

managed or motivated." Access, or future access, to this feature is included in the Air AI Access Card and is marketed as the core feature of the Licensing Business Opportunity. Defendants charge consumers by the minute for using the conversational AI technology.

49.     Defendants claim that their conversational AI is better than human sales representatives because it has "[z]ero ramp up time and can deliver above average performance out of the gate" and "requires zero management." For example, in a marketing video, Defendants display the following screen highlighting the claimed efficiencies created by using AI instead of a human representative, including that AI "never fails to deliver consistent performance," "[g]ets less expensive every year (yet better everyday [sic])," and works "24/7."

| Average Rep | Air |
|---|---|
| ✗ Clocks in and clocks out / takes vacations | ✓ Works 24/7 and never takes time off |
| ✗ Manual hiring process that requires time | ✓ Can instantly hire 100,000 reps at the tap of a button |
| ✗ Takes 3.2 months to ramp up and hit KPI[1] | ✓ Zero ramp up time and can deliver above average performance out of the gate |
| ✗ Burnout / lack of motivation / inconsistency in performance | ✓ Never burns out, always has great energy/attitude, and never fails to deliver consistent performance |
| ✗ Requires training and management (and with that a management team) | ✓ Is constantly learning/training on it's own and requires zero management |
| ✗ Requires HR liability / paying for benefits / payroll taxes etc | ✓ Zero HR liability and doesn't require you to pay for benefits or payroll taxes |
| ✗ More expensive every year when you factor in raises | ✓ Gets less expensive every year (yet better everyday) |
| ✗ Have to deal with churn & focus on retention. The average rep only stays at a company 1.5 years[1] | ✓ Zero churn & eliminates need to focus on retention |
| ✗ Costs $115,000 to replace 1 sales rep[2] | ✓ Because there's no churn you never have to pay to replace reps |

[1]: https://blog.hubspot.com/sales/how-to-manage-a-high-performing-sales-team
[2]: https://meetmaestro.com/blogs/the-cost-of-replacing-a-sales-rep/

50.     But Defendants' sweeping statements and representations about the capabilities of their conversational AI are overblown. As an initial matter, for some Air AI Access Card holders, the conversational AI technology was never available, even

though Defendants promised to give these consumers "first notice" upon releasing the feature.

51.    And even when available, the conversational AI technology does not function as advertised. Instead, the technology is faulty, often not able to perform basic functions like placing outbound calls to businesses, scheduling appointments, taking down email addresses, or responding accurately to questions.

52.    Rather than a built-for-you solution that requires minimal effort, getting the conversational AI to function at all requires a substantial time commitment where consumers must pre-script answers for every potential question, making it nearly impossible to use.

### iii.    Licensing Business Opportunity

53.    In addition to selling the Air AI Access Card, Defendants also offer a business opportunity that provides consumers with the option to purchase a License to use and resell "the world's most sophisticated conversational AI" to other businesses. The Licensing Business Opportunity is supposed to include coaching, as well as support services, notably "a thousand pre vetted, qualified business owner leads."

54.    Defendants claim that consumers can earn millions of dollars in income by referring and reselling their conversational AI technology to others, including by receiving a percentage of the revenue Defendants earn from AI calls placed by referred consumers. For example, Defendants claim that License holders could bring in a single business and get paid one million dollars a month, and that "we've organically had companies reach out to us that have over a hundred thousand reps. So if you had a rep

like that, that'd be like ten million dollars a month paid out to you."

55.     Defendants also claim that, because their conversational AI technology is both demonstrably and logically better than human sales representatives, it will be easy for consumers to resell because "The Easiest Thing on the Planet To Distribute Is a Product That is Cheaper Than the Alternative & Performs Exponentially Better." However, due to the poor performance and quality of the conversational AI technology, many consumers who purchase the Licensing Business Opportunity are not able to resell it to anyone.

