Rebecca Plett (VA Bar No. 90988, NC Bar No. 63273)
Lauren Rivard (NY Reg. No. 5308192)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-6316
Washington, DC 20580
(202) 326-3664 / rplett@ftc.gov
(202) 326-2450 / lrivard@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>            Plaintiff,<br><br>    v.<br><br>Air Ai Technologies, Inc., et al.,<br><br>            Defendants. | No.<br><br>**LODGED:** PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS NOTICED MOTION FOR A TEMPORARY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF AND FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE ATTACHED |

Rebecca Plett (VA Bar No. 90988, NC Bar No. 63273)
Lauren Rivard (NY Reg. No. 5308192)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-6316
Washington, DC 20580
(202) 326-3664 / rplett@ftc.gov
(202) 326-2450 / lrivard@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>Plaintiff,<br><br>v.<br><br>Air Ai Technologies, Inc., et al.,<br><br>Defendants. | No.<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS NOTICED MOTION FOR A TEMPORARY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF AND FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................... 1

II.   STATEMENT OF FACTS..................................................................... 3

  A.   Defendants......................................................................................... 3

  B.   Defendants' Deceptive Earnings Claims..................................... 7

  C.   Defendants Fail to Honor Refund Guarantees ........................ 13

  D.   Consumer Injury and Complaints ............................................. 16

III.  THE COURT SHOULD ISSUE A TRO ......................................... 17

  A.   The FTC Act Authorizes the Court to Grant the Requested Relief ........ 17

  B.   The FTC Has Shown a Likelihood of Success on the Merits................. 19

  C.   The Equities Favor Entry of the Proposed TRO ..................................... 26

  D.   Joint and Several Liability as a Common Enterprise.............................. 27

  E.   Personal Liability and Monetary and Injunctive Relief......................... 28

IV.   TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY.. 30

  A.   Conduct Relief .............................................................................. 30

  B.   Turnover of Business Records and Limited Expedited Discovery ......... 30

V.    CONCLUSION ................................................................................... 32

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                        **Page(s)**

3

*Am. Home Prod. Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982) ............................................ 21

4

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 134 (2021) .................................................... 17

5

*Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir. 1976) ...................................................... 21

6

*FTC v. Advert. Strategies LLC*, 16-cv3353-DJH, Dkt. No. 18 (D. Ariz. Oct. 4,

7

    2016) ................................................................................................................................ 30

8

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ................................. 18, 27

9

*FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080 (C.D. Cal. 1994) ........................... 28

10

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ........................................... 28

11

*FTC v. Beatrice Foods Co.*, 587 F.2d 1225 (D.C. Cir. 1978) ........................................... 19

12

*FTC v. Blue Saguaro Mktg. LLC*, No. 16-cv-3406-SPL, Dkt. No. 22 (D. Ariz. Oct.

13

    11, 2016) ......................................................................................................................... 30

14

*FTC v. Consumer Def., LLC*, 926 F.3d 1208 (9th Cir. 2019) ........................................... 18

15

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ..................................... 20, 21

16

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) ...................................... 28

17

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ...................................... 20

18

*FTC v. Elegant Solutions, Inc.*, No. 20-55766, 2022 U.S. App. LEXIS 15934 (9th

19

    Cir. 2022) ....................................................................................................................... 18

20

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ................................................. 17

21

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) .......................... 21

22

*FTC v. Gill,* 265 F.3d 944 (9th Cir. 2001) ........................................................................ 20

23

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ........................................... 27

24

*FTC v. Hite Media Grp LLC*, No. 18-cv-2221-SPL, Dkt. No. 14 (D. Ariz. July 17,

25

    2018) ................................................................................................................................ 30

26

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ............................... 27, 28

27

28

iii

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)........... 28

*FTC v. Kroger Co.*, No. 3:24-cv-00347-AN, 2024 WL 5053016 (D. Or. Dec. 10,

    2024).......................................................................................................... 19

*FTC v. Kutzner*, 2016 U.S. Dist. LEXIS 189695 (C.D. Cal. Aug. 24, 2016)................... 31

*FTC v. Lucas*, 483 Fed. Appx. 378 (9th Cir. 2012) ........................................................ 20

*FTC v. Medicor LLC*, 217 F. Supp. 2d 1048 (W.D. Cal. 2002)....................................... 21

*FTC v. Money Now Funding LLC*, No. 13-cv-1583-ROS, Dkt. No. 13 (D. Ariz.

    Aug. 5, 2013)......................................................................................... 30

*FTC v. Mortg. Relief Advocs. LLC*, 2015 U.S. Dist. LEXIS 186809 (C.D. Cal. July

    1, 2015)............................................................................................ 27, 28

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104 (S.D. Cal. 2008) ........................................... 27

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)........................... 27, 28

*FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 4318466 (D. Ariz. Sep.

    23, 2021)............................................................................................... 17

*FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2020 U.S. Dist. LEXIS 33470, *41

    (D. Ariz. Feb. 27, 2020).......................................................................... 27

*FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066 (11th Cir. 2021) ............................ 17

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir.1994) .................................................... 20

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) ...................................... 28

*FTC v. Vemma Nutrition Co.*, 15- cv-1578-JJT, Dkt. No. 25 (D. Ariz. Aug. 21,

    2015)..................................................................................................... 30

*FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111 (D. Ariz.

    Sept. 18, 2015)....................................................................................... 21

*FTC v. Warner Comm., Inc.*, 742 F.2d 1156 (9th Cir. 1984) ......................................... 18

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ............................... 19, 27

*Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002) ........................................................... 31

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984) ............................................. 20

*In re Thompson Med. Co.*, 104 F.T.C. 648 (1984) ............................................. 20

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992) ..................... 18

*Rep. of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) ..................................... 19

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086 (N.D. Cal. 2012) ......... 31

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) ............. 19

**Statutes, Regulations and Rules**                                                    **Page(s)**

15 U.S.C. § 45 .......................................................................................... 2, 19, 20

15 U.S.C. § 53 .................................................................................... 17, 27, 30

15 U.S.C. § 57a ...................................................................................................... 18

15 U.S.C. § 57b ............................................................................................... 17, 18

15 U.S.C. §§ 6101-6108 ................................................................................. 18, 22

16 C.F.R. § 16 C.F.R. Part 310 ............................................. 2, 18, 19, 22, 23, 24

16 C.F.R. § 16 C.F.R. Part 437 ............................................ 2, 18, 19, 24, 25, 26

Fed. R. Civ. P. 1 ................................................................................................. 31

Fed. R. Civ. P. 26(d) ......................................................................................... 31

Fed. R. Civ. P. 33(b) ......................................................................................... 31

Fed. R. Civ. P. 34(b) ......................................................................................... 31

**Other Authorities**                                                                  **Page(s)**

*FTC Policy Statement on Deception*, 103 F.T.C. 174 (1984) (*appended to In re*

   *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) ..................................................... 20

*FTC Policy Statement Regarding Advertising Substantiation*, 104 F.T.C. 648, 839

   (1984) (*appended to Thompson Med. Co.*, 104 F.T.C. 648 (F.T.C. 1984) ........... 20

**TABLE OF EXHIBIT VOLUMES**

**Notes on exhibits:** The FTC submits 15 volumes containing 63 exhibits in support of its Motion. All exhibits cited in the Memorandum are referenced as "PX [exhibit number]." References include citations to relevant paragraphs by number, or to relevant attachments or other exhibits by exhibit and/or page number. The exhibits are consecutively numbered.

| Volume no. | Plaintiff's Exhibits | Pages |
|---|---|---|
| 1 | PX01 – PX02 | FTC-000001-52 |
| 2 | PX03 – PX04 | FTC-000053-91 |
| 3 | PX05 – PX08 | FTC-000092-180 |
| 4 | PX09 (Part 1) | FTC-000181-215 |
| 5 | PX09 (Part 2) PX10 – PX11 | FTC-000216-361 |
| 6 | PX12 – PX22 | FTC-000362-463 |
| 7 | PX23 – PX28 (Part 1) | FTC-000464-608 |
| 8 | PX28 (Part 2) | FTC-000609-668 |
| 9 | PX28 (Part 3) | FTC-000669-717 |
| 10 | PX29 – PX37 | FTC-000718-907 |
| 11 | PX38 – PX43 | FTC-000908-979 |
| 12 | PX44 – PX45 | FTC-000980-1018 |
| 13 | PX46 – PX50 | FTC-001019-1062 |
| 14 | PX51 – PX59 | FTC-001063-1128 |
| 15 | PX59 – PX63 | FTC-001129-1178 |

vi

I.    **INTRODUCTION**

To halt Defendants' ongoing deception causing economic harm to consumers, Plaintiff seeks a temporary restraining order. Since early 2023, Defendants have used telemarketing, social media advertisements, websites, and other marketing vehicles to sell purportedly "revolutionary" conversational artificial intelligence ("AI"), business support tools, and coaching for as much as $250,000, falsely promising that by using the products and services, prospective customers would make thousands, if not millions, of dollars. To override any lingering doubts, Defendants promise consumers sweeping money-back refunds that they characterize as "the industry's boldest guarantee." But many consumers are unable to make any money and are left empty handed when Defendants fail to honor their refund policy.

