PLAINTIFF'S
EXHIBIT

**3**
_____

### DECLARATION OF KYLE CROSBY
### PURSUANT TO 28 U.S.C. § 1746

I, Kyle Crosby, hereby state that I have personal knowledge of the facts set forth below.
If called as a witness, I could and would testify as follows:

1.      I am over the age of 18 and live in Fleming Island, Florida.

2.      In or around April of 2023, I saw an ad on Instagram about scaling my business.
At the time, I was working on building a coaching program that I could sell to the public and was
interested in ways I could eventually scale up my business.

3.      I wasn't really interested in buying anything right away because I didn't have the
money to buy something new for my business at the time, but I was interested in the program, so
I clicked on the ad and provided my contact information. I figured it would be good to have the
information when I was ready to scale up.

4.      I was contacted by Air AI to set up a call. Before the call, I was asked to watch a
video about Air AI. The video was all about how great Air AI was. It had pictures of people I
know and trust, like Tony Robbins. That made me trust the company more and gave it more
credibility.

5.      I then had a call with an Air AI representative about Air AI.

6.      I learned about all the different features of the Air AI program either on the call
with the representative or the video I watched before the call. They told me about a training
course they offered, a platform I could use to get my customers financing for any of my coaching
courses, a dialing platform that could place outbound calls, dedicated sales representatives, and a
data analytics platform.

7.      During my call with the Air AI representative I told them that I had previously
paid someone to help me build a coaching program, but that I wasn't really happy with the
services I got, and that I wanted more help to build my program. They told me they could help
me with that.

8.      During my call with the Air AI representative, I also told them that I really
couldn't afford to buy into their program. But they talked me into it by telling me about a refund
guarantee. According to them, if I didn't double the investment I was making with them within 6
months after getting Air AI, they would give me my money back. That made me think that there

*Declaration of Kyle Crosby*

**FTC-000053**

wasn't a lot of risk involved, so I decided to move forward with the purchase. It seemed like a no brainer.

9.     By the end of the call, the Air AI representative was telling me that they could work with me no matter where I was financially. They asked me what the largest amount was that I could pay them that day, since I could pay that as a deposit. They could then get me financing through their in-house financing company.

10.     They connected me with what they called their in-house financing people and had me sign my loan paperwork while on the call with them. Because of the refund guarantee, taking out a loan seemed low risk. I could always pay it off with the refund if the program didn't work out for me, and that way, based on the loan I was offered, I wouldn't even have to pay any interest. The fact that the financing seemed related to Air AI also made me feel like if I had an issue and needed a refund, I could go directly to Air AI to deal with it. But I felt really rushed and didn't feel like I had time to read or review anything. I signed the loan paperwork on April 25, 2024. A true and correct copy of the loan contract is attached as Attachment A.[1]

11.     The loan I signed up for was for $17,000. I had to pay Air AI a deposit of $2,500 and my first month's loan payment the same day I signed up.

12.     Air AI also sent me a contract to sign. The contract repeated the guarantee I was told on the phone, and said:

> Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to double or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.

A true and correct copy of my contract with Air AI with the above language at page 2 is attached as Attachment B.

13.     I signed the contract on April 25, 2024.

14.     I started using the Air AI training courses at first, and those were not bad, but they were the same as all others that I had seen. Eventually, the training just tells you to go build out

---

[1] My contact information has been redacted from attachments to this declaration for privacy reasons.

*Declaration of Kyle Crosby*

**FTC-000054**

your own offer, without a ton of extra guidance. That kind of killed it for me.  I had told Air AI during the sales call that I wanted help building my offer, and they told me they would help me. But this approach was the opposite of what they told me on the phone.

15.     Other features that the software was supposed to have did not work well for me or didn't exist. For example, the funding software never worked for me. I tried using it, but none of my customers were ever able to qualify for any financing.

16.     I never got around to trying the phone dialer because you needed to have leads to use that feature. Other features, like the data analytics or the dedicated sales representatives just didn't exist. It also felt like the software was always in beta testing and never fully functioning.

17.     I also was supposed to have a whole team to support me on Slack, the messaging platform that Air AI used. But over time, they disappeared.

18.     Still, I hung in there. I didn't want to ask for a refund immediately because I really didn't want to be accused of not trying hard enough to make the program work. So I put down my head and tried to make it work. But I was never able to make any money with their program.

19.     Eventually, in or around July or August of 2024, the Air AI software stopped working all together, and I lost access to their systems and systems I access through their platform. That was a huge problem. I lost access to my business files and information that I had in their system and was not able to access those files for several months. That was a big nightmare.

20.     I reached out to Air AI repeatedly, but they would not respond. I then reached out to one of the platforms that I accessed through Air AI, to see if they could help me get my data. But they told me that they needed to hear from Air AI in order to help me, and Air AI was not responding to them. They said that Air AI had stopped paying them.

21.     At that point I finally felt comfortable asking for a refund. At first, I only asked for a refund for the amount of time that their system was down and I got locked out of my account. But on August 15, 2024, Air AI let me know that I was going to get a full refund.

22.     I have reached out to them about my refund, but I have gotten nothing. I even reminded them about the guarantee that I would double my money or get a refund and let them know that I got nothing through their system. But when they did eventually respond they just told me that even though they want to give me a refund, they can't afford to right now.

*Declaration of Kyle Crosby*

**FTC-000055**

23.     I then tried to resolve this with the loan company. Even though I thought that the loan was with Air AI, it was actually with a third-party lender called Special Finance Company, LLC ("Special Finance"). I only realized the loan was with them after I started making payments.

24.     I reached out to Special Finance and provided them with the message from Air AI about the refund guarantee. But they said unless they were told about a refund by Air AI directly, they couldn't help me. They were generally really difficult to work with. I gave authorization to someone to talk with them on my behalf as a legal representative, but they made it really difficult and essentially refused to talk to the person who was helping me with this situation.

25.     After making some payments to Special Finance, they resold my loan to yet another lender, this time called Table Rock Investments. So now the loan is even further removed from Air AI, and it is even harder for me to get out of it. I kept making payments on the loan even though all the Air AI systems are down because I am afraid of what will happen to my credit if I stop making payments. But now I've had to stop making payments because I just can't afford them. I am terrified that they are going to tank my credit.

26.     I recently received a letter from Special Finance that told me that I owe over $13,000. This is after having paid a substantial amount on this loan in the past two years.

27.     Now I'm stuck, broke, and without a business. If I had known what my experience with Air AI was going to be like, I would have told them to go straight to hell.

28.     I reached out to one of the owners of Air AI, Caleb Maddix, on Instagram. He put me in a text conversation with himself and the other owner, Ryan, but when I reach out to them, they don't respond.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _21 of january_, 202 5 .

_Kyle Crosby_

Kyle Crosby

Page **4** of **4**

054-62F6-4094-9B77-16EEA6BC23E8

## RETAIL INSTALLMENT SALES CONTRACT (with ARBITRATION CLAUSE)

085836

| Buyer: KYLE CROSBY | Seller of Services (Creditor): |
|---|---|
| Address: ▮ | AIR.AI,LLC-36 MONTH TERM |
| Apt./No.: ▮ | 1743 WESTBROOK AVE |
| City, State Zip: ▮ | LOS ALTOS, CA 94024 |
| Home Phone: ▮ | |
| Mobile Phone: ▮ | PHONE: 213-344-9856 |
| Work Phone: ▮ | |

| Quantity | Description of Services | Amount |
|---|---|---|
| 1 | AIR.AI ACCESS CARD | $17,000.00 |
| | | |
| | | |
| | | |
| | | |
| | **Total:** | $17,000.00 |

"We", "our" and "us" refer to the Seller/Creditor. "You" and "your" refer to the Buyer of services. If there is a Co-Signer, then "you" and "your" refer to both the Buyer, and Co-Signer.