56.     For example, in an attempt to promote the conversational AI to a building company, one License-holding consumer tried for months to build out an AI test agent that could answer questions about a few different housing floor plans and schedule potential customers for follow-up meetings. After troubleshooting and working around numerous software flaws – including the AI agent reading portions of the script not intended to be said aloud, hanging up on consumers moments after they picked up the phone, and struggling to accurately transcribe even basic consumer information – the License-holding consumer found that the AI test agent would not stick to the script, and simply made-up answers when it was asked questions for which he had not supplied responses. He determined that he could not possibly present the product to the intended buyer because it would not work as advertised.

**B. Defendants' Deceptive and High-Pressure Sales Funnel for Air Access Card and Licensing Business Opportunity**

57.    Defendants' sales funnel relies on a variety of misrepresentations – including earnings claims misrepresentations and misrepresentations related to refund guarantees.

58.    Defendants' sales funnel consists of online and social media advertising, telephone calls, video presentations, text messages, and emails.

59.    Since at least 2023, Defendants have disseminated, or caused to be disseminated, advertising for their Services, beginning with ads related to the Air AI Access Card, including through social media ads, online videos, and their website.

60.    Some of Defendants' online advertising has been focused on the business coaching element of the Air AI Access Card, promising that Defendants' Services will help consumers develop, start, or grow a business. According to a consumer, one ad claimed that Defendants could rapidly triple a company's income.

61.    Defendants also advertise their Licensing Business Opportunity. For example, some of Defendants' advertising for a "VIP" edition of their Licensing included the ability to resell the conversational AI technology.

62.    Consumers who see Defendants' advertising on social media or on Defendants' website are invited to provide their contact information to receive more information about Air AI.

63.    Upon receiving consumer contact information, Defendants typically call consumers by telephone for initial sales and scheduling calls and/or "closing calls."

64.     On these calls, Defendants may ask the consumer basic questions about their business or business idea, uniformly assuring them that they are a "perfect" candidate for Defendants' Services.

65.     Defendants use high-pressure sales tactics, like claiming that they have only a limited number of Licenses to sell, and warning consumers that if they delay, they may miss out on the opportunity altogether.

66.     Defendants reassure consumers that, if the Services do not work out for them, consumers can receive a full refund. Defendants focus on this claim when consumers express concern about the cost or performance of the Services.

67.     During initial sales calls, Defendants typically instruct consumers to watch a video ("Precall Video") before participating in a second sales call. Defendants are insistent that this Precall Video is a prerequisite for further closing phone calls, and follow-up to ensure that everyone watches the Precall Videos before their scheduled closing call.

68.     Defendants' Precall Videos amount to an extended sales pitch, doubling down on misrepresentations about the earnings potential of Defendants' Services, for example claiming that even if they signed up small "clients," consumers could make ten thousand dollars a year in profit.

69.     Defendants' deceptive claims extend to various written communications and materials, including text messages, emails that they send consumers throughout the sales funnel, and contracts.

70.     At times, Defendants also upsell their Licensing to consumers, even though consumers initially express interest only in the conversational AI feature advertised online.

**C. Defendants' False Earnings Claims and Refund Guarantees Regarding the Air AI Access Card and Licensing Business Opportunity**

> ### *i.     Defendants' false earnings claims*

71.     Defendants' marketing is rife with unsubstantiated and false earnings claims designed to induce consumers to purchase their Services, guaranteeing financial success to consumers whether they purchased the Air Access Card or Licensing Business Opportunity.

72.     For example, throughout the sales funnel for the Air Access Card, Defendants have made the following claims:

A.     Stating on phone calls that consumers can make back the cost of Services – ranging from $15,000-$30,000 – very quickly;

B.     Stating on phone calls that consumers would get a full refund if they didn't make back a $30,000 investment within three months;

C.     Stating in social media ads and marketing videos that Air Access Card holders will earn three times their current business income within a short period of time;

D.     Stating on phone calls that some consumers were making a million dollars a year using Defendants' Services;

E.     Stating on phone calls that the cost of the program (in one instance, $30,000), was "nothing" compared to what consumers would make

using Defendants' Services and that consumers would be able to pay

off any loans they took out to finance Defendants' Services within a

year; and

F.   Stating in contracts that they would provide consumers with access

to bonus lessons, including "[h]ow we'd recoup our Air investment

in 14 days."