Defendants have marketed and sold two broad categories of products and services ("Services"): (1) business coaching materials and support, coupled with a suite of AI-related business support products called an "Air AI Access Card" membership, featuring a flagship "conversational AI" product allegedly capable of replacing human customer service representatives; and (2) a high-priced license to resell Defendants' conversational AI to other businesses, including through Defendant-supplied leads ("License").[1]

Defendants market both sets of Services as money-making opportunities, claiming the potential of monthly six figure income or millions of dollars a year with their programs. To induce consumers to purchase Defendants' Services, Defendants offer full-

---

[1] Secondary to resale, Licensees are also permitted to use the conversational AI for their own, separate businesses.

refund guarantees. These guarantees are the closing salvo of sales pitches and are expressly outlined in contracts signed by consumers, promising that if consumers do not make a certain amount of money—typically double or treble their investment within a specified number of months—or if they are not happy with the products for any reason, Defendants will refund the entire purchase price.

As a result of these guarantees, consumers enter contracts with Defendants believing that their investment is risk free. But Defendants' products and services do not work well, if at all, and many consumers are not able to make any money, much less the thousands of dollars they were promised. When consumers inevitably ask for a refund, Defendants rarely honor their guarantee, often delaying and obfuscating before cutting off communication altogether.

Defendants' scheme violates: (1) Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which prohibits deceptive acts or practices in or affecting commerce; (2) the Telemarketing Sales Rule, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices; and (3) the Disclosure Requirements and Prohibitions Concerning Business Opportunities ("Business Opportunity") Rule, 16 C.F.R. Part 437, which requires sellers to give prospective buyers specific information.

To protect consumers from ongoing harm, the FTC seeks a temporary restraining order that enjoins Defendants' unlawful conduct, requires Defendants to fully disclose their assets and turn over their business records, and allows limited expedited discovery. The FTC also requests that the Court order Defendants to show cause why a preliminary injunction should not issue.

## II.    STATEMENT OF FACTS

### A.    Defendants

**Air Ai Technologies, Inc.** ("Air AI") also doing business as Air AI and Scale 13,[2] is a Delaware corporation with a principal place of business in Phoenix, Arizona.[3] Air AI was previously incorporated in Arizona as Air AI LLC beginning in February 2023, with its principal place of business in Phoenix.[4] It converted to Air AI Technologies, Inc. and moved to Delaware in 2024.[5] Maddix, O'Donnell, and Lancer co-own Air AI.[6]

**Apex Holdings Group LLC** ("Apex Holdings") is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona.[7] Maddix and O'Donnell are the sole principals.[8] Apex Holdings opened bank and payroll accounts that were used to create, market, and sell Defendants' Services to the public.[9] Apex Holdings

---

[2] PX02 (Declaration of Lauren Cotner) at ¶¶2-4, 6-7, 9, Att. H, pp. 40-41; PX11 (Declaration of Suzette West) at Att. F, pp. 357-58; PX12 (Declaration of Charlene Zielin) at ¶¶36-37, Att. G, pp. 392-93, Att. H, pp. 394-96; PX63 (Declaration of Investigator Reeve Tyndall) at ¶¶57(e), 67-68, 72-75.

[3] PX63 at ¶4; PX14, pp. 431-33. The address is 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016. *Id.*

[4] PX63 at ¶4; PX14, pp. 429-30.

[5] PX63 at ¶4; PX14, pp. 431-33.

[6] PX63 at ¶4; PX14, p. 430; PX52 (Answers, *Schwartz v. Air AI, LLC, et al.*, CV2024-011284 (Ariz. S.C. Aug. 2, 2024)) at pp. 1084, 1089, 1094, 1099 (admitting Lancer is an "owner and principal").

[7] Apex Holdings is registered at a residential address associated with Individual Defendants Caleb Maddix and Ryan O'Donnell. Its mailing address is listed as 4742 N 24th Street, Suite 300, Phoenix, Arizona 85016. PX63 at ¶6; PX16, pp. 437-38.

[8] *Id.*

[9] *See, e.g.*, PX13 (Declaration of Investigator Tyler Broome) at ¶¶12, 15-16, 18-19, 64.b, 70. For example, Apex Holdings-related payroll accounts were used to pay Defendants' salespeople, *see, e.g.*, *id.* at ¶71, Att. B (payments to Brett Moravec, Tim White, Tony Rios, Austin Higgins, Tyler Richards, David Rawlings, and Johnny Zentmeyer, who are affiliated with Air AI. *See* PX01 (Declaration of Erez Ahituv) at ¶6

3

1  comingled funds with Corporate Defendants.[10] Apex Holdings is the principal of

2  corporate Defendant Apex Scaling LLC.[11]

3      **Apex Scaling LLC** ("Apex Scaling"), also doing business as Air AI and Scale

4  13,[12] is an Arizona limited liability company with its principal place of business in

5  Scottsdale, Arizona, the same address as Apex Holdings.[13] Apex Holdings, (owned by

6  Maddix and O'Donnell) is the principal and organizer of Apex Scaling.[14] Apex Scaling

7  has co-mingled funds with all other Corporate Defendants,[15] and has held itself out as

8  entering into contracts with consumers.[16]

9
10      **Apex 4 Kids LLC[17]** ("Apex 4 Kids") is an Arizona limited liability company with

11  its principal place of business in Scottsdale, Arizona, the same address as Apex Holdings

12  and Apex Scaling.[18] Maddix and O'Donnell are the sole principals for Apex 4 Kids.[19]

13
14
15
16  (White); PX02 at ¶8 (Higgins); PX04 (Declaration of Michael Crowder) at ¶8
   (Zentmeyer); PX06 (Declaration of Laura Kamrath) at ¶10 (Moravec); PX09 (Declaration
17  of Armin Saberzadeh) at ¶35 (Richards); PX63 at ¶¶21-22 (Rios, Rawlings)). Some
   consumers also paid Apex Holdings for Defendants' Services. *See, e.g.*, PX01 at ¶13;
18  PX06 at ¶16, Att. C, p. 146.
19    [10] PX13 at ¶¶33, 35-36, 43-44, 48-53, 59.a. For example, it received over $13 million
   from Air Ai. *Id* at ¶35.
20    [11] PX63 at ¶10; PX20, pp. 447-48.
21    [12] *See* PX11 at Att. G, pp. 359-61; PX12 at ¶37, Att. H, p. 394-96.
22    [13] PX63 at ¶10; PX20, pp. 447-48. The mailing address listed as 4742 N 24th Street,
   Suite 300, PMB #111, Phoenix, Arizona 85016. *Id.*
23    [14] PX63 at ¶10; PX20, pp. 447-48.
24    [15] PX13 at ¶¶33, 37-38, 45, 48-49, 54-55, 59.e. It also received almost $800,000 in
   consumer funds from payment processor Stripe. *Id.* at ¶59.e.
25    [16]  *See, e.g.*, *supra* n. 12.
26    [17] It appears that Apex 4 Kids engaged in the sale of coaching materials geared towards
   children that are unrelated to Defendants' current scheme. PX63 at ¶53.
27    [18] PX63 at ¶5; PX15, pp. 434-36.
28    [19] *Id.*

4

Apex 4 Kids was incorporated in 2019 and predates Defendants' current scheme.[20] Apex 4 Kids has co-mingled funds with all other Corporate Defendants[21] and shares employees with other Corporate Defendants.[22]

**New Life Capital LLC** ("New Life Capital") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.[23] Maddix and O'Donnell co-own New Life Capital as the sole principals and organizers of the business.[24] New Life Capital co-mingled funds with all other Corporate Defendants.[25]

**Onyx Capital LLC** ("Onyx Capital") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.[26] Maddix and O'Donnell are principals. Onyx Capital has co-mingled funds with all other Corporate Defendants.[27]

**Caleb Matthew Maddix** ("Maddix") is the co-founder and managing member of Air AI, the principal for Apex Holdings, Apex 4 Kids, New Life Capital, and Onyx

---

[20] *Id.*

[21] PX13 at ¶¶33-34, 43-47, 59.d. For example, it received over $1.3 million from Apex Holdings and over $350,000 from Air AI. *Id.* at ¶¶34, 44.

[22] For example, Amber Worthington utilized corporate credit cards for Apex 4 Kids and Air AI. *See* PX13 at ¶¶75-76. She also interacted with Air AI customers. *See, e.g.*, PX04 at Att. F, pp. 86-90; PX09 at Att. H, pp. 226, 228-31, 239-41.

[23] PX63 at ¶7; PX17, pp.439-40. The principal place of business is listed as at 4742 N 24th Street, Suite 300, and a mailing address of PO Box 111, both in Phoenix, Arizona, 85016. *Id.*

[24] *Id.*

[25] PX13 at ¶¶33, 39-40, 46, 50-51, 54-55, 57-58, 59.c. New Life received over $5 million in consumer funds from merchant accounts, most of which it distributed to Apex Holdings. *Id* at ¶¶51, 59.c.

[26] PX63 at ¶8; PX18, pp. 441-42. The principal place of business is listed as at 4742 N 24th Street, Suite 300, and a mailing address of PO Box 111, both in Phoenix, Arizona, 85016. *Id.*

[27] PX13 at ¶¶33, 41-42, 47, 52-53, 56-58, 59.f. For example, Onyx sent over $109,000 to and received $76,000 and from Air AI. *Id.* at ¶¶41-42.