You may buy the services described above ("Services") for cash or credit. By agreeing to this contract ("Contract") you choose to buy the Services on credit under the terms and conditions of this Contract. You agree to pay the Seller/Creditor the Amount Financed as shown in the Truth in Lending Disclosures Box on page 1 of this Contract ("TILA Box"), plus finance charge. Buyer and Co-Signer agree to be jointly and severally liable. A Co-Signer is any person who is not receiving the Services, but is contractually obligated under this Contract.

<u>Services Agreement</u>: The Services you purchased under this Contract may have a separate agreement. Consult the separate agreement for the terms and conditions applicable to the Services.

### TRUTH-IN-LENDING DISCLOSURE STATEMENT ("TILA Box")

| ANNUAL PERCENTAGE RATE<br>The cost of your credit at a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. | TOTAL SALE PRICE<br>The total cost of your purchase on credit, including your down payment of $0.00 |
|---|---|---|---|---|
| 24.99 % | $ 6625.99 (e) | $17,000.00 | $ 23625.99 (e) | $ 23625.99 (e) |

**Your Payment Schedule will be:**

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 35 | $675.83 | Monthly Beginning on 4/25/2023 |
| 1 | ($28.06) (e) | Final Payment on 3/25/2026 |

<u>Prepayment</u>: If you pay the Amount Financed early, in whole or in part, you will not have to pay a penalty.

<u>Late Fees</u>: If a payment is not received in full within 10 days after it is due, you will be charged a late charge of $10.00.

<u>Security</u>: You are providing a security interest in the Optional Recurring Payment Authorization and the Optional Credit and Debit Card Payment Authorization, if you signed those documents.

<u>Additional Information</u>: See your contract documents, and the remaining pages of this contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment, refunds and penalties.

*(e) means an estimate.*

California-2016

Page 1 of 9

Application Number: 575995

**Attachment A**
**Declaration of Kyle Crosby**

FTC-000057

DocuSign Envelope ID: A8381654-62F6-4094-9B77-16EEA6BC23E8

**12-Months Same As Cash Option ("SAC"):** If you pay the Amount Financed disclosed in the TILA Box within 12 months of the date of this Contract, you will receive a 100% rebate of the Finance Charge paid. **However, you must pay each installment payment on time, and there can be no default under this Contract.** If any installment shown in the Payment Schedule is not paid on time, the SAC Option is no longer available. If another type of default occurred under the Contract, the SAC Option is no longer available.

**I understand that this Contract contains a 12 Months Same as Cash Option, and that I must satisfy certain conditions to exercise the option.**

Buyer: *KYLE CROSBY*  (DocuSigned by: 975E9958709A4A3...)          Co-Signer: _____

| Itemization of Amount Financed | |
|---|---|
| 1. Cash Price | $17,000.00 |
| 2. | |
| 3. Sales Tax | $0.00 |
| 4. Total Cash Price (#1 + #2 + #3) | $17,000.00 |
| Less  5. Cash Down Payment | $0.00 |
| 6. Amount Financed (#4 - #5) | $17,000.00 |

You acknowledge that this Contract contains an Arbitration Clause. See Section entitled "Additional Disclosures and Contract Terms"

**Notice to Buyer:**
    1. Do not sign this agreement before you read it or if it contains any blank spaces to be filled in.
    2. You are entitled to a completely filled-in copy of this agreement.
    3. You can prepay the full amount due under this agreement at any time.
    4. If you desire to pay off in advance the full amount due, the amount which is outstanding will be furnished upon request.

**Acknowledgement:** By signing below you acknowledge that you had the opportunity to read this completely filled in Contract and to leave with a copy of it. You also acknowledge that you signed a completely filled-in copy of this Contract.

Buyer: *KYLE CROSBY*  (DocuSigned by: 975E9958709A4A3...)          Date: 4/25/2023

Co-Signer: _____          Date: _____

Seller: *Britt Moravec*  (DocuSigned by: 95CD8311127FPE4A4...)          Date: 4/25/2023

☐ If this box is checked, the Services purchased are primarily for business or commercial purposes, and the notice below does not apply.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

California-2016                                        Application Number: 575995

**Attachment A**
**Declaration of Kyle Crosby**                    **FTC-000058**

DocuSign Envelope ID: A8381654-62F6-4094-9B77-16EEA6BC23E8

Additional Disclosures and Contract Terms

1. <u>Consent to Contract By Mail/Telephone/Text Message/Email</u>. For each address, email address and telephone number you provide to us, you agree that we may contact you by mail, telephone and email, to the extent not prohibited by law. We may contact you via voice calls or text messages to your cell phone and/or landline using a prerecorded/artificial voice message or an automatic telephone dialing system, for servicing and collection purposes, to the extent not prohibited by law. We may do so even if the telephone number is a mobile number and results in a charge to you.

You also understand and agree that if we contact you by telephone and we do not speak with you, we may leave a message for you with the person answering the telephone or on a voicemail or other answering machine device, to the extent not prohibited by law.

| Buyer's Initials: *bC* | Co-Signer's Initial: |
|---|---|

<u>ARBITRATION</u>. This arbitration Clause significantly affects your rights in any dispute with us. Please read it carefully before you sign this Contract. You have the right to have this Contract, including the Arbitration Clause, reviewed by a lawyer before you sign it. If either you or we elect to arbitrate a dispute:

- AN ARBITRATOR, AND NOT A COURT, WILL DECIDE THE DISPUTE.
- YOU AND WE EACH GIVE UP OUR RIGHT TO A COURT TRIAL OR A JURY TRIAL.
- YOU GIVE UP YOUR RIGHT TO ACT AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU HAVE AGAINST US.
- INFORMATION YOU AND WE MAY OBTAIN IN DISCOVERY FROM EACH OTHER IN ARBITRATION IS GENERALLY MORE LIMITED THAN IN COURT.
- OTHER RIGHTS YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE.
- WE MAY STILL SEEK PROVISIONAL REMEDIES FROM A COURT.

This Arbitration Clause applies to disputes between you and us. Disputes may arise from contracts, torts or otherwise. A dispute may involve the interpretation and scope of this clause and the arbitrability of any issue.

A dispute may be between you and us or our employees, agents, successors or assigns, which arise out of or relate to this Contract or any resulting transaction or relationship (including any relationship with third parties who do not sign this Contract).

Any dispute shall, at you or our election (or the election of any party entitled to elect to arbitrate), be resolved by neutral, binding arbitration and not by a court action. Any dispute is to be arbitrated on an individual basis and not as a class action. You waive any right you may have to arbitrate a class action. This is referred to below as the "waiver of class relief."

You may choose the applicable rules of the American Aribitration Association or JAMS. You may obtain a copy of the rules of these organizations by visiting their websites. If you cannot access these web sites, we will provide the rules to you upon request.

The arbitrator shall be an attorney or retired judge selected in accordance with the applicable rules. The arbitration award shall be in writing, but without a supporting opinion. The arbitration hearing shall be conducted in the federal district in which you reside.

We will pay the arbitration filing fee. We will pay the arbitration costs and the fees for the first day of arbitration, up to a maximum of eight hours. We will pay any additional costs and fees of arbitration if the arbitrator determines that applicable law or the arbitration organization's rules require us to do so or that we must do so to make this arbitration clause enforceable. Otherwise, the arbitrator shall decide who shall pay any additional costs and fees.

The arbitrator's award shall be final and binding on all parties, except that in the event of a "take nothing" award or an award in excess of $100,000, the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel.

The Federal Arbitration Act shall govern any arbitration under this Arbitration Clause notwithstanding any election of state law in this Contract or in any other document you sign.

You and we retain the right to seek provisional remedies from a court. Neither you nor we waive the right to arbitrate by filing suit, or seeking or obtaining provisional remedies from a court. Either you or we may enter judgment on the award rendered by the arbitrator in any court with jurisdiction.

If any part of this Arbitration Clause other than the waiver of class relief is held or deemed to be unenforceable, the rest of the clause shall be enforceable. If the waiver of class relief is held or deemed to be unenforceable, this entire Arbitration Clause shall be unenforceable.