73.   In selling the Licensing Business Opportunity, Defendants made the

following earnings claims, falsely implying that consumers could make similar amounts

of money:

A.   Stating on phone calls that a recent License holder generated

$450,000 in revenue in their first thirty days of holding a License, or

that Licensees were making "hundreds of thousands of dollars;"

B.   In emails, providing links to alleged testimonials claiming "$0-

$300k in first month!" or "$0-$33k/m in 30 days" and links to

"demos" purportedly showing "over $383,000 in sales in a single

day;"

C.   Stating in marketing videos that consumers would receive access to

a "client acquisition" system called "AirU" that has "allowed us to

scale 6 out of 8 service based companies to over $1M/month" and

that has "taken a company from $60 million a year to $100 million a

year;"

D.   Stating in marketing videos that License holders could bring in a

single business and get paid one million dollars a month:

*Air*

**And 12,000 Reps (Which There Are Single Businesses
You Could Bring To The Platform That Could Deploy
12k Reps) Is $1MM Every Single Month Paid Out To You**

E.    Showing alleged testimonials from other License holders in marketing videos that claim that individuals were making "$20k in three days, an extra $10k from this morning" or that individuals "have been signing $9600 everyday [sic]" and that someone "collected $79,620 in the past 30 days;"

F.    Stating in marketing videos that "worst case, if you decide to go in a different direction, you could just resell your license to someone else at breakeven – or even a large profit;"

G.    Stating in marketing videos that "our agency license holders are going to be extremely well compensated for their part in us achieving this vision;"

H.    Stating in marketing videos "on average every business you refer that deploys just ten reps, which this is a very, very, very, very, very small client, you get about ten thousand dollars a year in profit paid out to you;"

I.      Stating in marketing videos "we've organically had companies reach out to us that have over a hundred thousand reps. So if you had a rep like that, that'd be like ten million dollars a month paid out to you. But let's see. If you brought something that was twelve thousand reps you'd be making a million dollars every single month forever based off that;" and

J.      Stating in marketing videos that Air AI was a "no brainer" because it's a "10 x improvement on the bottom line."

74.    Defendants' claims are fantasy. In reality, most consumers do not make the promised money using the Air Access Card or Licensing and are not able to make tens of thousands of dollars a month as promised by Defendants. On information and belief, most consumers are not able to resell their Licenses.

75.    Instead, consumers are often left in debt after purchasing Defendants' Services, with no means of redress.

76.    Defendants do not provide any written or audio disclosures or disclaimers limiting the representations made about earnings potential.

### ii.      *Defendants fail to honor refund guarantee*

77.    Despite offering, as they claim, the "industry's boldest" refund guarantee, Defendants very rarely honor their refund guarantee.

78.    During their sales calls, Defendants promise consumers that if the Services do not work out for them, the consumer will be refunded their entire purchase price.

79.    Defendants support these sales claims with contractual refund guarantees. The contract provisions often state that if a consumer does not make a certain amount of money using Defendants' Services or does not accomplish a set goal within a certain period of time, they will be refunded their purchase price. Some consumers sign contracts offering a refund for "any reason at all."

80.    For example, Defendants have guaranteed refunds for the Air AI Access Card if consumers did not double or triple their investment in Defendants' Services within months, claiming in a clause titled "THE AIR AI GUARANTEE & EXPECTATIONS":

> Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the "Starting Term"), the Client will have used Air AI to generate revenue equal to double or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.