1 Capital, and controls Apex Scaling.[28] Maddix has signatory authority on corporate bank

2 accounts[29] and is aware of and involved in making deceptive claims about the features,

3 earnings potential, and refund guarantees related to Defendants' Services.[30] Defendant

4 Maddix was aware of consumer complaints and was alerted to the problems with this

5 deceptive scheme by a high-level employee.[31]

6

7 **Ryan Paul O'Donnell** ("O'Donnell") is the co-founder and managing member of

8 Air AI, principal for Apex Holdings, Apex 4 Kids, New Life Capital, and Onyx Capital,

9 and controls Apex Scaling.[32] O'Donnell has signatory authority on corporate bank

10 accounts and access to a corporate credit card.[33] He is aware of and involved in making

11 deceptive claims about the features, earnings potential, and refund guarantee related to

12 Defendants' Services, and controls and is heavily involved in day-to-day operations.[34]

13

14

15 [28] PX63 at ¶¶4-8, 10; PX14-PX18, PX20; PX12 at ¶17, Att. B, p. 377.
16 [29] PX13 at ¶5. *See also* PX63 at ¶36; PX26; PX57-PX62.
17 [30] PX63 at ¶¶69-70; PX63 at ¶19; PX07 at ¶6. For example, he appears in and narrates
deceptive video marketing. PX63 at ¶19; PX27 at p. 493:14-15; PX06 at ¶5; PX09 at ¶10.
18 He controls and is heavily involved in day-to-day operations for the business, regularly
reviewed sales calls and was involved in providing sales scripts to telemarketers. *See,
19 e.g.*, PX63 at ¶¶ 69-70. He also signs sales contracts with consumers, *see* PX04 at ¶15,
20 Att. D, p. 84; PX09 at ¶26, Att. E, p. 212; PX08, Att. A, p. 164; PX36, p. 844, and
corresponds with consumers on Slack, text message, and other messaging platforms, or
21 via phone calls. PX03 (Declaration of Kyle Crosby) at ¶28; PX04 at Att. F, p. 87-91;
PX08 (Declaration of Scott Patterson) at ¶18, Atts. D-H, pp. 176-80; PX09 at ¶¶54, 56,
22 Att. H, pp. 238, 242, 244, 249-253, 268-276; PX10 (Declaration of Anthony Vitale) at
23 ¶22; PX63 at ¶¶25, 69; PX34, p. 799.
24 [31] *See, e.g.*, PX02, ¶31, Att. I, pp. 43-50; PX04 at Att. F, pp. 87-91; PX09 at ¶57, Att. H,
pp. 242-44, 249-253, 268-276; PX10 at ¶22; PX12 at ¶33, Att. F, pp. 390-91; PX63 at
25 ¶¶74-80.
[32] PX63 at ¶¶4-8, 10; PX14-PX18; PX20; PX12 at ¶17, Att. B, p. 377.
26 [33] PX13 at ¶¶5, 75-76; PX63 at ¶36; PX26; PX57-PX62.
27 [34] PX63 at ¶¶ 69-70. For example, he regularly corresponds with consumers on Slack,
email, and other messaging services. PX02 at ¶28, Att. H, pp. 40-42; PX04 at Att. F, pp.
28
6

O'Donnell was aware of consumer complaints, and was alerted to the problems with this deceptive scheme by a high-level employee.[35]

**Thomas Matthew Lancer** ("Lancer") is a principal and became a co-owner of Air AI after it reincorporated in Delaware.[36] Lancer has access to corporate credit cards[37] and is aware of and involved in making deceptive claims about Defendants' Services.[38] Lancer was aware of consumer complaints and was alerted to the problems with this deceptive scheme by a high-level employee.[39]

**B.    Defendants' Deceptive Earnings Claims**

Defendants use aggressive online and telephone advertising and sales funnels to reach consumers. Defendants' sales funnel—consisting of online and social media advertising, telephone calls, video presentations, text messages, and emails—relies on a variety of misrepresentations, including earnings claims misrepresentations and misrepresentations related to refund guarantees.

---

87-91; PX07 (Declaration of Dylan Orms) at ¶16; PX08 at ¶¶18-20, Atts. D-H, pp. 176-80; PX09 at Att. H, pp. 242-44, 249-253, 272-76; PX10 at ¶21; PX11 at ¶¶24, 27, Att. E, pp. 335-36, Att. F, pp. 357-58; PX12 at ¶¶30, 36, Att. E, p. 386-87, Att. G, pp. 392-93; PX63 at ¶¶25, 69; PX34, p. 797. He also regularly reviewed sales calls and was involved in providing sales scripts to telemarketers. PX63 at ¶¶ 69-70.

[35] *See, e.g.*, PX02 at ¶¶30-31, Att. H, pp. 40-42, Att. I, pp.43-50; PX04 at Att. F, pp.87-91; PX10 at ¶21; PX12 at ¶¶32-33, Att. D, p. 380, Att. F, pp. 390-91; PX63 at ¶¶74-80.

[36] *See* PX52, pp. 1084, 1089, 1094, 1099.

[37] PX13 at ¶¶75-76.

[38] For example, he distributed marketing videos through an online video sharing account on the Vimeo platform. PX63 at ¶¶32-34. He controls and is heavily involved in day-to-day operations, for example reviewing sales calls and communicating with consumers through Slack. PX04 at Att. F, pp. 87-91; PX08 at ¶¶18-20, Atts. D-H, pp. 176-80; PX09 at Att. H, pp. 242-44, 249-253, 272-76; PX63 at ¶¶69-70.

[39] PX04 at Att. F, pp. 87-91; PX63 at ¶¶74-80.

The first of Defendants' Services, the Air Access Card (or "Air AI Program")[40] purportedly includes coaching services,[41] business support services like lead generation, and access to or first notice of four software features, including conversational AI.[42]

---

[40] Sales agreements refer to the "Air Access Card," and the "Air AI Program." *See, e.g.*, PX02 at ¶9, Att. B, pp. 19-20; PX05 (Declaration of Holly Gavel) at ¶10, Att. B, pp. 101-02; PX06 at Att. A, pp. 135-36. Defendants also called their Air AI Access Card Services "Scale 13." *See supra* n. 2.

[41] Both the Air AI Access Card and Licensing include coaching and business support services. *See, e.g.*, PX05 at ¶¶2, 6, 10-12, Att. B, pp. 101-02; PX06 at ¶¶ 6-8, Att. A, pp. 135-36; PX10 at ¶¶4-7; PX11 at ¶¶3-4, 6; PX12 at ¶¶ 4, 6, 8, Att. A, pp. 372-73 (Air AI Access Card); PX01 at ¶¶9, 12, Att. A, pp. 6-7; PX04 at ¶13, Att. D, pp. 80-81; PX08 at Att. A, p. 158-59; PX09 at ¶23, Att. E. 206-07; PX33, pp. 788-89; PX36, pp. 841-42 (Licensing). Consumers state that these services frequently were not as advertised. *See, e.g.*, PX01 at ¶¶17, 19, 23; PX02 at ¶¶19-21; PX03 at ¶¶14-17; PX04 at ¶¶17-19; PX06 at ¶¶17, 19-20, 27-29, 38 ("I feel like Air AI lied to me and did not give me the training and support they promised."); PX07 at ¶11; PX09 at ¶¶38-39, 42-44; PX10 at ¶¶15, 18; PX11 at ¶16. Many consumers found it impossible to launch a business and bring in the revenue they were promised. *See, e.g.*, PX03 at ¶22; PX06 at ¶38; PX07 at ¶12.

[42] *See, e.g.*, PX05 at ¶¶2, 6, 10-12, Att. B, pp. 101-02; PX06 at ¶¶6-8, Att. A, pp. 135-36; PX10 at ¶¶4-7; PX11 at ¶¶3-4, 6; PX12 at ¶¶4, 6, 8, Att. A, pp. 372-73. Software features included "Midas," "Max," and "Sherlock." PX02 at ¶11, Att. B, pp. 19-20; PX03 at ¶6 & Att. B, p. 62-63; PX05 at ¶10, Att. B, pp. 101; PX06 at Att. A, p. 135; PX11 at ¶3; PX12 at ¶¶ 6, 8, Att. A, p. 372. Several consumers described that some of these services did not perform as advertised. *See* PX03 at ¶15-16; PX05 at ¶20; PX07 at ¶10; PX11 at ¶¶13, 15; PX12 at ¶¶12, 18-21. Defendants claim their conversational AI (sold as part of the Air AI Access Card and Licensing) is human-like and capable of holding human-like 10-to 40-minute-long conversations, thereby reducing employee costs and increasing sales. PX63 at ¶¶13-15, 19; *see also* PX27 at 495:02-12, 499:11-20, 524:03-525:04; PX09 at ¶2. In emails, Defendants also claim that their conversational AI is "more than capable of closing clients" and asked consumers to "[i]magine every call promptly answered, questions handled by AI, and qualified leads effortlessly booked for appointments." PX04 at ¶11, Att. B, p. 75. But consumers report that the conversational AI is faulty, not able to perform basic functions like placing outbound calls to businesses, scheduling appointments, taking down names or email addresses, or responding accurately to questions, making it difficult to use and to resell. Rather than the promised built-for-you solution that requires minimal effort, getting the conversational AI to function at all required some consumers to invest substantial time and effort. *See, e.g.*, PX01 at ¶¶14-16, 19-22; PX04 at ¶18; PX06 at ¶30; PX08 at ¶16, Att. C, p. 175; PX09 at ¶¶37-41, 45, Att. H, pp. 222-24, 236, 246 (consumer describing issues with the AI,

Defendants have charged consumers between $15,000 and $30,000 for these services.[43]

Defendants' second Service involves Licenses for consumers to stand up their own operations reselling conversational AI to other businesses,[44] including to "1000 pre vetted leads" supplied by Defendants.[45] The License bundle typically costs consumers between $25,000 and $100,000, and as much as $250,000.[46] Defendants claim consumers will make money with Licenses in two ways: (1) through commissions from businesses that consumers refer to Defendants;[47] and (2) charging fees for setting up the conversational AI for other businesses.[48]

---

including that the AI agent read "'insert time'" instead of providing actual available appointments and that consumer was told "the only solution anyone could give [to prevent the AI agent from making up answers] was to code in every possible question a consumer could ask the AI agent, so that every scenario was scripted…").