You may opt out of this Arbitration Clause by sending us a notice stating that you do not want it to apply. You must send the notice not more than 15 days after the date of this Contract. You and all parties to the Contract other than us must sign it. You must send it by registered mail to Special Financing Company, LLC at 2504 BuildAmerica Drive, Hampton, Virginia 23666. The notice will be effective when we receive it.

3. <u>Promise to Pay:</u> You jointly and severally agree to pay us the "Amount Financed" shown in the TILA Box ("Amount Financed") and finance charge on the Amount Financed at a rate equal to the APR (defined below in Section 7). You agree to make all installment payments set forth in the "Payment Schedule," in the amounts and by the dates shown in the TILA Box ("Installments"). You also agree to pay additional amounts that may be assessed as provided in this Contract, such as late fees and NSF fees. "Jointly and severally" means that each person agrees to keep all the promises in this Contract even if the other person(s), if there is one, does not.

California-2016                                                                 Application Number: 575995

**Attachment A**
**Declaration of Kyle Crosby**

**FTC-000059**

DocuSign Envelope ID: A8381654-62F6-4094-9B77-16EEA6BC23E8

4. <u>Security</u>.

    [X] If this box is checked, you have chosen to sign and provide an Optional Recurring Payments Authorization ("Recurring Payment Authorization"). The Recurring Payment Authorization is on a separate piece of paper so that you can clearly and prominently see what you are agreeing to provide. The Recurring Payment Authorization is not required to obtain credit. If you provide it, the Recurring Payment Authorization is a part of this Contract. The Recurring Payment Authorization gives us permission to automatically debit your bank account. You may revoke the Recurring Payment Authorization at any time. See the Recurring Payment Authorization for details.

| Buyer's Initial: _DS_ | Co-Signer's Initial: |
|---|---|

    [X] If this box is checked, you have chosen to sign and provide an Optional Credit and Debit Card Payment Authorization ("Authorization"). The Authorization is on a separate piece of paper so that you can clearly and prominently see what you are agreeing to provide. The Authorization is not required to obtain credit. If you provide it, the Authorization is a part of this Contract. The Authorization gives us permission to charge your credit or debit card. You may revoke the Authorization at any time. See the Authorization for details.

| Buyer's Initial: _DS_ | Co-Signer's Initial: |
|---|---|

    For the box(es) checked, pursuant to Official Staff Comment 1 of the Bureau of Consumer Financial Protection Official Staff Commentary to Regulation Z § 1026.2(a)(25), where state law is silent or unclear as to whether a particular interest is a security interest, a creditor may disclose the interest as a security interest for Truth in Lending purposes. It is unclear whether an Optional Recurring Payment Authorization and/or an Optional Credit and Debit Card Payment Authorization are a security interest under state law. Because of this, we are disclosing in the TILA Box our right to initiate electronic debits and/or charge a credit or debit card as a "security interest" for Truth in Lending purposes. This disclosure is not intended to create, and shall not evidence, a security interest under state law.

5. <u>Application of Payments</u>. Unless otherwise required by law, we will apply payments we receive as follows: (1) first to unpaid finance charges; (2) second to any fees and other permissible costs (including a late fee) and (3) third to the declining balance of the Amount Financed.

6. <u>Final Payment</u>. If you do not pay the installments as shown in the Payment Schedule, your final payment may be higher than what is shown in the TILA Box. All amounts that are owed under this Contract and that have not been paid will become due and payable on the date of your final paymnet ("Maturity").

7. <u>Finance Charge</u>. You agree to pay a finance charge on the Amount Financed until this Contract has been paid in full. We will calculate the finance charge on a daily basis based upon a 365-day year by applying a daily periodic rate to the declining balance of the Amount Financed. The daily periodic rate is equal to the "Annual Percentage Rate" ("APR") shown in the TILA Box, divided by 365. The amount of finance charge you pay depends upon when you make your payments. Early payments or paying more than the scheduled installment may decrease the amount of finance charge that you will pay. Late payments may increase the amount of finance charge that you will pay.

    The Finance Charge you pay may be more than the Finance Charge shown in the TILA Box if you make your payments late or in an amount less than the scheduled installment.

    If any of the Amount Financed is unpaid after Maturity or a deferred Maturity, the Amount Financed will continue to accrue Finance Charge at the APR shown in the TILA Box, to the extent not prohibited by law.

    When a payment is received, the amount credited to the finance charge is computed as of the day the payment is received.

8. <u>Deferral of an Installment</u>. If any Installment(s) is deferred, you will pay more finance charge because the Amount Financed does not decline during the period of deferral and finance charge continues to accrue.

9. <u>Prepayment</u>. You may prepay this Contract, in full or in part, at any time without penalty. If you prepay in part -- meaning that you pay more than the amount of the scheduled Installment and there are no other amounts due -- you are still required to pay your next Installment on the date scheduled. Prepaying in part does not eliminate the obligation to pay Installments as they come due.

10. <u>Late Charge</u>. If an installment is not paid in full within 10 days after its scheduled due date, you agree to pay a late charge as shown in the TILA Box.

11. <u>NSF Charge</u>. If a payment in whatever form, including, but not limited to, a check, electronic funds transfer, electronic debit, or ACH ("Payment Instrument") is not honored or is returned unpaid, you agree to pay a NSF charge of $15.00, to the extent not prohibited by law. We may re-present the Payment Instrument to be paid, for a maximum presentment of 2 times.

    If the Payment Instrument is a check and it is re-presented, in the ordinary course of business, the check will not be provided to you with your bank statement, but a copy can be received by contacting your financial institution.

12. <u>Back-Up Payment</u>. If an Installment is not paid when due and you have provided the Authorization described in Section 4 above (and it has not been revoked), we will charge your credit/debit card (as applicable under the terms of the Authorization) in the amount of the Installment ("Back-Up Payment"). We will submit a Back-Up Payment only once for each installment that is not paid when due.

13. <u>Check Conversion</u>. If your Payment Instrument is a check, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. In the event a check is not honored or is returned unpaid, we may re-present the check electronically as described here. For questions, please contact us at 1-757-825-0450.

14. <u>Default</u>. You will be in default: (1) if you fail to pay an installment when due; (2) you fail to keep your promises under this Contract; (3) any information you furnished us in connection with this Contract is false or materially misleading; or (4) any proceeding is begun or petition is filed under any bankruptcy or insolvency law by or against you.

Page 4 of 9

California-2016                                                      Application Number: 575995

**Attachment A**
**Declaration of Kyle Crosby**

**FTC-000060**

DocuSign Envelope ID: A8381654-62F6-4094-9B77-16EEA6BC23E8

15. Our Rights and Remedies upon Default. If you default under this Contract, we may, in our sole discretion, demand that you pay all amounts owed under this Contract immediately (this is known as "to accelerate" or "accelerator"), subject to any state requirements to provide you with notice and/or a right to cure. If you default, you agree that we have all rights and remedies available to us under applicable law and this Contract. You agree to pay all costs and expenses we incur in enforcing this Contract, including, but not limited to, attorney's fees for an attorney who is not our salaried employee and court costs, to the extent not prohibited by law.

16. No Waivers. We may delay enforcing any of our rights or elect not to enforce our rights without losing them. Our acceptance of partial payments does not modify the terms of this Contract and does not constitute a waiver of any subsequent default. You waive the rights of demand, presentment, protest, and notice of dishonor, to the extent not prohibited by law. "Presentment" means the right to have us make demand for payment of amounts due. "Notice of Dishonor" means the right to require us to give notice that amounts due have not been paid. You also waive any common law right to receive a notice of our intent to accelerate and a notice of acceleration.

17. Entire Agreement. This Contract constitutes the entire agreement between you and us about the credit sale of the Services. There may be other agreements that relate solely to the Services (and not the financing of the Services). This Contract is binding on you, your heirs, personal representatives, successors and assigns. It is also binding on us and our sucessors and assigns.