81.    Contracts for Licensing included the following, or similar, buy-back or refund guarantees for consumers who meet certain criteria, for example placing a specific number of calls using the conversational AI:

> The License is backed by a results satisfaction guarantee. If Client is not satisfied with the performance of their agent or for any other reason at all, Client can receive a full buy back of the amount paid, but no sooner than 120 days after signing this Agreement…. This guarantee rests upon the premise that Air AI's conversational AI will deliver results for the client, and is offered to remove any risk that it will not work for the client.

82.    Defendants focus on the refund guarantee when consumers express hesitance at the cost or performance of the Services, leading consumers to believe that their purchase is essentially "risk free."

83.    In at least one instance, when a consumer became uncomfortable with his purchase and tried to cancel his contract with Defendants within 72 hours, as permitted by the contract, Defendants convinced the consumer not to cancel by pointing to their refund guarantee.

84.    Defendants' blanket refund guarantee is usually false. Once consumers request a refund, Defendants string them along for months, promising refunds, claiming that funds are on the way, or that refunds will be issued as soon as they can.

85.    Some consumers are cut off from some or all of Defendants' Services upon requesting a refund and are left waiting for their money back while unable to access the Services they paid for.

86.    Defendants even acknowledge that they are in no financial position to honor refunds when consumers continue to ask for their money. For example, in an email sent to several consumers in August 2024, Defendant O'Donnell explained:

> [O]ur company has come into some intense financial hardship. I mentioned before that we were looking to raise a large amount of outside capital and that it would hopefully put us in a better position.
> Sadly, our intense & persistent efforts to raise outside capital were not fruitful.
> This has led to us being in an even worse financial position than before and so I want to be fully transparent with you on where we are at now.
> We as owners have put 100% of our personal capital into keeping things afloat. We have spent 100% of our cash,

maxed out our credit, and even given up our apartment to cut back.

We have cut overhead aggressively and have been working as hard and fast as we can to get profit coming in so we can take care of all outstanding refunds.

At this point, there IS a path ahead with one of the ventures we are working on. But at this current moment, we are not even close to profitable and we have spent every last dollar that we have as owners. We are completely out of cash at this moment.

87. Despite claiming to be entirely without funds, Defendants continued to sell their Licensing Business Opportunity to consumers. As one consumer observed, he grew "concerned that they would just be raising money from other people like me to pay out my refund."

88. Defendants' refusal to honor refunds, even for those consumers who meet the refund policy requirements, flies in the face of their repeated assurances to consumers that purchasing Defendants' Services has no risk because of the refund guarantee.

89. Instead of getting their money back, many consumers lose tens of thousands of dollars and are frequently left paying off loans, some of which were brokered by Defendants, for Services they can no longer use or access.

**D. Consumer Injury**

90. Defendants charge consumers thousands, if not tens or hundreds of thousands of dollars, for their Services.

91. The prices for the Air AI Access Cards and Licenses vary, but usually exceed $10,000, with the price for Licensing reaching as high as $100,000. Defendants appear to set the price depending on a consumers' ability to pay, extracting as much money from each individual consumer as possible.

92.    For example, for the Air AI Access Card, Defendants have charged from $15,000 to $20,000, and up to $30,000, depending on the consumer. On information and belief, higher costs do not entitle consumers to more or different features for the Air AI Access Card, and consumers were not presented with a tiered pricing system.

93.    When one consumer told Defendants that he would not be able to afford the $30,000 price tag on the Air AI Access Card, Defendants assured him that they believed in his business so much that they would help him take out a loan for $15,000 and allow him the pay the second $15,000 by paying Defendants a cut of his future sales. The consumer was never able to get his business off the ground and made no sales. He now believes that the price was reduced as a means of salvaging the sale and that Defendants never expected him to come up with the rest of the money.

94.    When a different consumer told Defendants that he couldn't pay for the Air AI Access Card, Defendants convinced him to pay a "deposit" of $2,500, the only amount he could afford, and to get a loan for an additional $17,000. Defendants were able to convince the consumer to take on this significant debt by reiterating their promise of a refund guarantee, leading the consumer to believe that the purchase was low risk.