[43] PX02 at ¶¶15, 18 ($15,000 payment ); PX03 at ¶11 ($19,500 payment); PX05 at ¶¶ 10, 18, Att. B, p. 101, Att. D, p.110 ($15,000 payment); PX06 at ¶¶10, 14-16 ($30,000 requested, $14,200 payment); PX07 at ¶8 ($30,000 payment); PX10 at ¶¶9, 12 ($30,000 requested, $15,000 payment); PX11 at ¶¶7, 10, 14, Att. B, p. 310, Att. C., pp. 316-20 ($30,000 payment); PX12 at ¶11 ($20,000 payment); PX63 at ¶75.

[44] PX01 at ¶¶4, 6, Att. A, pp. 6-10; PX04 at ¶¶7, 12-13, Att. D, pp. 80-84; PX08 at ¶¶6-7, Att. A, p. 158; PX09 at ¶¶4-5, Att. E. pp. 206-12; PX63 at ¶18; PX25, p. 482; PX33, pp.788-89; PX31, pp. 747:5-748:3; PX36, pp. 841-42.

[45] PX63 at ¶19; PX27 at 534:18-536:1.

[46] PX01 at ¶13 ($22,800 payment); PX04 at ¶¶12, 16, Att. E, p. 85 ($9,800 "biannual" payment requested, $9,777 paid); PX08 at ¶12, Att. A, p. 158 ($25,000 payment); PX09 at ¶¶14, 31; PX63 at ¶75; PX36, p. 841 ($50,000); PX32, p. 787. Consumers are required to pay additional fees for the calls they place using the conversational AI. PX01 at Att. A, p. 6-7; PX04 at Att. D, pp. 80-84; PX08 at Att. A, p. 159; PX09 at Att. E, p. 207; PX36, p. 841; PX35, 818:11-15; *see also* PX11 at ¶15.

[47] PX01 at ¶¶6-7, Att. A, pp. 6-7; PX04 at ¶¶12, Att. D, p. 80; PX08 at Att. A, p. 158; PX09 at ¶¶4, 14, Att. C, p. 198, Att. E, pp. 206-07; PX33, p. 788; PX36, p. 841; PX25 at p. 482; PX63 at ¶18-19; PX27 at 511:09-18. Defendants tell consumers that Defendants will pay consumers a set percentage for every minute a referred business uses the conversational AI. *Id. See also* PX35, 818:22-819:11.

[48] PX01 at ¶¶6-7; PX09 at ¶14; PX63 at ¶19; PX27 at 514:08-515:17.

9

Defendants use social media advertising campaigns to entice consumers to provide contact information to engage with them over the phone.[49] Employing a dedicated phone marketing team armed with scripts written by the Individual Defendants, Defendants typically place initial sales and scheduling calls to consumers.[50] Defendants also typically instruct consumers to watch a video ("Precall Video") before participating in a second sales call.[51] The Precall Video amounts to an extended sales pitch, doubling down on misrepresentations about the earnings potential of Defendants' Services. [52] Neither the Video's audio nor visuals include any disclosures or disclaimers limiting the representations made about earnings potential or refunds.[53] Deceptive claims about earnings and refunds made on phone calls and in Precall Videos also extend to various written communications and materials, including text messages, emails, and contracts.[54]

---

[49] *See* PX01 at ¶4; PX02 at ¶2; PX03 at ¶¶2-3; PX05 at ¶¶2-3; PX06 at ¶3; PX07 at ¶¶3-4; PX08 at ¶¶3-4; PX09 at ¶¶2-3; PX10 at ¶4; PX11 at ¶¶3, 5; PX12 at ¶4; PX63 at ¶68.

[50] *See* PX01 at ¶5; PX02 at ¶3; PX03 at ¶5; PX04 at ¶5; PX06 at ¶4; PX07 at ¶4; PX08 at ¶5; PX09 at ¶4; PX10 at ¶5; PX11 at ¶6; PX12 at ¶7; PX63 at ¶¶68-71; PX30. Defendants tell consumers they are "perfect" candidates to purchase Services. *See* PX02 at ¶3; PX04 at ¶11; PX08 at ¶5; PX10 at ¶5; PX30 at pp. 740:17-741:05. They also use pressure tactics on calls, including telling consumers that they are selling a limited-time offer. *See* PX09 at ¶¶14, 19; PX10 at ¶11; PX31 at p. 781:16-21. In some calls, they upsell consumers to their Licensing. *See* PX08 at ¶¶6-8; PX09 at ¶¶4-5.

[51] *See* PX01 at ¶¶5-6; PX02 at ¶¶5-6; PX03 at ¶4-5; PX04 at ¶¶9-10, Att. C, pp. 77-78; PX05 at ¶4; PX06 at ¶4; PX09 at ¶¶8-9; PX63 at ¶¶18-19; PX25 at pp. 482-83; PX34 at pp. 795-96.

[52] *See, e.g.*, PX27; PX28; PX63 at ¶19; *see also* PX02 at ¶6; PX03 at ¶4; PX05 at ¶5; PX06 at ¶¶5-9; PX09 at ¶10.

[53] *Id.*

[54] *See, e.g.,* PX01 at ¶11, Att. A, p. 8; PX02 at ¶¶8.c, 13; PX03 at ¶12; PX04 at ¶¶7-8, ¶¶12-14, Att. A, pp. 72-74, Att. B, pp. 75-76; PX05 at ¶¶6-7, 13-14, Att. B, 101-02; PX06 at ¶13; PX07 at ¶7; PX08 at ¶¶9-12; PX09 at ¶¶11, 14, 16 21, 24, Att. C, p. 198, Att D, p. 205; PX10 at ¶¶8, 14; PX11 at ¶9; PX12 at ¶9. Defendants focus on refund claims when

10

**Air AI Access Card Earnings Claims**. Defendants make deceptive earnings claims throughout the sales funnel for the Air AI Access Card. First, Defendants make deceptive claims in online marketing, for example claiming on social media and in marketing videos that Air AI Access Card holders will earn three times their current business income.[55] Second, Defendants make deceptive earnings claims in outbound sales calls. Defendants claim on phone calls that consumers can make back the cost of the Air Access Card—upward of $15,000—very quickly,[56] including by telling one consumer they would get a full refund if they did not make back a $30,000 investment within three months.[57] Defendants' sales representative told another consumer on a sales call that he was making a million dollars a year.[58] Third, in contracts, Defendants repeat their guarantees of doubling or tripling returns on consumers' Air AI Access Card purchase price, promising that consumers will get full refunds if they don't double or triple their investment in six months,[59] and stating that they will show consumers how to recoup the "Air investment in 14 days."[60]

**Licenses Earnings Claims.** Defendants make similar false earnings claims selling

---

consumer express concerns about Defendants' services. *See* PX03 at ¶8; PX04 at ¶11; PX07 at ¶9; PX08 at Att. D, p. 176; PX10 at ¶8.

[55] PX05 at ¶2.

[56] PX06 at ¶10 (consumer would be able to pay off loans she took out within a year).

[57] PX10 at ¶8 (could make investment back in 90 days). On another call, Defendants told a consumer that the cost of the program (in this instance, $30,000), was "nothing" compared to what she would make using Defendants' Services. PX06 at ¶10.

[58] PX10 at ¶11.

[59] *See infra* n. 72.

[60] PX02 at ¶10, Att. B, p.20; PX05 at ¶12, Att. B, p.102; PX06 at Att. A, p. 135; PX12 at ¶8, Att. A, p. 373.

11

1  Licenses, stating and implying that consumers could make tens or hundreds of thousands,

2  even millions of dollars reselling Defendants' conversational AI. For example, on one

3  sales call, Defendants claimed that a recent License holder generated $450,000 in revenue

4  in their first thirty days, and that Licensees were making "hundreds of thousands."[61] In

5  emails to a consumer, Defendants included links to alleged testimonials claiming "$0-

6  $300k in first month!" or "$0-$33k/m in 30 days" and links to "demos" purportedly

7  showing "over $383,000 in sales in a single day."[62]

8

9        The Precall Video also includes express and implied earnings claims, for example

10  claiming consumers would receive access to a "client acquisition" system called "AirU"

11  that has "allowed us to scale 6 out of 8 service based companies to over $1M/month" and

12  that has taken "a company from $16 million a year to $100 million per year."[63] The Video

13  also claims that License holders could bring in a single business and get paid one million

14

15  dollars a month.[64] The Video further shows what appear to be testimonials from other

16  License holders claiming that individuals were making "$20k in 3 days, an extra $10k

17  from this morning" or that individuals "have been signing $9600 everyday [sic]" and that

18  someone "collected $79,620 in the past 30 days."[65] The Video makes other false earnings

19

20  claims, telling consumers that they could be making $10,000,000 a month, or "million

21

22

23  [61] PX08 at ¶7; PX30 at 740:11-15; *see also* PX35, 816:11-19, 817:19-22, 827:5-9
   829:16-30:13, 831:4-9.

24  [62] PX04 at ¶¶7-8, Att. A, p. 73, Att. B, p.75.

25  [63] PX63 at ¶19; PX28 at p. 658; PX27, 536:02-17, 538:07-11. The video includes a
   testimonial claiming "we were able to take [the business] to over $1,000,000 a month."

26  PX63 at ¶19; PX27 at 538:13-16.

27  [64] PX63 at ¶19; PX27 at 512:09-513:07; PX28 at p. 603.