18. Modification. This Contract may not be amended or modified except in a writing signed by you and us.

> This Contract contains the entire agreement between us and us relating to this Contract. Any change to this Contract must be in writing and we must sign it. No oral changes are binding.
>
> Buyer: _KYLE CROSBY_  Co-Signer: _____
> 676E696D790A4A2...

Assignment and Binding. We may assign this Contract without your permission, but you may not assign or transfer your rights or obligations without our prior written permission.

20. Governing Law. This Contract is governed by the laws of the State in which the Seller/Creditor is located and Services are provided.

> Assignment: This Contract is assigned to Special Financing Company, LLC according to the terms of the dealer agreement between the parties.
>
> Seller/Creditor Name: ~~ALL California Gra~~ 36 MONTH TERM _____
>
> Authorized Signature: _Brett Moravec_ _____
> 95CDB3T1Z7FE4A4...
>
> Title: Authorized Signer      Date: 4/25/2023

**Attachment A**
**Declaration of Kyle Crosby**

FTC-000061

*Air*

# AIR AI SALES AGREEMENT

NOTICE TO THE CLIENT: DO NOT ACCEPT THIS AGREEMENT BEFORE YOU READ IT. BY ACCESSING THE AIR AI PROGRAM, YOU ACKNOWLEDGE: YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT, AND YOU ACCEPT AND AGREE TO BE BOUND BY ITS TERMS. PLEASE KEEP A COPY OF THIS AGREEMENT FOR YOUR RECORDS. IF YOU HAVE ANY QUESTIONS OR CONCERNS, PLEASE CONTACT AIR AI BEFORE ACCEPTING THIS AGREEMENT.

Air AI hereby sells to Client ("Client" or "you") the goods and services comprising the Air AI Program ("Program") for $30,000 (the "Base Cost"). Client agrees to pay for the Program in full upon Client's acceptance unless offered a lower initial price (the "Entry Price"). In the case of an Entry Price below the Base Cost, Client will pay an additional 5% fee on all transacted volume through Midas, Air's Checkout Platform, until the full Base Cost is paid out of the additional merchant fee. In this case, foClient has been offered d to purchase the Air AI Program for an Entry Price of $30,000. This Agreement shall be binding upon and take effect to the benefit of the parties hereto, their respective heirs, successors, assigns, executors, and administrators. This Agreement constitutes the entire understanding of the parties unless modified in writing executed by both parties. Client understands that outside of this Agreement, no other agreements or promises have been made. Except as described below, this Agreement cannot be terminated except upon the express written agreement of both parties hereto and the Client agrees that their liability under the Agreement terms shall begin upon the authorization of this Agreement and shall not terminate unless Air AI consents in writing.

1. **The Air AI Program consists of:**

    1. The Air Software Suite (the "Software Suite")
        a. Access to Max: Lead maximizer and dialing platform
        b. Access to Midas: Checkout and financing platform. Midas will be fully white-labeled and branded in accordance with Client's business.
        c. Access to Sherlock: Analytics platform and constraint finder

**FTC-000062**

d. First notice upon the release of Odin: Our conversational AI product 2. The Air AI training platform which includes a library of internal processes and systems for operating and scaling a high-ticket business. **You have the full right to use our IP to grow your business and use it for any purpose.**

3. Direct access and group training calls with Air AI's internal team

4. Live sales training with Air AI's sales team for you or your team

5. Our vault of best-performing consulting calls

6. A pool of 100 sales reps for you to interview and hire

7. Complimentary PR package across a variety of publications

8. Bonus lessons:

      a. How we'd recoup our Air investment in 14 days

      b. Advertising Academy

      c. Media Masterclass

      d. Ultimate Author Accelerator

      e. How to Blow up Your Book

      f. CMX Social Media Plan

2. **THE AIR AI GUARANTEE & EXPECTATIONS:**

Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to double or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.

The Air Ai Program has multiple components designed for scaling the business therefore it is imperative that the CLIENT do the following items:

1. Client agrees to attend at least one meeting a week
2. Client agrees to execute the core systems and processes as taught in Air University and executed in the order advised. Failure to execute the processes advised may vary the results
3. Client agrees to follow the process on setting, lead generation and closing process

The guarantee is conditional upon the expectations executed as outlined above.

*KC*

3. **Content Ownership and Confidentiality.**

Client acknowledges that certain information or know-how relating to the information, documents, products, models or business of Air AI ("Confidential Information") obtained from this Program, including, without limitation processes, systems, contacts, documents, scripts, trade secrets, intellectual property is the exclusive property of Air AI and may comprise confidential and proprietary information or trade secrets that is not readily ascertainable and which derives economic value, actual or potential, from not being generally known.

For purposes of this Agreement, the Confidential Information provided through this Program shall be deemed confidential unless expressly indicated otherwise. Client agrees to hold the Information in the strictest confidence, not to make use thereof except as permitted by AIR AI, and not to directly or indirectly copy, reproduce, distribute, release or disclose the Information, in whole or in part, to any third party without the prior written consent of AIR AI.

You agree to use all reasonable measures to ensure that the confidentiality of the Confidential Information is not impaired. You further agree that your obligations of confidentiality of the Confidential Information survive the expiration or termination of this Agreement.

4. **DISCLAIMER OF WARRANTY**. NO WARRANTY IS MADE BY AIR AI REGARDING ANY INFORMATION, SERVICES OR PRODUCTS PROVIDED IN CONNECTION WITH THE PROGRAM, OR RESULTS FROM USE OF SAME. AIR AIi EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES AS TO THE ACCURACY, COMPLETENESS OR CONTENT OF INFORMATION, PRODUCTS OR SERVICES AND ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT TO THE EXTENT THE EXCLUSION OF IMPLIED WARRANTIES IS NOT PERMITTED BY LAW.

5. **LIMITATION OF LIABILITY AND DAMAGES.** YOU AGREE THAT AIR AI'S LEGAL LIABILITY, INCLUDING THE LIABILITY OF ITS AFFILIATES, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES OR AGENTS, FOR ANY CLAIM MADE BY YOU ARISING OUT OF YOUR USE OF THE WEBSITE OR PURCHASE OF PRODUCTS OR SERVICES OFFERED THEREON SHALL BE LIMITED TO THE AMOUNT YOU PAID TO AIR AI EXCEPT AS PROVIDED IN THE ARBITRATION AGREEMENT IN SECTION 11 HEREINBELOW, UNDER NO CIRCUMSTANCES WILL SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES BE AWARDED, EVEN IF WE HAVE BEEN ADVISED

OF THE POSSIBILITY OF SUCH DAMAGES. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS EXCLUSION MAY NOT APPLY TO YOU.

6. **Indemnity.** You agree to defend, indemnify and hold Air.ai , its affiliates, officers, subsidiaries, affiliates, successors, assigns, directors, officers, agents, service providers, attorneys, suppliers and employees, harmless from any claim or demand, including reasonable attorneys' fees and court costs, made by any third party due to or arising out of your use of the Air.ai Products and Services, your violation of this Agreement, or your breach of any of your acknowledgements, agreements, representations, warranties and obligations herein.

YOU ACKNOWLEDGE THAT AIR AI HAS SET ITS PRICES AND HAS PROVIDED ACCESS TO ITS PRODUCTS AND SERVICES IN RELIANCE ON THESE LIMITATIONS OF LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT, AND THAT THOSE LIMITATIONS ARE AN ESSENTIAL BASIS UPON WHICH AIR AI OFFERS ITS PRODUCTS AND SERVICES. YOU AGREE THAT THE LIMITATIONS OF LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT SURVIVE AND APPLY EVEN IF FOUND TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

7. **Governing Law, Jurisdiction and Venue.** This Agreement shall be construed in accordance with and governed by the laws of the State of Arizona.