95.    Defendants convinced yet another consumer to take out a new credit card with a $4,500 credit limit, on top of the $15,000 personal loan she had already taken out. When she refused to spend the entirety of the $4,500 available credit on the Air AI Access Card, Defendants called and tried to negotiate with her, eventually convincing her to pay them an additional $1,000 using the credit card.

96.     For their Licensing, Defendants have charged anywhere from $9,800 up to $100,000. They have created a tiered pricing structure with purported benefits increasing the more a consumer pays.

97.     Regardless of the amount they are charged, many consumers cannot afford to pay for Defendants' Services without going into debt, and many pay for the Services using one or more credit cards.

98.     For consumers who cannot afford to pay for the Services, Defendants offer loan options through their Midas financing platform. Defendants use Midas to broker loans and retail installment credit transactions they assign to various third-party lenders, arranging for loans with interest rates up to 24.99%.

99.     Ultimately, most consumers are not able to make any money using Defendants' Services and lose thousands of dollars.

**E.  Complaints and Prior Legal Action Against Defendants**

100.    Consumers have posted extensive comments about Defendants on online platforms. For example, on the third-party review website "Trustpilot," consumers have posted 78 negative one-star reviews about Defendants, compared to only three positive reviews.

101.    In 2024, at least four separate private plaintiffs filed actions against Defendants related to their deceptive and unlawful marketing and sales of their Services. In at least three instances, Defendants have defaulted in those lawsuits, all the while continuing to peddle their Services.

102.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIII.  VIOLATIONS OF THE FTC ACT

103.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

104.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### 1.    Count I. False and Unsubstantiated Earnings Claims (as to Air AI Access Card and Licensing Business Opportunity)

105.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' Services, Defendants represent, directly or indirectly, expressly or by implication, that their Services will help consumers achieve substantial earnings.

106.    In fact, in numerous instances in which Defendants have made the representations described in Paragraph 105, Defendants fail to deliver those substantial earnings.

107.    Therefore, Defendants' representations as described in Paragraph 105 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### 2. Count II. Misrepresentations with Regard to Refund Guarantees (as to Air AI Access Card and Licensing Business Opportunity)

108.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' Services, Defendants represent or have represented, directly or indirectly, expressly or by implication, that consumers are protected by a refund or buy-back guarantee if they fail to earn threshold monetary amounts, or are otherwise dissatisfied.

109.    In fact, in numerous instances in which Defendants have made the representations described in Paragraph 108, Defendants have failed to refund consumers.

110.    Therefore, Defendants' representations as described in Paragraph 108 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## IX.    VIOLATIONS OF THE TELEMARKETING SALES RULE REGARDING DEFENDANTS' SALE OF AIR AI ACCESS CARDS

111.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

112.    Defendants are "seller[s]" or "telemarketer[s]" engaging in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(ee), (hh), and (ii). The TSR defines telemarketers as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(hh). The TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the

purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(ii). A "seller" under the TSR is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(ee).

113.    As alleged in Section VII.A. and B., Defendants initiated and received telephone calls to and from customers in connection with their plan or campaign to induce the purchase of their Services, including through interstate telephone calls. As part of their plan or campaign, they offered to provide their Services to customers in exchange for consideration.

114.    The TSR generally exempts certain inbound telephone calls from coverage under the Rule. *See, e.g.*, 16 C.F.R. § 310.6(b)(5). However, inbound calls related to the sale of investment opportunities or that involve upsells are not exempt from the TSR. 16 C.F.R. § 310.6(b)(5)(i) and (ii). Under the TSR, an investment opportunity "means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(s)

115.    Defendants make outbound telemarketing calls to consumers. They also engage in the sale of investment opportunities when they make express or implied representations about future income or profit that their customers will be able to realize by purchasing Defendants' Services. In some instances, Defendants also upsell customers to their Licensing.