28  [65] PX63 at ¶19; PX28 at p. 663.

                                        12

dollars every single month forever," from a single large-scale client.[66]

Defendants' earnings claims for the Air AI Access Card and License are fantasy. Defendants provide no substantiation for their assertions, and no disclaimers purport to limit the rampant representations about earnings potential.[67] According to Defendants' former sales manager, earnings claims were merely hypothetical.[68] Many consumers do not make the promised money using the Air AI Access Card or Licensing and are not able to double or triple their investment or make tens of thousands of dollars a month as promised by Defendants.[69]

## C.    Defendants Fail to Honor Refund Guarantees

During sales calls, Defendants tell consumers that if the Services do not work out for them, the consumer will be refunded their purchase price.[70] Defendants focus on the refund guarantee when consumers express hesitance at the cost or performance of the Services, and claim in their contracts that refund guarantees are designed to "remove any

[66] PX63 at ¶19; PX27 at 512:17-513:01, *see also* 512:02-06. Defendants also assure consumers that Licenses themselves will become valuable, claiming that, one day, "Being Able To Resell Your License Alone Could Be Worth $1MM."  "[W]orst case," they tell consumers, "you could just resell your license to someone else at breakeven [sic] – or even a large profit." PX63 at ¶19; PX28 at pp. 667-69, 687; *see also* PX27 at 540:16-541:06. But because the Licensing does not perform as advertised, *see supra* n. 42, the Licenses do not accrue value in the manner Defendants claim. *See also, e.g.*, PX04 at ¶¶17-18, 20; PX09 at ¶¶37-42, 44-45, 47; PX63 at ¶¶54-56; PX38; PX39; PX40; *see also*, PX01 at ¶31.
[67] PX63 at ¶29; PX22; PX23; PX24 (Air AI policy documents containing no relevant disclosures).
[68] PX63 at ¶70.
[69] *See, e.g.*, PX03 at ¶22; PX05 at ¶22, Att. F, p. 115; PX06 at ¶38; PX07 at ¶12; PX10 at ¶24.
[70] *See* PX01 at ¶11; PX02 at ¶8.c; PX05 at ¶¶6-7; PX07 at ¶9; PX08 at ¶9; PX09 at ¶16; PX10 at ¶8.

13

risk" for the purchaser."[71] Contracts include more refund guarantees, for example, Defendants promise refunds if Air AI Access Card purchasers meet usage and trouble-shooting requirements but do not double or triple their investment within months, claiming:

> Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to double or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.[72]

Contracts for Licensing included the following, or similar, buy-back or refund guarantees, including refunds for "any other reason at all":

> The License is backed by a results satisfaction guarantee. If Client is not satisfied with the performance of their agent or for any other reason at all, Client can receive a full buy back of the amount paid, but no sooner than 120 days after signing this Agreement…. This guarantee rests upon the premise that Air AI's conversational AI will deliver results for the client, and is offered to remove any risk that it will not work for the client.[73]

Defendants rarely honor their refund guarantee. When a consumer requests their money back, Defendants string them along with promises of refunds.[74] Many consumers

---

[71] *See* PX03 at ¶8, 10; PX04 at ¶11; PX05 at ¶7; PX06 at ¶13; PX07 at ¶9; PX08 at ¶14, Att. A, p. 159, Att. D, p. 176; PX09 at ¶24, Att. E, p. 207.

[72] PX03 at ¶12, Att. B, p. 63; PX06 at ¶13 & Att. A, p. 136; PX12 at ¶9, Att. A, p. 373 (double); *see also* PX02 at ¶13, Att. B, p. 20; PX05 at ¶13, Att. B, p. 102 (triple).

[73] PX08 at ¶10, Att. A, p. 159; PX09 at ¶24, Att. E, p. 207.

[74] PX02 at ¶¶22-32; PX03 at ¶¶21-22; PX07 at ¶¶14-16; PX08 at ¶¶20-25; PX09 at ¶¶47-49, 51-52, 54-57; PX10 at ¶¶19, 21-22; PX11 at ¶¶20-28; PX12 at ¶¶22-34, 36.

are cut off from some or all of Defendants' Services upon requesting a refund.[75] But the refunds rarely materialize.[76] Moreover, Defendants are aware that they are in no financial position to honor their refund guarantees.[77] For example, in an email sent to several consumers in August 2024, O'Donnell explained:

> Sadly, our intense & persistent efforts to raise outside capital were not fruitful…
>
> We…have been working as hard and fast as we can to get profit coming in so we can take care of all outstanding refunds.
>
> At this point, there IS a path ahead with one of the ventures we are working on…We are completely out of cash at this moment.[78]

Despite claiming to be without funds, Defendants continued to sell their Licensing, including by distributing contracts with a refund guarantee.[79] Defendants' refusal to honor refunds flies in the face of their repeated assurances to consumers that purchasing Defendants' Services has no risk because of the refund guarantee.[80] Instead of getting their money back, many consumers lose tens of thousands of dollars.[81]

---

[75] PX05 at ¶¶24-34; PX10 at ¶¶19-20.

[76] PX13 at ¶¶26-28 (showing at least 189 consumers attempted to charge back payments and two Defendant merchant accounts suspended due to high chargebacks); *see also id.* at ¶19 (identifying only $149,700 in refund payments). *See also* PX01 at ¶¶29-32; PX02 at ¶¶22-32; PX03 at ¶¶21-27; PX04 at ¶¶20-26; PX06 at ¶38; PX07 at ¶¶13-16, 18; PX08 at ¶¶17-29; PX09 at ¶¶47, 51-60; PX10 at ¶¶19-22; PX11 at ¶¶18-32; PX12 at ¶¶22-23, 27-31, 34.

[77] *See* PX63 at ¶78.

[78] PX11 at ¶¶28-30, Att. F, pp. 357-58; PX12 at ¶36, Att. G, p. 392-93; *see also* PX08 at ¶19-20, Att. E, p. 179 (alerting consumers to this issue in June 2024).

[79] PX63 at ¶28; PX36, p. 843 (License agreement dated Nov. 2024).

[80] *See supra* at n.70-73.

[81] *See, e.g.,* PX01 at ¶¶24-29; PX02 at ¶¶20-22, 30-33; PX03 at ¶¶11, 14-19, 25-27; PX04 at ¶¶ 16-19, 28; PX06 at ¶¶15-32, 36-38; PX07 at ¶¶8, 10-13, 18; PX08 at ¶¶12,

15

1

      **D.**    **Consumer Injury and Complaints**

2

      Prices vary, but for the Air AI Access Card, Defendants have charged typically

3

from $15,000 to $30,000, depending on the consumer.[82] For their Licensing, Defendants

4

have charged anywhere from $9,800 "biannually" up to $250,000, typically using a tiered

5

pricing structure with purported benefits increasing the more a consumer pays.[83] Many

6

consumers cannot afford to pay Defendants out of pocket and take on substantial debt to

7

pay for Defendants' Services.[84] Between February 2023 and June 2024, Defendants

8

appear to have received consumer payments of at least $17.8 million.[85]

9

10

      Defendants have been the subjects of numerous private lawsuits. For example, one

11

suit accused several Defendants of "wildly misrepresent[ing] the operational status,

12

functionality, and integration capabilities" of its conversational AI.[86] Defendants have

13

also been sued by creditors who have claimed, *inter alia*, that Defendants moved funds

14

15

16

17

---

18

16-17, 23, 27-29; PX09 at ¶¶31, 33-50, 59; PX10 at ¶¶15-18, 24; PX11 at ¶¶11-17, 33; PX12 at ¶¶11, 18-21, 39.  *See also supra* at n. 76.

19

  [82] *See supra* at n. 43.

20

  [83] *See supra* at n. 46; *see also e.g.*, PX32, p. 787.

  [84] Some consumers pay using credit cards, *see* PX01 at ¶13; PX02 at ¶15; PX06 at ¶16;

21

PX07 at ¶8; PX11 at ¶11; PX12 at ¶11, or Defendant-brokered loans. PX02 at ¶¶16-18, Att. D, pp. 27-31; PX03 at ¶¶9-11; PX05 at ¶¶16-17, Att. C, p. 107; PX06 at ¶¶14-16;

22

PX08 at ¶¶12-14, Att. B, pp. 165-74; PX10 at ¶¶12-13; PX11 at ¶14, Att. C, pp. 316-25. Several consumers expressed that the refund guarantee mitigated the risk associated with

23

the debt. PX03 at ¶10; PX08 at ¶14, Att. B, p. 166.

24

  [85] PX13 at ¶20.

  [86] PX44 (Complaint, *Healthy Homes 365, LLC v. Air AI Technologies, Inc. et al.*, 3:24-

25

cv-1481 (N.D. Tex. June 14, 2024)), p. 986. *See also* PX41 *(*Complaint, *Alchemy

26

Partners Holdings, LLC v. Air AI Technologies, Inc.*, Case No. 240500359 (Utah D.C. 30 Apr. 2024)); PX54 (*Wieselman v. Air AI Technologies, Inc.*, Case No. 24SC32740 (Or.

27

Cir. Oct. 31, 2024)); PX51 (Complaint, *Schwartz v. Air AI*, LLC, et al., CV2024-011284

28

(Ariz. S.C. May 8, 2024)).

1  out of designated accounts, thereby blocking creditors from collecting on loans.[87]

2  Moreover, consumers have left 78 negative one-star reviews on public review platform

3  Trustpilot.[88] Some consumers have even created a dedicated website and petition to

4  uncover Defendants' scam and shut down Defendants' operation.[89] Despite these actions

5  and complaints, Defendants continue to engage in deceptive and unlawful practices.