8. **Dispute Resolution and Class Action Waiver.** Most or your concerns can be resolved quickly to your satisfaction by contacting our Client Service Center via concierge@air.ai In the unlikely event that Client Service cannot resolve your complaint to your satisfaction, or if we have not been able to resolve a dispute with you after trying to do so informally, then except for collection claims and petitions for injunctive relief, we each agree to resolve all other disputes through binding arbitration rather than in court. Arbitration is less formal than a lawsuit. Arbitration uses a neutral arbitrator instead of a judge or jury, allows less discovery than courts, and is subject to very limited court review. The American Arbitration Association (AAA) will serve as the arbitration provider. We agree that any arbitration under these Terms will take place on an individual basis. Representative, group, collective or class actions are not permitted.

You may speak with your own lawyer before purchasing any product or

service offered by Air AI, but your purchase of any such product or service constitutes your acceptance of this Agreement, including this provision.

You agree that, by entering into this Agreement, you and Air AI are each WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A REPRESENTATIVE, GROUP, COLLECTIVE OR CLASS ACTION OR ARBITRATION. YOU AND AIR AI AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITIES AND NOT AS PLAINTIFFS OR CLASS MEMBERS IN ANY PURPORTED REPRESENTATIVE, GROUP OR CLASS ACTION OR ARBITRATION, OR IN THE CAPACITY OF A PRIVATE ATTORNEY GENERAL.

9. **Severability of Agreement.** If any provision of the Agreement is found by a court or other binding authority to be invalid, you agree that every attempt shall be made to give effect to the parties' intentions as reflected in that provision, and remaining provisions contained in this Agreement shall continue in full force and effect.

By electronic authorization, the Client accepts the terms and conditions of this Agreement and authorizes Air AI to immediately charge the credit card and/or debit the bank account provided in payment for the purchase of the Program.

IN WITNESS WHEREOF, the Client below executes this Sales Agreement between them and Air AI:

**CLIENT**

Name _Kyle Crosby_____

Email ███████████_____

Phone ███████_____

Entity (optional) _____

Date _04/25/2023_____

Signature _Kyle Crosby_____

PLAINTIFF'S
EXHIBIT

4

## DECLARATION OF MICHAEL CROWDER
## PURSUANT TO 28 U.S.C. § 1746

I, Michael Crowder, have personal knowledge of the facts stated below. If called as a witness, I could and would testify as follows:

1.      I am over the age of 18 and live in Burke County, North Dakota.  I am a fulltime student.

2.      In May of 2024, I saw a friend's Facebook post about a company called Air AI. The post said that the company's AI voice technology was the cutting edge – miles ahead of anything else on the market – with bots that sounded like real people.

3.      At the time, I was interested in starting a business using AI voice technology to help gyms and sports clubs recruit and sign-up new members.  Air AI's bots sounded like exactly what I needed to get going, so I clicked the link included in the post to check out the website.

4.      On the website I listened to a recorded demo call where the AI bot sold a product to a human customer.  I also took advantage of a feature that let me build and test my own basic AI bot for free after signing up for an account and providing a phone number and email address. I was impressed – the bots really did sound human.  I had never heard anything like it before.

5.      After I gave Air AI my phone number I started getting promotional calls from an Air AI bot – it was like the demo, but this time they were selling to me.

6.      On May 15, 2024, I got an email from an Air AI employee named Anthony Callen including a link to a pre-call video.  I didn't watch the video at the time because I didn't have a phone call scheduled.  A true and correct copy of the email exchange between me and A. Callen is attached as Attachment A.

7.      I responded on May 22, 2024, telling Mr. Callen that "I would like to sell Air and probably use it myself too[,]" and asking him "[w]hat's the first step?"  He responded a few minutes later, asking to set up a call the next day.  *See* Attachment A at 1.  I told him that I was not available over the next few days, but asked if there was anything I could do in the meantime. *Id.* at 2.  He sent me an email containing a half-dozen links to videos, including two testimonials labeled "Testimonial #1 ($0-$300k in first month!) and "Testimonial #2 ($0-$33k/m in 30 days)."  The email also included links to a few more demos.  *Id.*

8.      On May 27, 2024, I received an email from the Air AI "General Manager of Client Success," Johnny Zentmeyer.  The email included links to the same demo calls Mr. Callen

*Declaration of Michael Crowder*

**FTC-000067**

had sent me a few days earlier, as well as "a number where [I could] interact with [Air's] conversational AI." He told me that the Air AI "team specializes in developing proven agents and automations that seamlessly integrate into your business" and to "[i]magine every call promptly answered, questions handled by AI, and qualified leads effortlessly booked for appointments." Mr. Zentmeyer encouraged me to "[p]icture running a promotional campaign offering substantial discounts on your services, coupled with a referral program for anyone they introduce to you. Whether it's 1000 leads or 10,000 leads, envision being able to reach out to them all simultaneously." He also highlighted a link to a demo that he said showed Air AI's technology calling "2000 leads simultaneously, generating over $383,000 in sales in a single day[.]" Mr. Zentmeyer asked to "schedule a call to explore how [Air AI] can automate your sales process and drive revenue growth," including a scheduling link. I clicked the link and scheduled a call for May 29, 2024. A true and correct copy of the May 27, 2024 email from J. Zentmeyer is attached as Attachment B.

9.      Almost immediately, I got a text message from an Air AI salesperson named Tim White confirming a phone call for the afternoon of May 29, 2024. The text message asked me to watch a linked video "from one of our co-founders before [the] call," saying that they would have to cancel if I didn't. A true and correct copy of the text message exchange between me and T. White is attached as Attachment C.

10.      I must not have watched the video quickly enough, because on the morning of May 29, 2024, I received two back-to-back text messages from Mr. White reminding me to watch the pre-call video. I told him that I would. *See* Attachment C at 2. I don't recall much about the pre-call video except to say that it was another sales pitch.

11.      I talked to Mr. White on May 29, 2024, as scheduled. On the call, he made it sound like he was a higher-up at the company and that he was excited to get me started with Air AI. He made a lot of promises about how good the technology was and said that it was more than capable of closing clients. Mr. White said that my business plan sounded like a perfect fit for Air AI, but that if things didn't end up working out, I would get a full refund of my purchase price. This sealed the deal for me. It seemed like there was no risk to buying in.

12.      Mr. White explained that there were several packages for me to choose from. The more expensive packages entitled you to more services and benefits, but I wanted to be able to pay out of pocket, so I bought in at the lowest tier of the VIP program. According to my

contract, for "a bi-annual amount of $9,800," Air AI would build me one "Air AI agent," as well as provide discount rates and referral fees for referring new customers. A true and correct copy of my executed Air VIP Agreement is attached as Attachment D.

13.     Air AI would also give me access to certain templates, demos, and training materials including AirU and Air AI's "Advertising Academy." I was given the right to refer potential VIP clients to Air AI for a 20% commission, and to "white-label" Air AI's technology as my own. Attachment D at 1-2.

14.     The contract also included the following "Guarantee":

> Air's Guarantee:  Air VIP comes with a no questions asked Customer Satisfaction Guarantee. If the Client is dissatisfied with the performance of their agent, or for any other reason, they are entitled to a full refund of the amount paid. The Client can choose to refund at the end of the agreement period, which is 6 Months from the date of this agreement being activated. To request a refund, Client simply needs to provide notice in writing in their slack channel, before the end of the 6 Months period. By the Client providing notice in writing, the refund will automatically be processed at the end of the 6 Months agreement period. Upon refunding Client's agent and account will be fully removed from the Air platform, including all associated benefits.

> Attachment D at 3.

15.     On May 29, 2024, after reviewing the contract to make sure important terms like the refund guarantee were included, I signed the contract. My then business partner also signed. Air AI CEO Caleb Maddix countersigned, dated May 22, 2024. *See* Attachment D at 4-5.

16.     On May 30, 2024, I transferred $9,777.22 in crypto currency to Air AI to pay for my VIP package. A true and correct copy of a receipt showing the transfer is attached as Attachment E. The entire sales process, from first seeing the Facebook post to purchasing a VIP package, took approximately three weeks.