116.    Under the TSR, telemarketers are prohibited from "[m]isrepresenting, directly or by implication, in the sale of goods or services … material information" including (1) "any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;" (2) "any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;" and (3) "any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." 16 C.F.R. § 310.3(a)(2)(iii), (iv), and (vi).

117.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), a violation of the TSR is treated as a violation of a rule promulgated under the FTC Act regarding unfair or deceptive acts or practices.

118.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**1.    Count III Telemarketing Violations (as to Air AI Access Cards)**

119.    In numerous instances, Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of their Services, material aspects of the nature or terms of Defendants' refund, cancellation, or repurchase policies, or material aspects of the risk, earnings potential, or profitability of Defendants' Services.

120.    Therefore, Defendants' acts or practices as described in Paragraph 119 violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii), (iv), and (vi), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## X.    VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE REGARDING DEFENDANTS' SALE OF LICENSING BUSINESS OPPORTUNITIES

121.    The amended Business Opportunity Rule, 16 C.F.R. Part 437, which was extended in scope to cover certain work-at-home opportunities, became effective on March 1, 2012.

122.    Defendants are "sellers" who, as described in Section VII.A. and B., have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q).

123.    Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity. 16 C.F.R. § 437.1(q). Defendants offer to sell and sell business opportunities to consumers.

124.    Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business;" the "prospective purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will … [p]rovide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services[.]" 16 C.F.R. § 437.1(c). Defendants sell consumers "business opportunities" when they sell their Licensing by soliciting consumers to enter into the business of reselling Defendants' software and promising consumers leads.

125.     Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments. In the disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation or refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)–(5). Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2.

126.     The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

127.     Defendants do not provide consumers with disclosure documents as required by the Business Opportunity Rule.

128.     Defendants, as described in Paragraph 73(A)-(J), have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

129.    The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an earnings claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it. 16 C.F.R. § 437.4(a).

130.    Defendants do not furnish earnings claims statements to customers.

131.    The Business Opportunity Rule also prohibits sellers from making certain misrepresentations, including about (1) the amount of sales, or gross or net income or profits a prospective purchaser may earn; and (2) any term or condition of the seller's refund or cancellation policies. 16 C.F.R. § 437.6(d), (i), (k). Sellers are also prohibited from failing to provide refunds or cancellations when consumers meet the relevant terms and conditions. 16 C.F.R. § 437.6(l).

132.    Defendants, as described in Section VII.C., have misrepresented the amount of income or profits consumers may earn and their refund policies. They have also failed to refund consumers who met the refund guarantee criteria.

133.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### 1.    Count IV Business Opportunity Violations (as to Licensing Business Opportunities)

134.    In numerous instances, in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with a disclosure document and any required attachments within the time period prescribed by the Business Opportunity Rule; made earnings claims to prospective purchasers without providing an earnings claim statement; and misrepresented (1) the amount of sales, income, or profits consumers could earn, and (2) terms or conditions of their refund or cancellation policies. Defendants also failed to refund consumers who met their refund terms and conditions.

135.    Therefore, Defendants' acts or practices as described in Paragraph 134 violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2, 437.3(a), 437.4(a), 437.6(d), (i), (k) and (l), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## XI.    CONSUMER INJURY

136.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the Business Opportunity Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**XII.    PRAYER FOR RELIEF**

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the Business Opportunity Rule;

B.    Grant preliminary injunctive and ancillary relief;

C.    Award monetary and other relief within the Court's power to grant; and

D.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: August 25, 2025

/s/ Rebecca Plett
Rebecca Plett (VA Bar No. 90988, NC Bar No. 63273)
Lauren Rivard (NY Reg. No. 5308192)
Federal Trade Commission
600 Pennsylvania Ave., NW,
Mailstop CC-6316
Washington, DC 20580
Plett: (202) 326-3664 / rplett@ftc.gov
Rivard: (202) 326-2450 / lrivard@ftc.gov

**Attorneys for Plaintiff**
**Federal Trade Commission**