6

7  **III.    THE COURT SHOULD ISSUE A TRO**

8

9  **A.    The FTC Act Authorizes the Court to Grant the Requested Relief**

10      The FTC brings this action under Sections 13(b) and 19 of the FTC Act, 15 U.S.C.

11  §§ 53(b) and 57b.[90] Section 13(b) and Section 19 authorize the FTC to seek, and the

12  Court to issue, an injunction against violations of any provisions of law enforced by the

13  FTC.[91] With that authority comes the power to grant ancillary relief, including a TRO, a

14

15  preliminary injunction, and other prospective relief.[92] In addition, Section 19 authorizes

16

17  [87] PX47 (Summons and Complaint, *Meged Funding Grp Corp. v. Apex Holdings Group LLC et al.*, Index no. 614017/2024 (N.Y. Sup. Ct. Nassau Cnty. Aug. 8, 2024)) pp. 1032-

18  33; *see also* PX49 (Summons and Complaint, *New Vista Capital, LLC v. Apex Holdings Group LLC, et al.*, Index no. E2024011367 (N.Y. Sup. Ct. Monroe Cnty. July 10, 2024))

19  p. 1054; PX45 (Complaint, *Insta Funding, LLC v. Apex Holdings Grp. LLC*, No. 2025-

20  002148-CA-01 (Fla. 11th Cir. Ct. Feb. 7, 2025)), pp. 1004-05; PX46 (Complaint, *Liquidibee 1 LLC v. Apex Holdings Grp. LLC d/b/a Scale 13 et al.*, No. 513706-2024

21  (N.Y. Sup. Ct. Kings Cnty. June 10, 2024)), pp. 1020-21.

22  [88] PX63 at ¶¶54-55; PX38.
   [89] PX63 at ¶56; PX39; PX40.

23  [90] Complaint at ¶1.

24  [91] *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347-49 (2021); *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985); *FTC v. Noland*, No. CV-20-00047-PHX-

25  DWL, 2021 WL 4318466, *4 (D. Ariz. Sep. 23, 2021).

26  [92] *AMG*, 141 S. Ct. at 1348 (holding that Section 13(b) of the FTC Act authorizes the issuance of temporary restraining orders and preliminary injunctions ancillary to

27  permanent injunctions); *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021); *Noland*, 2021 WL 4318466 at * 4 ("Moreover, under longstanding Ninth

28

17

this Court to grant retrospective relief, including monetary relief, for violations of FTC rules—here, the Telemarketing Sales Rule ("TSR") and the Business Opportunity Rule,[93] which the FTC seeks to enforce in this action. This relief may include the full range of equitable remedies, including the relief sought by the FTC in this action, and any other measures the Court deems necessary to redress injury to consumers.[94]

When granting preliminary relief under Section 13(b) of the FTC Act, courts must consider two factors: (1) the FTC's likelihood of ultimate success on the merits, and (2) whether the public equities outweigh any private equities.[95] Unlike private litigants, the FTC does not need to prove irreparable injury[96] because it is presumed under Section

---

Circuit law, district courts have 'inherent equitable power to issue provisional remedies ancillary' to a request for 'final equitable relief.'") (quoting *Reebok Int'l, Ltd. V. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992).

[93] The enforcement authority in Section 19 applies to FTC trade regulation rules, generally those promulgated under Section 18 of the FTC Act (15 U.S.C. § 57a). 15 U.S.C. § 57b(a)(1) and (b). Congress, through the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, directed the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). Under the Telemarketing Act, the FTC promulgated and enforces the TSR. 16 C.F.R. § 310.1. The Telemarketing Act provides that violations of the TSR are treated as violations of rules promulgated under Section 18 of the FTC Act. 15 U.S.C. § 6102(c)(1). The Business Opportunity Rule was promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

[94] 15 U.S.C. § 57b(b); *see also FTC v. Elegant Solutions, Inc.*, No. 20-55766, 2022 U.S. App. LEXIS 15934, *6-7 (9th Cir. 2022) ("[S]ection 19 of the Act…authorizes the FTC to seek monetary relief to address violations of certain rules…").

[95] *See, e.g., FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999) ("Under this more lenient standard, a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.") (internal quotation removed).

[96] *See FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019) (quoting *FTC v. Warner Comm., Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984)); *Affordable Media*, 179 F.3d at 1233 (quoting *Warner Comm.*, 742 F.2d at 1159).

18

1    13(b).[97] The Court "need only … find some chance of probable success on the merits" in

2    order to award preliminary relief.[98] Moreover, when weighing the equities, the public

3    interest should receive greater weight than private interests.[99]

4

5        As explained below, the substantial evidence submitted in support of this motion

6    demonstrates that the FTC has a strong likelihood of success in establishing that

7    Defendants' conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as well as

8    the TSR, 16 C.F.R. Part 310, and the Business Opportunity Rule, 16 C.F.R. Part 437, as

9    amended. The record further demonstrates that the equities favor the requested relief.

10

11        **B.    The FTC Has Shown a Likelihood of Success on the Merits**

12        The FTC "meets its burden on the likelihood of success issue if it shows

13    preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate

14    success on the merits."[100]

15

16

17    _____

18    [97] *FTC v. World Wide Factors, Ltd*., 882 F.2d 344, 346-47 (9th Cir. 1989) (quoting
*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)).
19    Although the FTC need not show irreparable injury, consumer declarants have reported
such injuries, for example, time wasted pursuing fulfillment of Defendants' Services or
20    seeking a refund, and concerns regarding damage to creditworthiness due to loans
consumers entered into in order to pay for Defendants' Services. *See, e.g.*, *supra* n. 74;
21    PX03 at ¶25; PX05 at ¶¶22-35; PX06 at ¶22; PX10 ¶17-18. Consumer also lost tens and
hundreds of thousands of dollars. *See supra* n. 43, 46; PX39.
22
23    [98] *World Wide Factors*, 882 F.2d at 347.
       [99] *Id*.
24    [100] *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978) (internal quotation
marks omitted); *see also Odessa Union Warehouse Co-op*, 833 F.2d at 176. In
25    considering an application for a TRO or preliminary injunction, the Court has the
discretion to consider hearsay evidence. *See FTC v. Kroger Co.*, No. 3:24-cv-00347-AN,
26    2024 WL 5053016, *5 (D. Or. Dec. 10, 2024) ("The court may consider, for example,
27    hearsay or other inadmissible evidence" in the context of preliminary injunction hearings)
(quoting *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988)).
28

1

### 1.    Defendants Violated the FTC Act (Counts I and II)

2    Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting

3    commerce." 15 U.S.C. § 45(a). An act or practice is deceptive under Section 5(a) if it

4    involves a material representation or omission that is likely to mislead consumers acting

5

6    reasonably under the circumstances.[101] Section 5 also requires marketers to have a

7    reasonable basis for their claims.[102] A representation is material if it "involves

8    information that is important to consumers and, hence, likely to affect their choice of, or

9    conduct regarding, a product."[103] Moreover, "[e]xpress product claims are presumed to be

10

11    material."[104]

12    A representation is likely to mislead consumers if: (1) the express or implied

13    message conveyed is false; or (2) the maker of the representation lacked a reasonable

14    basis for asserting that the message was true.[105] Where the maker lacks adequate

15

16    substantiation evidence, the maker necessarily lacks any reasonable basis for its claims.[106]

17    In determining whether a representation is likely to mislead consumers, courts consider

18

19

20

---

21    [101] *See, e.g., FTC v. Lucas*, 483 Fed. Appx. 378, 378-79 (9th Cir. 2012) (citing *FTC v.*

22    *Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *see also* FTC Policy Statement on Deception, 103
F.T.C. 174, 175 (1984) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)).

23    [102] FTC Policy Statement Regarding Advertising Substantiation, 104 F.T.C. 648, 839

24    (1984) (appended to *In re Thompson Med. Co.*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d
189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987)).

25    [103] *FTC v. Cyberspace.com*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale*

26    *Assocs.*, 103 F.T.C. at 165 (1984), 1984 WL 565319, at *37 (F.T.C. Mar. 23, 1984).

    [104] *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994).

27    [105] *Id.* at 1096.

28    [106] *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010)).

20

the overall net impression it creates.[107] "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[108]

**False and Unsubstantiated Earnings Claims.** "[M]isrepresentations regarding income potential are material and violate the FTC Act."[109] Earnings claims and express claims are presumed material because they relate directly to consumer decisions to buy a good or service.[110] Here, Defendants made oral and written earnings claims, many of which were express.[111] Defendants' earnings claims are false or unsubstantiated and therefore deceptive.[112] In fact, Defendants merely calculated theoretical earnings claims.[113]

**Misrepresentations With Regard to Refund Guarantees.** Courts have found that misrepresentations regarding refund policies—including guaranteeing refunds prior to purchase and then denying those refunds when requested—violate Section 5.[114] Defendants repeatedly assured consumers that they would get their money back if

---

[107] *See Cyberspace.com*, 453 F.3d at 1200; *Am. Home Prod. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976).

[108] *Cyberspace.com*, 453 F.3d at 1200.

[109] *FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111, at *5 (D. Ariz. Sept. 18, 2015) (citing *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528-29 & 532-33 (S.D.N.Y. 2000)).

[110] *Id.*

[111] *See supra* Section II.B.

[112] *See supra* n. 69; PX63 at ¶70.

[113] *See supra* n. 67-69. Defendants have no basis for their claims and in making them have misled consumers, who often make no money after spending thousands of dollars on Defendants' Services. *See, e.g., supra* n. 81.