17.     I discovered pretty quickly after buying in that the technology wasn't nearly as good as the promotional materials and salespeople promised. I was expected to use Slack to communicate with Air AI employees, but they struggled to keep the program from crashing. Even when Slack was working, it took days to get responses to my questions. Employees would tag other employees to look into the issues, but nothing was ever resolved. Air AI also had group support calls once or twice a week, which were full of people having problems like mine.

*Declaration of Michael Crowder*
**FTC-000069**

18.     It took Air AI a long time to get me my AI Agent, and it seemed like there were major software issues with the bot.  The program wasn't super straightforward to use, and, even when I could get ahold of someone at Air AI to troubleshoot issues, they weren't especially helpful.

19.     Early on, I asked about getting my friend a commission on my VIP package, since his post was how I found out about the company.  I was surprised when I was told no, since, based on my own contract, I thought receiving commissions for referrals was part of the package.

20.     On July 6, 2024, I raised the issue of a refund in the Air AI Slack chat.  I knew the AI bot wasn't going to be able to contact potential customers and close sales the way I needed it to and just wanted to get my investment back.  A true and correct copy of an excerpt from my Air AI slack channel is attached as Attachment F.

21.     On July 8, 2024, an Air AI employee named Kiara Smith wrote back that, per my contract, I was not eligible for a refund until November 29, 2024, six months after signing my contract.  I asked if it was possible to get the money sooner, but on July 19, 2024, the founders explained that "at the moment, it [was]n't physically possible for us to/in the budget." *See* Attachment F at 1-4.

22.     On July 15, 2024, I texted Tim White, my original salesperson, asking for help.  I did not get a response.  On July 16, 2024, I sent a longer text message, explaining that I wanted to cancel my membership and wanted my refund.  I did not get a response.  Attachment C at 3.

23.     On July 31, 2024, I offered in the Slack chat to pay $500 to get the rest of my refund back immediately.  I didn't get a response from the founders, so on August 7, 2024, I upped my offer to $1,000.  *See* Attachment F at 4-5.  I followed up a few times over the next week, but didn't hear anything from the founders until August 15, 2024, when they again told me that they would not be able to get me a refund prior to my refund date.  *Id.* at 6.

24.     On August 22, 2024, I texted Tim White one more time asking if he could help.  I never received a response.  Attachment C at 3.  I had no choice but to wait it out.

25.     I accepted that I would have to wait for my refund under my contract but decided to look into the founders in the meantime.  I was shocked by what my searches turned up.  Apparently, there were tons of people who were waiting on refunds from Air AI that had never come.

*Declaration of Michael Crowder*

**FTC-000070**

26.    To date, I have not received my refund, despite being clearly entitled to one by the terms of my contract.

27.    My involvement with Air AI has had a huge impact on me. I can't get over losing so much money to a company that was essentially a scam. I think about it every day and it hurts. I am more distrustful and cautious than I was before, which I think is going to hurt me in the long run.

28.    Everything anyone from Air AI told me was a lie. The AI technology does not work the way it was presented, and the money back guarantee was an empty promise. I want my money back and I don't want them selling this faulty product to anyone else.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December _16_, 2024.

Michael Crowder

*Declaration of Michael Crowder*
**FTC-000071**



**Michael C** < ██████████████████████ >

---

## Air AI Partner Info

7 messages

---

**Anthony Callen** <anthonycallen@air.ai>                                   Wed, May 15, 2024 at 5:54 PM
To: ██████████████████████

https://www.joinair.ai/vip-pre-call-video

---

**Michael C** < ██████████████████████ >                                    Wed, May 22, 2024 at 9:10 PM
To: Anthony Callen <anthonycallen@air.ai>

Hey Anthony I would like to sell Air and probably use it myself too. What's the first step?

On Wed, May 15, 2024 at 5:54 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://www.joinair.ai/vip-pre-call-video

---

**Anthony Callen** <anthonycallen@air.ai>                                   Wed, May 22, 2024 at 9:12 PM
To: Michael C ██████████████████ >

Are you free for a quick call tomorrow?


On Wed, May 22, 2024 at 7:10 PM Michael C ██████████████████████ > wrote:
Hey Anthony I would like to sell Air and probably use it myself too. What's the first step?

On Wed, May 15, 2024 at 5:54 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://www.joinair.ai/vip-pre-call-video

---

**Michael C** ██████████████████ >                                          Wed, May 22, 2024 at 9:13 PM
To: Anthony Callen <anthonycallen@air.ai>

Do you have a booking link?

On Wed, May 22, 2024 at 9:12 PM Anthony Callen <anthonycallen@air.ai> wrote:
Are you free for a quick call tomorrow?


On Wed, May 22, 2024 at 7:10 PM Michael C ██████████████████████ > wrote:
Hey Anthony I would like to sell Air and probably use it myself too. What's the first step?

On Wed, May 15, 2024 at 5:54 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://www.joinair.ai/vip-pre-call-video

---

**Anthony Callen** <anthonycallen@air.ai>                                   Wed, May 22, 2024 at 9:14 PM
To: Michael C ██████████████████ >

https://calendly.com/scalewithair

---

On Wed, May 22, 2024 at 7:13 PM Michael C <███████████████> wrote:
Do you have a booking link?

On Wed, May 22, 2024 at 9:12 PM Anthony Callen <anthonycallen@air.ai> wrote:
Are you free for a quick call tomorrow?

On Wed, May 22, 2024 at 7:10 PM Michael C <███████████████> wrote:
Hey Anthony I would like to sell Air and probably use it myself too. What's the first step?

On Wed, May 15, 2024 at 5:54 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://www.joinair.ai/vip-pre-call-video

---

**Michael C** <███████████████>                                    Wed, May 22, 2024 at 9:16 PM
To: Anthony Callen <anthonycallen@air.ai>

I actually am busy for the next 3 days and can't take calls. I'll definitely book one when I'm free again, but is there something I can do until then?

On Wed, May 22, 2024 at 9:15 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://calendly.com/scalewithair

On Wed, May 22, 2024 at 7:13 PM Michael C <███████████████> wrote:
Do you have a booking link?

On Wed, May 22, 2024 at 9:12 PM Anthony Callen <anthonycallen@air.ai> wrote:
Are you free for a quick call tomorrow?

On Wed, May 22, 2024 at 7:10 PM Michael C <███████████████> wrote:
Hey Anthony I would like to sell Air and probably use it myself too. What's the first step?

On Wed, May 15, 2024 at 5:54 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://www.joinair.ai/vip-pre-call-video

---

**Anthony Callen** <anthonycallen@air.ai>                          Wed, May 22, 2024 at 9:18 PM
To: Michael C <███████████████>

www.air.ai

Testimonial #1 ($0-$300k in first month!):
https://www.veed.io/view/a554ab5f-dc5b-4ef4-bfa2-2eb93778b3d1?panel=share

Testimonial #2 ($0-$33k/m in 30 days)
https://drive.google.com/file/d/1Up2vdoGhqD9BJe49-IA6nDUQj_GqE8bC/view

Current Partner (VIP) Examples:
https://prospectignite.io/
https://www.companyaiagency.com/
https://www.best-realestate.net/

-

**Attachment A**                                    **FTC-000073**
**Declaration of Michael Crowder**

Anthony Callen
Manager of Client Success
anthonycallen@air.ai

On Wed, May 22, 2024 at 7:16 PM Michael C <████████████████████> wrote:
I actually am busy for the next 3 days and can't take calls. I'll definitely book one when I'm free again, but is there something I can do until then?

On Wed, May 22, 2024 at 9:15 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://calendly.com/scalewithair

On Wed, May 22, 2024 at 7:13 PM Michael C <████████████████████> wrote:
Do you have a booking link?

On Wed, May 22, 2024 at 9:12 PM Anthony Callen <anthonycallen@air.ai> wrote:
Are you free for a quick call tomorrow?

On Wed, May 22, 2024 at 7:10 PM Michael C <████████████████████> wrote:
Hey Anthony I would like to sell Air and probably use it myself too. What's the first step?