[114] *FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1053-54 (W.D. Cal. 2002).

21

1    Defendants' Services did not work for them, focusing on this representation when

2    consumers were hesitant to move forward, and continuing to make these guarantees even

3    when they knew they could not honor them.[115] And, as with Defendants' earnings claims,

4    these refund guarantees are material, express claims, going to the heart of the consumer's

5    decision to buy Defendants' Services.[116] But many consumers who requested a refund

6

7    never received one.[117]

8

9    ### 2.    Defendants Violated the Telemarketing Sales Rule when selling the Air AI Access Card (Count III)

10

11    To sell Air AI Access Cards, Defendants have run a telemarketing campaign that

12    violates the TSR.[118] The TSR prohibits (1) "[m]aking a false or misleading statement to

13    induce any person to pay for goods or services"; (2) misrepresentations regarding

14    material aspects of refund or repurchase policies; and (3) misrepresentations regarding

15    the nature of an investment opportunity, including risk and potential earnings.[119]

16

17

18    ---

[115] *See supra* Section II.C.

19    [116] *See supra* n. 71-73. Consumer declarants emphasized the import of these claims in
convincing them to go through with their purchase, believing that their purchase was
20    essentially risk free because, at worst, Defendants would make them financially whole.

21    [117] *See supra* n. 74-76.

[118] *See supra* Section II. The FTC promulgated the TSR in 1995 after Congress directed
22    it to establish regulations prohibiting deceptive and abusive practices in telemarketing.
Telemarketing Act, 15 U.S.C. §§ 6101-08. Defendants sold Licenses through the same
23    telemarketing campaigns, but because Licenses are "business opportunities" (*see infra*
24    Section III.B.3) they are exempt from coverage under the TSR. 16 C.F.R. § 310.6(b)(2).

[119] *See* 16 C.F.R. §§ 310.3(a)(2)(iii), (iv), (vi) and (a)(4). Prior to May 2024, the TSR
25    exempted business-to-business calls from many of its requirements. The FTC amended
26    the TSR, effective May 16, 2024, to prohibit the misrepresentations listed in Sections
310.3(a)(2) and (4) (including those about earnings and refunds) on business-to-business
27    calls. 16 C.F.R. § 310.6(b)(7)(i). Prior to May 2024, Defendants sold the Air Access
Cards to at least some individual consumers. *See, e.g.* PX07 at ¶¶2, 11. Moreover, upon
28

22

The TSR typically applies to "sellers" or "telemarketers."[120] Under the TSR, a "seller" is any person who, in connection with a telemarketing transaction,[121] provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.[122] A "telemarketer" under the TSR is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer[.]"[123] Defendants are "sellers" because they provided, offered to provide, or arranged for others to provide Air AI Access Cards to consumers.[124] Defendants are "telemarketers" because they initiated or received telephone calls from consumers in connection with these sales.[125]

**Misrepresentations about Refund Policies.** The TSR prohibits "any seller or telemarketer" from misrepresenting "[a]ny material aspect of the nature or terms of the seller's refund, cancellation, exchange or repurchase policies."[126] As discussed in Section II.C, Defendants promised consumers the "industry's boldest" refund guarantee, but Defendants rarely honored their refund guarantee, often leaving consumers in debt.

---

information and belief, Defendants continued selling the Air Access Cards to individual consumers and business owners after May 2024.

[120] *See, e.g.*, 16 C.F.R.§ 310.3(a) ("It is a deceptive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct…").

[121] "Telemarketing" is defined as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. 310.2(ii). Defendants sell Air AI Access Cards by phone to consumers across the U.S. *See infra* n. 125.

[122] *Id*. at § 310.2(ee).

[123] *Id*. at § 310.2(hh).

[124] *See* Section II.B., n. 40-43; 49-52; 55-60 *see also* PX63 at ¶¶68-71 (describing Defendants' telemarketing sales funnel).

[125] *See* Section. II.B., n. 50, 56-57; PX63 at ¶¶68-71.

[126] 16 C.F.R. § 310.3(a)(2)(iv).

23

**Misrepresentations about Investment Opportunities.** The TSR also prohibits "[m]isrepresenting, directly or by implication, in the sale of goods or services…[a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability[.]"[127] Under the TSR, an investment opportunity is "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation."[128]

The Air AI Access Card is an investment opportunity under the TSR because Defendants have offered and sold it through telemarketing based on representations of past, present, or future income. As set forth in Section II.B, in much of their marketing and sales efforts, Defendants have cited the potential earnings of Air AI Access Card as the basis for consumers investing in the scheme. In making these claims, Defendants have misrepresented the risk, earnings potential, and/or profitability of Air AI Access Cards in violation of the TSR.

### 3. Defendants violated the Business Opportunity Rule when selling Licenses (Count IV)

The Business Opportunity Rule requires that business opportunity sellers provide consumers with specific information so consumers can evaluate fairly the business opportunity being sold.[129] The Business Opportunity Rule also requires sellers to honestly

---

[127] 16 C.F.R. § 310.3(a)(2)(vi).
[128] *Id.* § 310.2(s).
[129] 16 C.F.R. §§ 437.2-4.

disclose and honor their refund policies.[130] Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business"; the "prospective purchaser makes a required payment"; and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will ... [p]rovide outlets, accounts, or customers, including but not limited to Internet outlets, accounts, or customers, for the purchaser's goods or services" or that the seller will "Buy back any or all of the goods or services that the purchaser makes...."[131]

In offering their Licenses for sale, Defendants sell a "business opportunity" as defined in the Rule because Defendants: (1) solicit consumers to enter a new business to sell conversational AI services to other businesses;[132] (2) require consumers to pay for the Air AI License;[133] and (3) represent that they will provide "outlets, accounts, or customers" in the form of "leads."[134]

The Business Opportunity Rule requires sellers to provide purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule.[135] Defendants have failed to deliver this required disclosure document

---

[130] *Id.* § 437.6(k), (l).
[131] *Id.* § 437.1(c).
[132] *See supra* n. 44.
[133] *See supra* n. 46.
[134] *See supra* n. 45.
[135] 16 C.F.R. § 437.3(a)(l)-(5). Under the Rule, this disclosure document must be provided at least seven days before the prospective purchaser signs a contract or makes a payment. *Id.* § 437.2.

25

1   prior to accepting payments from consumers.[136] Defendants' failure to provide any

2   disclosure document violates the Rule.

3       The Rule also prohibits sellers from making claims about likely earnings from a

4   business opportunity unless the seller: (i) has a reasonable basis for the claim at the time

5   it is made; (ii) has in its possession written materials to substantiate the claim at the time

6   it is made; (iii) furnishes to prospective purchasers an "Earnings Claim" statement in

7   conjunction with the Business Opportunity Rule disclosure document; and (iv) makes

8   written substantiation of the earnings claim available to any prospective purchasers who

9

10  request it.[137] As described in Section II.B, Defendants made earnings claims without a

11  reasonable basis for the claims,[138] and Defendants failed to provide "Earnings Claim"

12  statements to prospective purchasers, in violation of the Rule.[139]

13      Finally, the Business Opportunity Rule prohibits sellers from misrepresenting their

14

15  refund policies or failing to honor refunds when consumers meet the requirements of a

16  refund policy.[140] Defendants violated the Rule when they regularly told consumers that

17  refunds were guaranteed but failed to pay those refunds.

18

19

20      **C.    The Equities Favor Entry of the Proposed TRO**

21      Once the FTC establishes the likelihood of success on the merits, preliminary

22  injunctive relief is warranted if the Court, weighing the equities, finds that relief is in the

23

24

25  [136] PX63 at ¶29.

26  [137] 16 C.F.R. § 437.4(a).
    [138] *See supra* n. 68-69.

27  [139] *See supra* n. 67.

28  [140] 16 C.F.R. § 437.6(k), (l).

1    public interest.[141] "[W]hen a district court balances the hardships of the public interest

2    against a private interest, the public interest should receive greater weight."[142] Public

3    interest in this case is compelling: halting the Defendants' unlawful conduct and

4    preserving records regarding the scope of the scheme and the assets that may be available

5    for victim restitution. Defendants, by contrast, have no legitimate interest in continuing to

6

7    engage in unlawful acts and practices.[143] Therefore, as the evidence attached hereto

8    demonstrates, the FTC is likely to succeed on the merits, and the equities tip decidedly in

9

10    the public's favor. A TRO is warranted.

11        **D.    Joint and Several Liability as a Common Enterprise**

12        "Where corporate entities operate together as a common enterprise, each may be

13    held liable for the deceptive acts and practices of the others."[144] To determine if a

14

15    common enterprise exists, courts consider various factors, including common ownership

16    and control; shared officers, shared office space, comingling of funds, unified

17    advertising, and "whether the business was transacted through a maze of interrelated

18    companies."[145] But "[i]t is not necessary that the FTC prove any particular number of

19

20

21        [141] *See* 15 U.S.C. § 53(b).

22        [142] *FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *World Wide Factors*, 882 F.2d at 347); *see also FTC v. Noland*, 2020 U.S. Dist. LEXIS 33470, *41
23    (D. Ariz. Feb. 27, 2020).

24        [143] *World Wide Factors*, 882 F.2d at 347.

25        [144] *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010)); *see also FTC v. J.K.
26    Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000).

27        [145] *FTC v. Mortg. Relief Advocs. LLC*, 2015 U.S. Dist. LEXIS 186809, *15 (C.D. Cal. July 1, 2015) (citation omitted); *see also FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116
28    (S.D. Cal. 2008).