On Wed, May 15, 2024 at 5:54 PM Anthony Callen <anthonycallen@air.ai> wrote:
https://www.joinair.ai/vip-pre-call-video

 Gmail                                    Michael C <██████████████████>

## Air's Conversational AI Demo's
1 message

**Johnny Zentmeyer** <johnnyzentmeyer@air.ai>                    Mon, May 27, 2024 at 8:17 PM
To: ██████████████████

Here are a few demo calls for you to listen to, along with a number where you can interact with our conversational AI.

Our team specializes in developing proven agents and automations that seamlessly integrate into your business. Imagine every call promptly answered, questions handled by AI, and qualified leads effortlessly booked for appointments.

Check out these demo calls:—it's powered by dedicated capacity and priority servers for optimal performance.

Solar Demo

Real Estate Investing Demo

Property Management Demo

The number provided below is a Conversational AI agent that excels at handling auto accident inquiries. It will answer and say, "have you been involved in an auto accident" Just reply with, "Can I ask you a few questions?"—and voilà! You're in demo mode, ready to explore and role-play.

To demo our conversational AI in action, call this number: 623-246-4057
Another Demo Agent that you can ask what it knows about your specific industry and how you can leverage conversational AI for that industry: (775)261-1782

Picture running a promotional campaign offering substantial discounts on your services, coupled with a referral program for anyone they introduce to you. Whether it's 1000 leads or 10,000 leads, envision being able to reach out to them all simultaneously.

Just like this >> They called 2000 leads simultaneously, generating over $383,000 in sales in a single day: https://www.youtube.com/shorts/ti93mlkeih8

Let's schedule a call to explore how we can automate your sales process and drive revenue growth.
    Schedule a call through this link: https://calendly.com/johnnyzentmeyer

Looking forward to connecting!



**Johnny Zentmeyer** ✿
General Manager of Client Success

**Air.ai**
(303) 905-4669
johnnyzentmeyer@air.ai



IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.



FTC-000077







# Air VIP Agreement

THIS AIR VIP AGREEMENT ("Agreement") is made as of ___05/29/2024___ (the "Effective Date") by and between Air AI Technologies Inc ("Air AI"), a Delaware Corporation. 3500 South DuPont Highway Dover, Delaware 19901, and __Michael Crowder and Ramon Henry__ with its principal place of business at __PO Box 404 Powers Lake ND, 58773, US__ ("The Client").

NOTICE TO THE CLIENT: DO NOT ACCEPT THIS AGREEMENT BEFORE YOU READ IT. BY ACCESSING AIR VIP, YOU ACKNOWLEDGE: YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT, AND YOU ACCEPT AND AGREE TO BE BOUND BY ITS TERMS. PLEASE KEEP A COPY OF THIS AGREEMENT FOR YOUR RECORDS. IF YOU HAVE ANY QUESTIONS OR CONCERNS, PLEASE CONTACT AIR AI BEFORE ACCEPTING THIS AGREEMENT.

1. **PRICING & SCOPE OF THE "AIR VIP" SERVICES:** The Client agrees to pay a bi-annual amount of $9800, for these services. In return, The Client will receive the following services and benefits for a period of one 6 months from the effective date of this Agreement:

   a. The Client shall receive a discount of 20% on their total "talk time" spend on the Air AI platform.

   b. The Client will be provided with a unique "referral link" by Air AI. For each new user who signs up for the Air AI platform using The Client's referral link, and who has not previously opted into Air AI's existing pages, The Client will receive a commission equal to 20% of the "talk time" spend generated by the referred user.

   c. Referral compensation will be calculated and distributed on a monthly basis with net 30-day terms. (ex: August 1 to August 31  revenue share would be calculated and distributed by September 30).

   d. The Client and The Client's referred customers will receive priority support from Air AI.

   e. Air AI will build one Air AI agent for The Client at no additional cost. The Client is entitled to three Air AI Agent revisions within 30 days of the initial Air AI agent build, subject to reasonable scope and complexity as determined by Air AI. Air AI reserves the right to charge additional fees for revisions that exceed this scope, at its sole discretion.

   f. From time to time, at the sole discretion of Air AI, The Client and The Client's referred customers may be granted early access to "beta test" new features on the Air AI platform. The Client acknowledges and agrees that not all new features released by Air AI will be made available for early access, and that Air AI reserves the right to determine which features will be offered to The Client as "early access."

   g. The Client will receive some exclusive GHL snapshots, automation walkthroughs and templated integrations.  However, Air AI will not cover the costs of anything on the GHL platform.

   h. The Client will receive templated roadmap & "how to" for connections to The Client CRM's

   i. The Client will receive the "Air AI Certification," a hands-on training program that teaches tactics useful for implementing Air AI for The Client and The Client's referred customers.

   j. The Client will receive video training materials that teach useful strategies and best practices for pricing, packaging, and positioning conversational AI as a service, regardless of if The Client

intends to offer such services.

k.  Air AI will deliver to The Client a set of pre-made resources, including product demos, sales funnel templates, marketing automations, Air AI scripts, and AI agents. These resources are designed to assist The Client in driving referrals to their designated Air AI referral link. However, Air AI will not cover the costs of any of the softwares necessary to use these resources.

l.  The Client will be granted access to "AirU," Air AI's proprietary client acquisition system. This system, which has been sold many times before at a price of $30,000, will be provided to The Client at no additional cost.

m.  The Client will be granted access to Air AI's 'Advertising Academy' video series as an additional benefit of this agreement. The video series is designed to provide The Client with valuable insights and strategies related to effective advertising practices.

n.  Air AI grants The Client the right to refer potential VIP clients to Air AI. If a referred client purchases Air VIP, The Client will receive a one-time commission equal to 20% of the referred client's initial payment for Air VIP. The Client acknowledges and agrees that this commission is strictly limited to the referred client's first payment for Air VIP and does not extend to any subsequent payments made by the referred client for Air VIP, the referred client's spend on the Air platform, or the spend of any users the referred client may subsequently refer to the Air platform through their own referral perk associated with their Air VIP membership. The Client further acknowledges and agrees that Air AI reserves the right to revoke The Client's ability to refer potential VIP clients at any time, for any reason, and without prior notice to The Client. In the event that Air AI revokes The Client's referral rights for Air VIP, The Client will not be entitled to any commissions for Air VIP referrals made after the date of revocation. However, The Client will still maintain the ability to refer users to the Air platform in general and receive commissions on their "talk time" spend, as outlined in the "referral fee" clause of this agreement.

o.  Air AI will, if of interest to The Client, allow The Client to "white-label" Air's technology. For clarity, "white-labeling" Air's technology does not entail Air AI providing a version of the Air web app where The Client can replace the Air logo with their own. Instead, it means that if The Client chooses to use the aforementioned Air APIs to build their own web app, they are not obligated to disclose that it is powered by Air AI. Additionally, if The Client wishes to offer a service or product to their customers, where The Client's customers never directly use the Air web app, but in some way interacts with the Air technology, The Client is not required to mention that they are utilizing Air technology or that they are an Air VIP member. The Client acknowledges that Air AI is not obligated to assist The Client in creating a "white-label" solution or to make any modifications to the existing Air Technology, Air Web App, Air Platform, or future product roadmap to accommodate the creation or improvement of The Client's potential or existing "white-label" offering.

p.  The Client and The Client's referred customers will still be required to pay for running Air AI campaigns, although The Client will be able to run campaigns at the aforementioned discount and will receive the aforementioned referral fee. The Client and The Client's referred customers understand that telephony fees are billed separately, and they will not receive a discount or referral commission on telephony fees. The current public telephony fees of Air AI's current telephony provider, Twilio, can be found at https://www.twilio.com/pricing. Other telephony providers may be used in the future, and in this case, these telephony's will also be billed separately at the rate of their publicly listed prices and will not warrant a discount or referral commission.