27

entity connections in order to establish a common enterprise, and, similarly, no one connection is dispositive."[146]

Here, Individual Defendants have operated the Corporate Defendants as a common enterprise while engaging in the unlawful acts and practices described in Section II.B-C, *supra*. Corporate Defendants all share at least one address and are owned and operated by Maddix and O'Donnell.[147] Air AI, Apex Holdings, and Apex 4 Kids have shared employees, and Corporate Defendants have comingled over $23,631,000 between corporate bank accounts.[148]

### E.    Personal Liability and Monetary and Injunctive Relief

An individual defendant is liable (1) for injunctive relief if he directly participated in the unlawful acts or had some control over the acts, and (2) for monetary relief if he also possessed actual or constructive knowledge of the unlawful acts.[149] "Status as a corporate officer is sufficient to establish individual liability."[150]

**Maddix and O'Donnell**. Maddix and O'Donnell are the co-founders and managing members of Air AI, and principals for and/or control Defendants Apex

---

[146] *Mortg. Relief Advocs.*, 2015 U.S. Dist. LEXIS 186809, at *15.

[147] *See supra* n. 3, 6-8, 13-14, 18-19, 23-24, 26.

[148] PX13 at ¶¶33, 72 Att. B, *supra* n. 22.

[149] *Network Servs.*, 617 F.3d at 1138-39; *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

[150] *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal. 2012) (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989), *overruled on other grounds by FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019)), *aff'd*, 644 F. App'x 709 (9th Cir. 2016); *J.K. Publ'ns*, 99 F. Supp. 2d at 1204 ("[S]tatus as a corporate officer…can be sufficient to demonstrate the requisite control."); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994).

Holdings, Apex Scaling, Apex 4 Kids, New Life Capital, and Onyx Capital.[151] They have

signatory authority on corporate bank accounts and access to corporate credit cards.[152]

Maddix and O'Donnell are the chief architects of and involved in making deceptive

claims about the earnings potential and refund guarantee related to Defendants'

Services.[153]

       Maddix and O'Donnell control and are heavily involved in day-to-day operations

for the business, signing sales contracts and corresponding with consumers.[154] Maddix

and O'Donnell are also well aware of consumer complaints and legal actions related to

the deceptive scheme and were alerted to the issues with the scheme by an employee.[155]

       **Lancer.** Lancer is a principal and co-owner of Air AI.[156] He has access to

corporate credit cards.[157] Along with his co-Defendants, Lancer was involved in drafting

sales scripts and reviewing sales calls and was responsible for distributing marketing

videos.[158] Lancer was aware of consumer complaints and the problems with Defendants'

scheme.[159]

---

[151] *Supra* n. 28, 32.

[152] PX13 at ¶¶5, 75-76; PX63 at ¶¶36, 38-46; PX26; PX57-61.

[153] Maddix and O'Donnell drafted sales scripts for Air AI's telemarketing and reviewed call recordings and joined sales calls. PX63 at ¶¶ 69-70. Maddix narrates deceptive video marketing consumers were required to watch. *See supra* n. 30.

[154] *See supra* n. 29-30, 34.

[155] *Supra* n. 31, 35, 78.

[156] PX63 at ¶11. He also filed responses on behalf of himself as "owner and principal of Air AI" as well as on behalf of Air AI in state court litigation. *See supra* n. 36.

[157] PX13 at ¶¶75-76.

[158] PX63 at ¶¶33-34, 67-70.

[159] *Supra* n. 39.

1

## IV.    TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY

2

3

        In addition to an injunction halting Defendants' illegal conduct, the FTC seeks

4

restitution for the consumer victims of Defendants' scheme. The FTC respectfully

5

requests a TRO to: (a) implement immediate conduct relief; (b) grant a turnover of

6

Defendants' business records and other relevant information; and (c) permit the FTC

7

limited expedited discovery. Courts in this District have frequently granted the same

8

relief the FTC seeks here and have granted even broader relief in many instances.[160] The

9

FTC is seeking a noticed TRO and is actively engaged in efforts to provide notice to

10

Defendants.[161]

11

12

### A.    Conduct Relief

13

        To prevent continued consumer injury, the proposed TRO would prohibit

14

Defendants from misrepresenting material facts to consumers, including any refund or

15

cancellation policy as well as risk, earnings potential, and profitability (*see* Section I,

16

proposed TRO). These measures simply require Defendants to comply with the law and

17

are within the Court's injunctive authority under Section 13(b) of the FTC Act.[162]

18

19

### B.    Turnover of Business Records and Limited Expedited Discovery

20

        To locate wrongfully obtained assets and secure important business records, the

21

22

23

24

    [160] *See, e.g.*, *FTC v. Hite Media Grp. LLC*, No. 18-cv-2221-SPL, Dkt. No. 14 (D. Ariz. July 17, 2018); *FTC v. Blue Saguaro Mktg. LLC*, No. 16-cv-3406-SPL, Dkt. No. 22 (D. Ariz. Oct. 11, 2016); *FTC v. Advert. Strategies LLC*, 16-cv3353-DJH, Dkt. No. 18 (D. Ariz. Oct. 4, 2016); *FTC v. Vemma Nutrition Co.*, 15- cv-1578-JJT, Dkt. No. 25 (D. Ariz. Aug. 21, 2015); *FTC v. Money Now Funding LLC*, No. 13-cv-1583-ROS, Dkt. No. 13 (D. Ariz. Aug. 5, 2013).

25

26

27

    [161] *See* Declaration of Rebecca Plett Pursuant to Rule 65.
    [162] *See* Section III. A, *supra*.

28

30

FTC requests that this Court permit expedited discovery and direct Defendants to turn over business records to the FTC (*see* Sections IX and X of the proposed TRO). District courts are authorized to depart from normal discovery procedure to meet the needs of the particular case.[163] In granting expedited discovery requests, courts have applied a "good cause" standard, finding that good cause for expedited discovery exists where "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party."[164]

Here, expedited discovery and turning over business records are necessary for the administration of justice, outweighing any burden to Defendants. Turnover of business records and expedited discovery are necessary to ensure that the FTC and the Court are fully informed of: (1) the scope of Defendants' business operations, financial status, and organization; (2) the extent of Defendants' unlawful conduct; (3) the identity of injured consumers; (4) total consumer harm; and (5) the location, nature, and extent of Defendants' assets. Defendants have shown that they are unlikely to be forthcoming in regular discovery or to take seriously their obligations to preserve relevant records.[165]

---

[163] *See, e.g.*, *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (quoting cases); Fed. R. Civ. P. 1, 26(d), 33(b), and 34(b).

[164] *FTC v. Kutzner*, 2016 U.S. Dist. LEXIS 189695, *26 (C.D. Cal. Aug. 24, 2016) (citing *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1099 (N.D. Cal. 2012)).

[165] In several legal actions, some or all Defendants have failed to respond. *See* PX21 (*Healthy Homes 365, LLC v. Air AI Tech., Inc.*, 3:24-cv-1481, Dkt. No. 10 (N.D. Tex. Aug. 30, 2024)); PX53 (Docket, *Schwartz v. Air AI, LLC*, CV2024-011284 (Ariz. S.C. Nov. 18, 2024)), p. 1105; PX42 (*Alchemy Partners Holdings, LLC v. Air AI Technologies, Inc.*, Case No. 240500359, Dkt No. 18 (Utah D.C. Sept. 17, 2024)); PX55 (Judgment, *Wieselman v. Air AI Tech., Inc.*, Case No. 24SC32740 (Or. Cir. Mar. 14, 2025)); PX48 (Judgment, *Meged Funding Group Corp. v. Apex Holdings Grp. LLC*, Index no.

Moreover, Defendants may be attempting to hide assets from creditors,[166] which signals Defendants may be willing to go to some lengths to avoid legal obligations. Finally, preliminary evidence suggests that individual Defendants may be evolving their telemarking scheme under a new corporate identity and are continuing to make refund guarantees and unsubstantiated earnings claims.[167] A business record turnover will allow the FTC to secure and prevent destruction of relevant evidence, and limited discovery will further allow the FTC and this Court to have a fulsome understanding of consumer harm involved and the assets available for redress, as well as the full extent of Defendants' scheme.

## V.    CONCLUSION

Plaintiff, the Federal Trade Commission, respectfully requests that the Court grant this motion for a TRO with turnover of business records, limited expedited discovery, and other equitable relief, and require Defendants to show cause why a preliminary injunction should not issue against them.

---

614017/2024 (N.Y. Sup. Ct. Nassau Co. Aug. 8, 2024)); PX50 (Judgment, *New Vista Capital, LLC v. Apex Holdings Grp. LLC*, Index no. E2024011367 (N.Y. Sup. Ct. Monroe Co. July 10, 2024)). Defendants also appear to have failed to pay outstanding arbitration awards. *See* PX43 (Complaint for Confirmation of Arbitration Award, *Amedistaf, LLC v. Air AI, LLC*, No. CV-2025-002054 (Ariz. Sup. Ct. Jan. 16, 2025)), p. 963.

[166] *See supra* n. 87.

[167] PX63 at ¶¶81-94. Defendants are now going to some length to obfuscate their identity. *Id.* at ¶¶83-84.

1

2   Dated: August 25, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

/s/ Rebecca Plett
Rebecca Plett (VA Bar No. 90988, NC Bar
No. 63273)
Lauren Rivard (NY Reg. No. 5308192)
Federal Trade Commission
600 Pennsylvania Ave., NW,
Mailstop CC-6316
Washington, DC 20580
Plett: (202) 326-3664 / rplett@ftc.gov
Rivard: (202) 326-2450 / lrivard@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

33