2. **AGREEMENT GUARANTEE, ACTIVATION, RENEWAL & TERMINATION TERMS:**

a. Air's Guarantee: Air VIP comes with a no questions asked Customer Satisfaction Guarantee. If the Client is dissatisfied with the performance of their agent, or for any other reason, they are entitled to a full refund of the amount paid. The Client can choose to refund at the end of the agreement period, which is 6 Months from the date of this agreement being activated. To request a refund, Client simply needs to provide notice in writing in their slack channel, before the end of the 6 Months period. By the Client providing notice in writing, the refund will automatically be processed at the end of the 6 Months agreement period. Upon refunding, Clients agent and account will be fully removed from the Air platform, including all associated benefits.

b. Activation: This agreement shall be activated and come into effect upon the date of the first payment made by The Client for Air VIP. The obligations and benefits outlined in this agreement for both Air AI and The Client shall not commence until the first payment is received by Air AI. The initial term of this agreement shall be 6 Months, starting from the date of the first payment.

c. Automatic Renewal: This agreement shall have an initial term of 6 Months, commencing on the date of the first payment for Air VIP. Upon the expiration of the initial term, this agreement shall automatically renew for successive 6 Months terms, with each renewal term expiring on the anniversary of the signing date. Air AI will automatically charge The Client for each renewal term, subject to the same pricing and payment terms outlined in this agreement, unless otherwise notified by Air AI. Air AI reserves the right to change pricing for the services provided before the commencement of the next renewal term. In the event of a pricing change, Air AI will not automatically charge The Client but will rather give them written notice, and The Client can decide if they would like to renew Air VIP.

d. Cancellation by The Client: If The Client wishes to cancel this agreement, they must provide written notice at least thirty (30) days prior to the expiration of the current term. In the event of cancellation, The Client will lose all existing benefits associated with the services provided and will not be entitled to any refund unless a refund is requested. The Client acknowledges that failure to provide written notice will result in the automatic renewal of this agreement and the associated charges.

e. Non-Renewal by Air AI: Air AI has the right to not renew the contract at will, without cause. In this case, The Client will cease to receive the benefits of Air VIP and will not be entitled to any refund for any money they have ever spent with Air AI.

f. At-Will Termination by Air AI: Air AI reserves the right to terminate this contract at any time during the active term, for any reason and at its sole discretion. If the termination is not due to a breach of any provision in this contract (including but not limited to the provisions regarding non-competition, non-solicitation, non-disparagement, etc.), a violation of Air AI's terms of use, or any "illegal activity" (including, but not limited to, scams, fraudulent activities, or non-compliance with FCC, FTC, GDPR, CCPA, COPPA, HIPAA etc.) by The Client through the use of the Air AI technology or The Client's Air VIP access, all of The Client's privileges granted under this Agreement will be immediately revoked, and Air AI will refund The Client's last payment. This termination will take effect 72 hours after written notice from Air AI. In the event of this "At-Will Termination by Air AI", the only benefit for The Client that will survive the termination of this agreement is the referral commission. In this event, The Client will continue to receive referral commissions for their previously attributed referred customers for 6 Months post-termination but will not be able to generate any new referred customers immediately upon termination

g. Termination for Cause by Air AI: If Air AI terminates the contract during the active term due to a breach of any provision in this contract (including but not limited to the provisions regarding non-competition, non-solicitation, non-disparagement, etc.), a violation of Air AI's terms of use, or any "illegal activity" (including, but not limited to, scams, fraudulent activities, or non-compliance with regulations as set forth by or required by regulatory bodies or acts such as FCC, FTC, GDPR,

TCPA, CCPA, COPPA, HIPAA, etc.) by The Client through the use of the Air AI technology or The Client's Air VIP access, all of The Client's privileges granted under this Agreement will be immediately revoked, and no refund will be provided for any money The Client has spent with Air AI. This termination will take effect immediately upon written notice from Air AI. To avoid confusion, in the event of this "Termination for Cause by Air AI", along with all other benefits, all referral commissions will cease to be paid out to The Client.

h.  Post Termination Obligation: In all cases of breach, The Client shall immediately cease all representations of affiliation with Air AI. The Client agrees not to represent itself as being associated with Air AI in any capacity, or to use any trademarks, service marks, trade names, or logos associated with Air AI. The Client shall immediately also cease all future business activities related to Air AI. The Client shall also promptly return or destroy, at Air AI's discretion, all confidential information, materials, and any other property belonging to Air AI. This obligation shall survive the termination or expiration of this Agreement and shall be binding upon The Client & its successors.

i.  Compliance & Terms Of Use:

   i.  The Client acknowledges that they must remain compliant with all applicable laws, regulations, and Air AI's of use throughout the duration of this agreement. "Illegal activity" will not be performed by The Client in any way, shape, or form using the Air AI technology, Air VIP services, or any of the benefits that are issued under this agreement. Failure to do so may result in immediate termination of the contract without refund.

   ii.  The Client acknowledges that they have read, understand, and are aware of Air AI's terms of use. The Client agrees comply with and stay up to date on the latest changes to Air AI's terms of use, which can be found at this link: https://chat.air.ai/terms-of-use

3. **GOVERNING LAW, JURISDICTION AND VENUE.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.

4. **NON-ASSIGNMENT & NON-SUBCONTRACTING:** The Client shall not assign, transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of Air AI. Any purported assignment, transfer, delegation, or subcontracting in violation of this provision shall be null and void. No assignment or delegation shall relieve The Client of any of its obligations hereunder.

5. **ENTIRE AGREEMENT:** This Agreement constitutes the entire & complete understanding and agreement between the parties with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties, and understandings of the parties, whether oral or written. The Client acknowledges that no promises or agreements outside of this Agreement have been established.

IN WITNESS WHEREOF, The Client below executes this Licensing Agreement between them and Air AI:

**Air AI Technologies Inc**

Name: _Caleb Maddix_____

Title: ___CEO___

Date: ___05/22/2024___

Signature: _~~Caleb Mytile~~_

**CLIENT**

Name ___Michael Crowder and Ramon Henry___

Email ███████ ████████

Phone +1 ██████

Entity (optional) N/A

Date ___05/29/2024___

Signature _~~Michael Crowder & Ramon Henry~~_




**aigymgrowth-air-vip**
1 member • 1 tab ⌄

would like to make to your agent.

**Jul 6th**

36 unread ✕


**Michael Crowder** 3:34 PM
Hey I've been considering some things and I think I'd like to cancel my vip, sorry

I might come back sometime but right now I can't

**Jul 8th**


**Kiara Smith** 11:28 AM
Hey @Michael Crowder, I've reviewed your contract with us and you would be eligible for a refund on November 29, 2024 as that will be the end of your 6 month period noted in your contract.

ⓘ **This file isn't visible to you**
This file is only visible to members of the conversation where it was originally shared.


**Michael Crowder** 11:29 AM
It's not possible to do that sooner?

**Jul 9th**


**Amber Worthington** 12:14 PM
@Michael Crowder we do ask that cancellations abide to the contract.


**Michael Crowder** 12:20 PM
Is that a requirement or a strong suggestion

Just curious



 

‹   **aigymgrowth-air-vip**
    1 member • 1 tab ˅

Tagging @Caleb, Thomas, And Ryan as they
would be the  36 unread  ×  that decision.

 **Caleb, Thomas, And Ryan** 6:42 PM

Replied to a thread:
**I need to cut it short and get a refund sooner.**

Sadly, at the moment, it isn't physically
possible for us to/ in the budget. However, I'm
happy to help you in any way I can in the
meantime. Even if not Air related. Just any way
regarding your business

**Jul 31st**

 **Michael Crowder** 6:14 PM

How about now? Haha, I'd pay $500 if I could
get it now instead of later

  

**Aug 4th**

 **Michael Crowder** 10:58 PM

Maybe now would work?

**Aug 5th**

 **Amber Worthington** 2:38 PM

tagging for you @Caleb, Thomas, And Ryan 

**Aug 7th**

 **Michael Crowder** 4:00 PM

I'd pay like 1k to get it back now if possible





