PLAINTIFF'S
EXHIBIT

5

## DECLARATION OF HOLLY GAVEL
### PURSUANT TO 28 U.S.C. § 1746

I, Holly Gavel, have personal knowledge of the facts stated below. If called as a witness, I could and would testify as follows:

1.    I am over the age of 18 and live in Morris County, New Jersey.  I own and operate a company with my business partner Daniel Myricks.

2.    In July 2023, I saw a Facebook advertisement for Air AI.  The ad promoted products that it claimed would grow my business, including a financing tool called Midas and a human-like AI agent that would contact and talk to potential customers.  The ad included a demo of the AI agent, and it really did sound like a person.  The ad said that these tools came with instructions and access to education on how to scale a business.  The ad promised that Air AI would triple the amount of money our company was currently bringing in, and that if it failed to do so within six months we would get a full refund.  It seemed like a no-lose situation, so I entered my contact information to learn more.

3.    Air AI contacted me right away.  On July 18, 2023, I received two emails from a Scale13 "Executive Consultant" named Nick Myers.  I understood Scale13 to be a subsidiary of Air AI.

4.    The first email confirmed a phone call for the next day, July 19, 2023.  I received the second email, with a subject line referencing a "private training," one minute later.  In that email, Mr. Myers urged me to watch the "super important in-depth training" linked in the email, telling me that the "system tracks who watches it and it's policy we have to cancel [scheduled calls with] anyone who doesn't [watch the training]…"  He asked that I watch the training before our call the next day so that I could "get the most out of" it.  A true and correct copy of the two July 18, 2023 emails from N. Myers to me are attached as Attachment A.[1]

5.    Daniel and I watched the training.  It was more like a sales pitch than a real "training," focused on Air AI's AI technology.  The video did not explain how Air AI would increase our profits in a short amount of time, but it assured us that it would.  I specifically remember the video saying that, using Air AI, we would make three-times as much money as we were currently bringing in.

---

[1] My professional email address uses the name "Holly Zuelle," which is my professional moniker.

*Declaration of Holly Gavel*
**FTC-000092**

6.      As scheduled, Mr. Myers called me at 8PM on July 19, 2023.  Daniel joined the call.  Mr. Myers told us that he was really excited to have our company onboard.  He said that Air AI was a revolutionary technology that was going to change the world, and that Air AI would provide the training, support, and promotion to take our business to the next level.  He told us that our company was going to get tons of new clients but reiterated that, if the business relationship didn't work out for one reason or another, we would get our money back, guaranteed.

7.      The guarantees Air AI made were impressive.  The sales process seemed fast to me, but based on the advertisement I had seen, the training I watched, and now the call with Mr. Myers, I believed that the Air AI products and training would work for my company.  But I was very reassured that if something went wrong, we would get our money back.  I didn't think there was any financial risk to buying in.

8.      Mr. Myers told us that the base price for the suite of Air AI tools was $15,000.  I knew I would need financing for that amount of money and told Mr. Myers as much.  Mr. Myers assured me that it was not an issue.  He said that Air AI worked with lenders to provide payment plans and said that I could use the Midas financing tool to secure a loan to cover the base price.  At the end of the call, we asked Mr. Myers to send us a contract to review.  Since I had strong credit, I asked that he send the Midas financing details to me.

9.      On July 19, 2023, Daniel and I received the Air AI Sales Agreement for electronic signature.  We both reviewed the contract.  The details reflected our conversation with Mr. Myers and everything seemed to be in order.  A true and correct copy of the executed Air AI Sales Agreement is attached as Attachment B.

10.     According to the terms, in exchange for the $15,000 "Base Cost," as the "Client," we would be entitled to the "Air AI Program," which consisted, in part, of:

   a.  "The Air Software Suite," including Max, a "[l]ead maximizer and dialing platform," and Midas, a checkout and financing platform, *id.* at 1; and

   b.  "First notice upon the release of Sherlock, an "Analytics platform and constraint finder," as well as first "notice upon the release of Odin" a "conversational AI product."  *Id.* at 1-2.

11.     The Air AI Program also entitled us to access to the Air AI training platform, including "a library of internal processes and systems for operating and scaling high-ticket

*Declaration of Holly Gavel*
**FTC-000093**

business[,]" access to Air University 2.0, which was "a step-by-step guide to building and scaling systems," and a year of live group consulting and sales training. *Id.* at 2.

12.    We would also get access to various PR resources and packages to aid in marketing our business, as well as bonus lessons, including one on "[h]ow we'd recoup our Air investment in 14 days." *Id.* at 2.

13.    The contract also included the following "Guarantee":

> Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to triple or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost.

Attachment B at 2.

14.    This guarantee was conditional upon us: 1) attending one meeting a week; 2) executing the "systems and processes as taught in Air University"; 3) following the "process on setting, lead generation and closing"; and 4) completing "End Of Week reports" so the Air team could track our progress and help with any issues. *Id.* at 2-3. These terms seemed reasonable to us – Air AI just wanted to be sure that we were using the products correctly and troubleshooting before claiming that the program had failed.

15.    Daniel signed the Air AI Sales Agreement on behalf of our company, dated July 19, 2023. *See* Attachment B at 6.

16.    Around that same time, I worked with a phone agent to enter my information into Midas to secure our financing. It immediately referred me for a $15,000 loan from a loan company called Best Egg.

17.    On or around July 20, 2023, I took out a loan for $15,000, plus a $787.81 origination fee, from Best Egg. The loan required me to pay just over $430 a month for a term of 60 months and had an annual interest rate of 21.48%. The Truth in Lending Disclosure Statement included a header reading "Best Egg," but listed the "Lender" as Cross River Bank, located in Teaneck, New Jersey. A true and correct copy of the Best Egg Truth in Lending Disclosure Statement provided to me is attached as Attachment C.

18.    Cross River Bank transferred the full loan amount, minus the origination fee, into my bank account on July 20, 2023. A true and correct copy of my July 14-August 13, 2023 TD Bank Statement showing $15,000 deposited into my account on July 20 at page 1 is attached as

*Declaration of Holly Gavel*
**FTC-000094**

Attachment D.  I transferred the entire $15,000 to Air AI on July 24, 2023.  *See* Attachment D at 3.

19.      On July 25, 2023, Daniel and I received an email at our shared company email address from an Air AI employee named Tyler Skaryd, giving us instructions for our "next steps," including getting set up on Slack, which was the primary way we were supposed to interact with Air AI from then on.  A true and correct copy of the first page of the email from T. Skaryd to support@fluxfusion.info is attached as Attachment E.

20.      After we got set up, Daniel and I used Midas as a merchant checkout platform for about seven or eight months.  Our clients may have tried to secure financing through Midas as well, but, as far as I know, no one qualified for a loan.  Midas did technically work as a checkout platform, but not on the scale Air AI had promised.  Each month, we made just enough to make our loan payment, which was nowhere near the three-times-increased income we were promised.  We were essentially just barely breaking even.

21.      In spring 2024, we decided that the cost was not worth it.  While I received some training on Air AI's voice technology, we never got access to this technology, and Air AI never provided any support to drive new traffic or any lead generation services.  Air AI told me that we were going to get a phone number staffed by an AI agent to give out to prospective clients, but we never got the number.

22.      On June 4, 2024, I emailed Tyler Skaryd, asking him to put me in touch with our original sales representative and explaining that, while "[w]e did get sales," we were now "stuck," and had "not ma[d]e three times as much as the program was worth" and were "unable to land any clients recently."  Mr. Skaryd responded the next day, directing me to contact support@air.ai to set up a one-on-one call with Cynthia Vo to "figure out a solution."  A true and correct copy of the June 4-5, 2024 email exchange is attached as Attachment F.

23.      I followed Mr. Skaryd's instructions and on June 6, 2024, Cynthia Vo scheduled a one-on-one meeting for June 10, 2024.  A true and correct copy of the meeting invitation from C. Vo is attached as Attachment G.

24.      On the call, I explained the issues we were having, and our feeling that the investment in Air AI had not panned out as we expected.  I reiterated that we had not made the promised income and that we had not received many of the services we were entitled to, particularly the lead generation and promotional services.  I told Ms. Vo that we would be happy

for the company to make good on its promises by teaching us how to get more clients, but she did not seem to take that seriously.  Ms. Vo told us that we would get a refund in August.

25.     Air AI cut off our access to Midas while we waited for the refund.  My automatic loan payments, however, continued.

26.     On June 11, 2024, Air AI Concierge told me that, based on their relationship with the loan company, "cancelling a loan with the loan company means they charge [Air AI] the FULL amount of the loan, even though they only refund back to you what you have paid to them."  So, I could expect to receive my loan payments back, but Air AI would be on the hook for the entire loan because that was "how the loan company work[ed]."  A true and correct copy of the June 11, 2024 email is attached as Attachment H.

27.     On June 14, 2024, I emailed concierge@air.ai to check on the status of my refund and provide my loan account number, in case that would speed up the process.  An employee named Mohamed Elawam from the concierge team told me that there were no further updates at that time, but that he had made a request for more information and would "send it as soon as it is received!"  A true and correct copy of the June 14, 2024 email exchange is attached as Attachment I.  I was satisfied with this answer for the time being.

28.     I followed up with concierge@air.ai on July 3, 2024 and July 23, 2024.  True and correct copies of my July 3 and 23, 2024 emails are attached as Attachment J.  I was promised a refund in August or September 2024, once Air AI had completed its current round of funding.  I continued to make my loan payments and hoped everything would be settled in the next few months.

29.     But September came and I was not refunded.  I emailed concierge@air.ai again on September 5, 2024, reminding them that Daniel and I had been told we would be paid back by September and asking how much longer we would need to wait for reimbursement.  I also reminded Air AI that the "contract stated that we [would] be paid back after 6 months on the program if we decided not to continue."  An unnamed member of the Air AI concierge team responded later that day, saying that they still did not have any updates for me and apologizing for the delay.  A true and correct copy of the September 5, 2024 email exchange is attached as Attachment K.

30.     On September 6, 2024, I reached out to Best Egg, explaining that I was continuing to make payments on a loan for a service I was no longer receiving, and asking that

*Declaration of Holly Gavel*
**FTC-000096**

my account be put on hold until the issue was resolved.  A true and correct copy of the Sept. 6, 2024 email to Best Egg is attached as Attachment L.

31.     Much to my surprise, a representative responded a few days later saying that Best Egg did "not have a partnership with Air" and would not cancel my loan.  This went directly against everything I had been told by Air AI.  A true and correct copy of the Sept. 10, 2024 email from Best Egg is attached as Attachment M.

32.     On September 10, 2024 I emailed concierge@air.ai, reminding the company that we had "signed a contract stating that I would get my money refunded by Air," and that I was "being charged and not getting any service."  I told them that the situation was "causing my business serious damage," and that I needed to get my money back, either in a lump sum or on a payment schedule.  A true and correct copy of the September 10, 2024 email to concierge@air.ai is attached as Attachment N.

33.     On September 11, 2024, I received a response from Air AI that was similar to the company's September 5, 2024 email, assuring me that I "will receive [my] refund, we just don't have a specific date or timeline at the moment."  A true and correct copy of the September 11, 2024 email is attached as Attachment O.

34.     I did not hear from Air AI for approximately two months.  During this time, I continued to make loan payments that I could not afford despite being locked out of my Air AI account.  On November 8, 2024, I noticed a $15,000 credit show up on my TD Bank statement. I confirmed with the bank that the money had come from Air AI.

35.     However, the refund does not change the fact that my involvement with Air AI has been extremely damaging.  I feel totally betrayed.  I wasted a lot of time and focus on a company that was lying to me and making promises it couldn't keep.  They never delivered on their products, and used misleading information and false assurances to keep me on the hook for as long as possible.  Their failure to give me the refund we all agreed I was entitled to in a timely manner jeopardized my credit and destroyed my business, causing me serious distress.

36.     I do not believe they will stop scamming people unless someone stops them.

*Declaration of Holly Gavel*

**FTC-000097**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November ⟶ 23 ⟶ , 2024.

Holly Gavel

*Declaration of Holly Gavel*

FTC-000098





Here's the private training you were promised    Inbox ×

**Nick Myers**  <nickmyers@air.ai>                           Tue, Jul 18, 2023, 6:51 PM

to me

Also Holly,

Here's the super important in-depth training William hawkins just told you about :) - https://precall.scale13.ai?email=hollyzuelle@gmail.com

Our system tracks who watches it and it's policy we have to cancel anyone who doesn't…

I really want to make sure we avoid you missing out on this opportunity, so please make sure to watch it before your call (if it's not the worst time, I highly recommend just doing it right now while it's top of mind)

Anyway, it's extremely valuable and will help you get the most out of our call on Wednesday, July 19, 2023 8:00 PM. You'll love it!

Talk soon,

- Nick Myers

Scale13

*Air*

# AIR AI SALES AGREEMENT

NOTICE TO THE CLIENT: DO NOT ACCEPT THIS AGREEMENT BEFORE YOU READ IT. BY ACCESSING THE AIR AI PROGRAM, YOU ACKNOWLEDGE: YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT, AND YOU ACCEPT AND AGREE TO BE BOUND BY ITS TERMS. PLEASE KEEP A COPY OF THIS AGREEMENT FOR YOUR RECORDS. IF YOU HAVE ANY QUESTIONS OR CONCERNS, PLEASE CONTACT AIR AI BEFORE ACCEPTING THIS AGREEMENT.

Air AI hereby sells to Client ("Client" or "you") the goods and services comprising the Air AI Program ("Program") for $15,000 (the "Base Cost"). Client agrees to pay for the Program in full upon Client's acceptance unless offered a lower initial price (the "Entry Price"). In the case of an Entry Price below the Base Cost, Client will pay an additional 5% fee on all transacted volume through Midas, Air's Checkout Platform, until the full Base Cost is paid out of the additional merchant fee. In this case, Client has been offered to purchase the Air AI Program for an Entry Price of $15,000. This Agreement shall be binding upon and take effect to the benefit of the parties hereto, their respective heirs, successors, assigns, executors, and administrators. This Agreement constitutes the entire understanding of the parties unless modified in writing executed by both parties. Client understands that outside of this Agreement, no other agreements or promises have been made. Except as described below, this Agreement cannot be terminated except upon the express written agreement of both parties hereto and the Client agrees that their liability under the Agreement terms shall begin upon the authorization of this Agreement and shall not terminate unless Air AI consents in writing.

1. **The Air AI Program consists of:**

   1. The Air Software Suite (the "Software Suite")
      a. a. Access to Max: Lead maximizer and dialing platform
      b. b. Access to Midas: Checkout and financing platform. Midas will be fully white-labeled and branded in accordance with Client's business.
      c. c. First notice upon the release of Sherlock: Analytics platform and

constraint finder
- d. d. First notice upon the release of Odin: Our conversational AI product
2. The Air AI training platform which includes a library of internal processes and systems for operating and scaling a high-ticket business. **You have the full right to use our IP to grow your business and use it for any purpose.**
3. Access to Air University 2.0, Air's step-by-step guide to building and scaling systems
4. 1 year of live group consulting calls with AIR AI's internal team
5. 1 year of live sales training with Air Ai's sales team for you or your team
6. Our vault of best-performing consulting calls
7. 1 year of access to our recruitment pipeline of sales reps for you to interview and hire
8. Complimentary PR package across a variety of publications
9. Complimentary 30 Day DFY Cold Email Campaign
10. Access to our list of Pre-Built White-label offers
11. Complimentary DFY marketing assets including headlines, funnel copy and templates, and video templates
12. Complimentary DFY affiliate marketing assets swipe file
13. Direct feedback from the Air team on your work inside of Air University
14. Bonuses lessons:
    - a. How we'd recoup our Air investment in 14 days
    - b. Advertising Academy
    - c. Media Masterclass
    - d. Ultimate Author Accelerator
    - e. How to Blow up Your Book
    - f. CMX Social Media Plan

### 2. **THE AIR AI GUARANTEE & EXPECTATIONS:**

Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to triple or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.

The Air Ai Program has multiple components designed for scaling the business therefore it is imperative that the CLIENT do the following items:
1. Client agrees to attend at least one meeting a week
2. Client agrees to execute the systems and processes as taught in Air

University and executed in the order advised. Failure to execute the processes advised may vary the results

3. Client agrees to follow the process on setting, lead generation and closing process
4. Client agrees to fill out End Of Week reports so our team can track their progress and help them when they run into constraints

The guarantee is conditional upon the expectations executed as outlined above.

*DM*

### 3. **Content Ownership and Confidentiality.**

Client acknowledges that certain information or know-how relating to the information, documents, products, models or business of AIR AI ("Confidential Information") obtained from this Program, including, without limitation processes, systems, contacts, documents, scripts, trade secrets, intellectual property is the exclusive property of Air AI and may comprise confidential and proprietary information or trade secrets that is not readily ascertainable and which derives economic value, actual or potential, from not being generally known.

For purposes of this Agreement, the Confidential Information provided through this Program shall be deemed confidential unless expressly indicated otherwise. Client agrees to hold the Information in the strictest confidence, not to make use thereof except as permitted by AIR AI, and not to directly or indirectly copy, reproduce, distribute, release or disclose the Information, in whole or in part, to any third party without the prior written consent of AIR AI.

You agree to use all reasonable measures to ensure that the confidentiality of the Confidential Information is not impaired. You further agree that your obligations of confidentiality of the Confidential Information survive the expiration or termination of this Agreement.

4. **DISCLAIMER OF WARRANTY**. NO ADDITIONAL WARRANTY IS MADE BY AIR AI REGARDING ANY INFORMATION, SERVICES OR PRODUCTS PROVIDED IN CONNECTION WITH THE PROGRAM, OR RESULTS FROM USE OF SAME. AIR AI EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES AS TO THE ACCURACY, COMPLETENESS OR CONTENT OF INFORMATION, PRODUCTS OR SERVICES AND ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT TO THE EXTENT THE

EXCLUSION OF IMPLIED WARRANTIES IS NOT PERMITTED BY LAW.

5. **LIMITATION OF LIABILITY AND DAMAGES.** YOU AGREE THAT AIR AI'S LEGAL LIABILITY, INCLUDING THE LIABILITY OF ITS AFFILIATES, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES OR AGENTS, FOR ANY CLAIM MADE BY YOU ARISING OUT OF YOUR USE OF THE WEBSITE OR PURCHASE OF PRODUCTS OR SERVICES OFFERED THEREON SHALL BE LIMITED TO THE AMOUNT YOU PAID TO AIR AI EXCEPT AS PROVIDED IN THE ARBITRATION AGREEMENT IN SECTION 11 HEREINBELOW, UNDER NO CIRCUMSTANCES WILL SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES BE AWARDED, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS EXCLUSION MAY NOT APPLY TO YOU.

6. **Indemnity.** You agree to defend, indemnify and hold AIR AI, its affiliates, officers, subsidiaries, affiliates, successors, assigns, directors, officers, agents, service providers, attorneys, suppliers and employees, harmless from any claim or demand, including reasonable attorneys' fees and court costs, made by any third party due to or arising out of your use of the Air.ai Products and Services, your violation of this Agreement, or your breach of any of your acknowledgements, agreements, representations, warranties and obligations herein.

YOU ACKNOWLEDGE THAT AIR AI HAS SET ITS PRICES AND HAS PROVIDED ACCESS TO ITS PRODUCTS AND SERVICES IN RELIANCE ON THESE LIMITATIONS OF LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT, AND THAT THOSE LIMITATIONS ARE AN ESSENTIAL BASIS UPON WHICH AIR AI OFFERS ITS PRODUCTS AND SERVICES. YOU AGREE THAT THE LIMITATIONS OF LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT SURVIVE AND APPLY EVEN IF FOUND TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

7. **Governing Law, Jurisdiction and Venue.** This Agreement shall be construed in accordance with and governed by the laws of the State of Arizona.

8. **Dispute Resolution and Class Action Waiver.** Most or your concerns can be resolved quickly to your satisfaction by contacting our Client Service Center via concierge@air.ai In the unlikely event that Client Service cannot resolve your complaint to your satisfaction, or if we have not been able to

resolve a dispute with you after trying to do so informally, then except for collection claims and petitions for injunctive relief, we each agree to resolve all other disputes through binding arbitration rather than in court. Arbitration is less formal than a lawsuit. Arbitration uses a neutral arbitrator instead of a judge or jury, allows less discovery than courts, and is subject to very limited court review. The American Arbitration Association (AAA) will serve as the arbitration provider. We agree that any arbitration under these Terms will take place on an individual basis. Representative, group, collective or class actions are not permitted.

You may speak with your own lawyer before purchasing any product or service offered by AIR AI, but your purchase of any such product or service constitutes your acceptance of this Agreement, including this provision.

You agree that, by entering into this Agreement, you and AIR AI are each WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A REPRESENTATIVE, GROUP, COLLECTIVE OR CLASS ACTION OR ARBITRATION. YOU AND AIR AI AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITIES AND NOT AS PLAINTIFFS OR CLASS MEMBERS IN ANY PURPORTED REPRESENTATIVE, GROUP OR CLASS ACTION OR ARBITRATION, OR IN THE CAPACITY OF A PRIVATE ATTORNEY GENERAL.

9. **Severability of Agreement.** If any provision of the Agreement is found by a court or other binding authority to be invalid, you agree that every attempt shall be made to give effect to the parties' intentions as reflected in that provision, and remaining provisions contained in this Agreement shall continue in full force and effect.

By electronic authorization, the Client accepts the terms and conditions of this Agreement and authorizes Air AI to immediately charge the credit card and/or debit the bank account provided in payment for the purchase of the Program.

IN WITNESS WHEREOF, the Client below executes this Sales Agreement between them and AIR AI:

**CLIENT**

Name _Daniel Myricks_

Email _[redacted]_

Phone _[redacted]_

Entity (optional) _FluxFusion Streams_

Date _07/19/2023_

Signature _Daniel Myricks_



DATE: 7/20/2023

## TRUTH IN LENDING DISCLOSURE STATEMENT

Lender                                                    Borrower
Cross River Bank                                          Holly Gavel
885 Teaneck Road
Teaneck, NJ 07666

| **ANNUAL PERCENTAGE RATE** The cost of your credit at a yearly rate | **FINANCE CHARGE** The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 23.99% | $10,888.24(e.) | $15,000.00 | $25,888.24(e.) |

Your payment schedule will be as follows:

| Number of Payments | Amount(e.) | When payments are due |
|---|---|---|
| 59 | $431.39 | First payment is due on 8/19/2023 (e.), |
| 1 | $436.23 | and then monthly on the same date thereafter. |

Late charges: If your payment arrives after your 3-day grace period, you will be charged a late fee in the amount of $15. This fee is charged only once per late payment.

Prepayment policy: If you pay off your loan in advance, you will not be charged a penalty. In the event of a prepayment, you will not be entitled to a refund of any pre-paid finance charges or other fees.

See your Loan Agreement for any additional information about nonpayment, default or other matters related to your loan.

(e.) means estimate

---

Itemization of amount financed:
Amount of Your Loan: $15,787.81
Origination Fee: $787.81
Amount Given to You Directly or your designee: $15,000.00

---

Annual Loan Interest Rate: 21.48%. Interest at this Loan Interest Rate plus the Origination Fee results in the Finance Charge and Annual Percentage Rate disclosed above.

**Attachment C**                    **FTC-000107**
**Declaration of Holly Gavel**

**TD Bank**

America's Most Convenient Bank®

HOLLY N GAVEL

**TD Convenience Checking**

HOLLY N GAVEL

**DAILY ACCOUNT ACTIVITY**

**Electronic Deposits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 07/20 | RTP RCVD, Cross River Bank | 15,000.00 |

**Electronic Payments**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|

**Attachment D**
**Declaration of Holly Gavel**

**FTC-000108**

# How to Balance your Account

**Begin by adjusting your account register as follows:**

- Subtract any services charges shown on this statement.

- Subtract any automatic payments, transfers or other electronic withdrawals not previously recorded.

- Add any interest earned if you have an interest-bearing account.

- Add any automatic deposit or overdraft line of credit.

- Review all withdrawals shown on this statement and check them off in your account register.

- Follow instructions 2-5 to verify your ending account balance.

1. Your ending balance shown on this statement is:

2. List below the amount of deposits or credit transfers which do not appear on this statement. Total the deposits and enter on Line 2.

3. Subtotal by adding lines 1 and 2.

4. List below the total amount of withdrawals that do not appear on this statement. Total the withdrawals and enter on Line 4.

5. Subtract Line 4 from 3. This adjusted balance should equal your account balance.

❶ Ending Balance          1,090.13

❷ Total Deposits     +

❸ Sub Total

❹ Total Withdrawals   -

❺ Adjusted Balance

| ❷ DEPOSITS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| **Total Deposits** |  | ❷ |

| ❹ WITHDRAWALS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

| WITHDRAWALS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| **Total Withdrawals** |  | ❹ |

**FOR CONSUMER ACCOUNTS ONLY — IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

If you need information about an electronic fund transfer or if you believe there is an error on your bank statement or receipt relating to an electronic fund transfer, telephone the bank immediately at the phone number listed on the front of your statement or write to:

**TD Bank, N.A., Deposit Operations Dept, P.O. Box 1377, Lewiston, Maine 04243-1377**

We must hear from you no later than sixty (60) calendar days after we sent you the first statement upon which the error or problem first appeared.  When contacting the Bank, please explain as clearly as you can why you believe there is an error or why more information is needed.  Please include:

- Your name and account number.
- A description of the error or transaction you are unsure about.
- The dollar amount and date of the suspected error.

When making a verbal inquiry, the Bank may ask that you send us your complaint in writing within ten (10) business days after the first telephone call.

We will investigate your complaint and will correct any error promptly.  If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you have the use of the money during the time it takes to complete our investigation.

**INTEREST NOTICE**

Total interest credited by the Bank to you this year will be reported by the Bank to the Internal Revenue Service and State tax authorities.  The amount to be reported will be reported separately to you by the Bank.

**FOR CONSUMER LOAN ACCOUNTS ONLY — BILLING RIGHTS SUMMARY**

In case of Errors or Questions About Your Bill:

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at P.O. Box 1377, Lewiston, Maine 04243-1377 as soon as possible.  We must hear from you no later than sixty (60) days after we sent you the FIRST bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question.

FINANCE CHARGES: Although the Bank uses the Daily Balance method to calculate the finance charge on your Moneyline/Overdraft Protection account (the term "ODP" or "OD" refers to Overdraft Protection), the Bank discloses the Average Daily Balance on the periodic statement as an easier method for you to calculate the finance charge. The finance charge begins to accrue on the date advances and other debits are posted to your account and will continue until the balance has been paid in full. To compute the finance charge, multiply the Average Daily Balance times the Days in Period times the Daily Periodic Rate (as listed in the Account Summary section on the front of the statement). The Average Daily Balance is calculated by adding the balance for each day of the billing cycle, then dividing the total balance by the number of Days in the Billing Cycle. The daily balance is the balance for the day after advances have been added and payments or credits have been subtracted plus or minus any other adjustments that might have occurred that day. There is no grace period during which no finance charge accrues. Finance charge adjustments are included in your total finance charge.



STATEMENT OF ACCOUNT

HOLLY N GAVEL

Page: 3 of 5
Statement Period: Jul 14 2023-Aug 13 2023
Cust Ref #: T-###
Primary Account #:

**DAILY ACCOUNT ACTIVITY**
**Electronic Payments (continued)**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 07/24 | ELECTRONIC PMT-WEB, AIR AI AIR AI ST-H8H9I8J0F5R8 | 15,000.00 |





**America's Most Convenient Bank®**

HOLLY N GAVEL

STATEMENT OF ACCOUNT

| | |
|---|---|
| Page: | 4 of 5 |
| Statement Period: | Jul 14 2023-Aug 13 2023 |
| Cust Ref #: | T-### |
| Primary Account #: | |



Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender

**Attachment D**
**Declaration of Holly Gavel**

FTC-000111



**America's Most Convenient Bank®**

STATEMENT OF ACCOUNT

HOLLY N GAVEL

| | |
|---|---|
| Page: | 5 of 5 |
| Statement Period: | Jul 14 2023-Aug 13 2023 |
| Cust Ref #: | T-### |
| Primary Account #: | |

## Upcoming changes to your TD Bank account(s)

**We want to make you aware of some changes we're implementing to your deposit account on September 15, 2023 or shortly after.** Not all of these changes may affect you, but please see the information below so that you can make the best decisions to fit your banking needs.

**Increasing Paper Statement fee to $3**

We are increasing the fee for receiving paper statements. This change will apply to the account types outlined in the chart below. But you can avoid these fees just by enrolling in paperless statements. Log in to Online Banking or the TD Bank app to set it up.

| Account Type | Current Fee | New Fee |
|---|---|---|
| TD Simple Checking | $1 | **$3** |
| TD Convenience Checking | $1 | **$3** |
| TD Beyond Checking | $0 | **$3** |
| TD Premier Checking | $0 | **$3** |
| TD Interest Checking | $0 | **$3** |
| TD Student Checking | $0 | **$3** |
| TD Core Checking | $0 | **$3** |
| TD Value Checking | $0 | **$3** |
| TD Relationship Checking | $0 | **$3** |
| TD 50 Plus Checking | $0 | **$3** |

**Additional things to know regarding this fee change:**

- If you are currently enrolled to receive paperless statements, this fee will not impact you.
- This fee increase **will not apply** if you have a TD 60 Plus Checking, TD Essential Banking, TD Growth Money Market, TD Wealth or TD personal savings account.

**We're eliminating some of our deposit product fees as well. Here's what you can expect.**

**We're eliminating the Return Deposit Item fee**

If a check you deposited into your account is returned, you'll no longer be charged a fee.

**We're eliminating the Non-Sufficient Funds fee on savings accounts**

We won't charge you a Non-Sufficient Funds fee for returned payments on your personal savings account, no matter the reason.

**We're decreasing Excess Transaction fees**

We're reducing the fee to $3 (per transaction) if you make transactions more than 6 times a month with your savings account.

**Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com**

Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender

**Attachment D**
**Declaration of Holly Gavel**

**FTC-000112**

FTC-000113



34 of 41    ⟨    ⟩

**Your Next Steps to Get into Momentum with Air!** ⟳  Inbox ×  support@fluxfusion.info ×

**Tyler Skaryd** ⟨ᴬ⟩ <tylerskaryd@air.ai>    Tue, Jul 25, 2023, 5:13 PM
to support ⟨

Hey Dan!

Here is a detailed list of the next steps you will need to take:

1. Go to slack.com and set up a workspace if you don't already have one

Check out these videos so you have a clear picture of how to take full advantage of your slack channel with Air!

How to connect your slack channel with Air:
https://www.loom.com/share/cd4236d2cf2a4680943f22eac3bbefa1

How to use slack:
https://www.loom.com/share/9e267ef0e6f948ce9458bf3971f1c186

2. Find the slack invite in your support@fluxfusion.info email and connect our Air workspace with yours







Invitation from an unknown sender: Holly Zuelle and Cynthia Vo @ Mon Jun 10, 2024 1pm - 1:30pm (EDT)
(          @gmail.com)  ⟩  Inbox ×

**Cynthia Vo** ⚏ <cynthiavo@air.ai>                                    Thu, Jun 6, 4:07 PM ☆ ☺ ↩ ⋮
to me, support, dmyricks ▾

| Jun **10** Mon ⚐ | **Holly Zuelle and Cynthia Vo** View on Google Calendar | **Agenda** Mon Jun 10, 2024 |
|---|---|---|
| | When    Mon Jun 10, 2024 1pm – 1:30pm (EDT) | *No earlier events* |
| | Who     support@fluxfusion.info,          com, Cynthia Vo* | 1pm    Holly Zuelle and Cynthia Vo |
| | [Yes]  [Maybe]  [No]   More options | *No later events* |

**Unknown sender**
This event from cynthiavo@air.ai won't appear in your calendar unless you say you know the sender.
**Know this sender?**

Event Name: 30 Minute Meeting

Please share anything that will help prepare for our meeting.: Want to review the initial agreement and how we can make at least 15 thousand more dollars
according to the agreement of 3 times what the program was worth. We are having difficulty.

On Tue, Jun 11, 2024 at 10:40 PM Air.ai Concierge <concierge@air.ai> wrote:

Hey Holly,

Yes, because cancelling a loan with the loan company means they charge our company the FULL amount of the loan even though they only refund back to you what you have paid to them. So for example, if your loan was for $15k but have only paid $6k on it, you will be refunded 6k but our company will be charged $15k. It's how the loan company works.

Always at your service :)

Concierge @ Air.ai | 𝒜~

**How would you describe the experience with concierge today?**

| Extremely satisfied | Neither satisfied nor dissatisfied | Extremely dissatisfied |
|---|---|---|



On Fri, Jun 14, 2024 at 4:53 PM Air.ai Concierge <concierge@air.ai> wrote:

Hey Holly,

At this time we don't have a further update . We have asked for a more detailed update and will send it as soon as it is received! We truly appreciate your patience.

Always at your service :)

Mohamed Elawam | Concierge @ Air.ai |

On Fri, 14 Jun at 3:45 PM , Holly Zuelle <          @gmail.com> wrote:

Hello Concierge,

I just spoke to the loan company Best Egg that provided the Scale 13 loan I was approved for.
Best Egg told me I need to give you my account number for the loan.
          - Holly Gavel Loan Refund

About how long will the refund process take?

Thank you,

On Wed, 3 Jul at 11:44 AM , Holly Zuelle <████████@gmail.com> wrote:
Dear Air Concierge,

I am checking in to see if I am in the loan reimbursement process and about how long I will need to wait. I can not make the payments and really need to stop the loan.

Do you have an exact date or month on when the loan will be refunded?

████████ Holly Gavel Loan Refund (BEST EGG)

Thank you,

Holly Gavel



Refund request-Holly Gavel- via Cynthia Vo

**Holly Zuelle** <____@gmail.com>                                          Tue, Jul 23, 10:31 AM
to Air.ai

Dear Air Concierge,

I spoke to you about 20 days ago regarding the refund request for the Air loan. I am checking to see how much longer I have to wait to be reimbursed. I can not make the payments and really need to stop the loan.

Do you have an exact date or month on when the loan will be refunded?

Holly Gavel Loan Refund (BEST EGG)

Thank you,

Holly Gavel



Holly Gavel Air Refund Request 9/5/24 urgent  ▶  Inbox ×

**Holly Zuelle** <████████gmail.com>
to Air.ai, Daniel █████  ▾

Dear Air Concierge,

I spoke to you in July a few months ago regarding the refund request for the Air loan. I am checking to see how much longer I have to wait to be rembursed. I can not make the payments and really need to stop the loan.

Do you have an exact date or month on when the loan will be refunded? The contract stated we will be paid back after 6 months on the program if we decide not to continue. We were told we would be paid back by September. Attached see the original agreement. I also can not log into Midas for weeks. This is an urgent matter that needs to be addressed.

████████ Holly Gavel Loan Refund (BEST EGG)

Thank you,

Holly Gavel

On Thu, Sep 5, 2024 at 11:36 AM Air.ai Concierge <concierge@air.ai> wrote:

Hey Holly,

Currently, we still don't have any additional updates beyond Ryan's email. We are also unable to provide a precise ETA at this time, but rest assured that we will update you as soon as we have more information.

We are really sorry for the delay and need more of your patience.

Always at your service :)

Concierge @ Air.ai | 𝒜𝓋

**Holly Zuelle**

· 3·, 6· 20· ·, · 4·  M EDT

Dear Best Egg,

I was offered this loan in an agreement where I am provided a payment processing service with Air. I attached the agreement. Now the company that provided me this loan is not providing me the service and I can not pay the best Egg loan without the service.

I am not sure what to do or if your company was aware of this. They said they worked with you.

I need my account put on hold until this is resolved. I don't owe a payment till October 19th.

Thank you,

Holly Gavel



Sender notified by
Mailtrack

**Madison** (Best Egg)
Sep 10, 2024, 10:50 AM EDT

Thank you for contacting Best Egg.

We do not have a partnership with Air. Additionally, this loan is under your information and cannot be cancelled.

Please feel free to give us a call at 855-282-6353. We are available Monday through Thursday from 8:00am – 10:00pm, Friday from 8:00am – 8:00pm and Saturday from 9:00am – 6:00pm ET.

You can also reach us via the live chat feature in your <u>Best Egg account</u> Monday - Thursday 8:00 am – 9:00 pm, Friday 8:00 am – 7:00 pm, and Saturday 9:00 am – 6:00 pm ET.

All the best,
Your Best Egg Team




On Tue, 10 Sep at 11:44 AM , Holly Zuelle < ▆▆▆▆▆ @gmail.com> wrote:
Dear Air Concierge,

I spoke to the Bestegg loan company that Air provided me with and they said that I have to get the money back from Air in order to pay it back. I signed a contract stating I would get my money refunded by Air. I'm surprised that Air can not pay me back  the monthly payment per month. Regardless, Midas did not answer my several emails I sent after concierge told me to refer all Midas questions to Midas email. I am being charged and not getting any service. This is causing my business serious damage as I paid for a service I am not receiving. At this point, I need my 15 thousand and returned to me. I am willing to work on a payment schedule, but this just can not be. I have consulted the contract and this is a direct breach of contract.

Please advise.

Holly Gavel

▆▆▆▆▆▆

On Fri, Sep 6, 2024 at 10:57 AM Air.ai Concierge <concierge@air.ai> wrote:
Hey Holly,

For any Midas related support requests, kindly send your inquiries to Midas@air.ai.

Always at your service :)

Concierge @ Air.ai | 



**Air.ai Concierge**
to me, support, ▮▮▮▮

Sep 11, 2024, 8:13 AM (13 days ago)    ☆    ☺    ↩    ⋮

Hey Holly,

You will receive your refund, we just don't have a specific date or timeline at the moment. Our team is still waiting for updates from Ryan and our founders regarding your refund. As soon as we receive further information, we will contact you immediately.

We apologize for the long wait and appreciate your patience.

Always at your service :)

Concierge @ Air.ai |

DECLARATION OF LAURA KAMRATH
PURSUANT TO 28 U.S.C. § 1746

I, Laura Kamrath, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.      I am over the age of 18 and live in Houston, Texas.

2.      I run an online marketing solutions company.

3.      In or around March of 2023, I started seeing ads on Facebook about a company called Air AI. The ads talked about how the future of marketing was in AI, which piqued my interest. After seeing several of these ads, I engaged with one of them and provided my contact information.

4.      I received a call from someone about Air AI to schedule an appointment for a sales call. That person told me I needed to watch a three-hour video about Air AI before my appointment. They also told me that if I missed my appointment, I would be charged $100.

5.      I watched the video. It was very well produced and was all about Caleb Maddix, the founder of the company. The video talked about how Caleb was a child entrepreneur who had become a millionaire at 16. I also remember the video showing Caleb and others in front of sports cars and other flashy things. The video implied that I could be living that lifestyle, and that Air AI was going to show me how to do it.

6.      The video also talked about the different features of Air AI. For example, they offered a coaching program that included a subscription to tools, an online course, and daily coaching calls to help people build and grow their business. It sounded really promising.

7.      One of the tools included was an AI phone dialer, that, according to Air AI, had a higher call completion rate than industry standard, with Air AI-dialed calls going through 70% of the time compared to the industry average of 20%.

8.      The video also talked about other tools in the Air AI program, some of which were still in development. It described an AI financing tool called Midas that could match my customers with loans. That kind of a structure would be really great because it helps with cash flow: you can have clients pay for your services up front, through the financing, rather than waiting for them to pay you small amounts each month. The video also talked about a conversational AI that was still in development.

Page **1** of **7**

*Declaration of Laura Kamrath*

**FTC-000128**

9.      The video also gave me the impression that Air AI was co-created by Russell Brunson, someone who is well-known in the online marketing world. The video also gave me the impression that Tony Robbins, a well-known coach, had endorsed the program. That gave me some confidence to trust Air AI.

10.     After watching the video, I had a call with another person at Air AI called Brett Moravec. Brett told me that the Air AI program cost $30,000, which was a lot of money to me. But Brett assured me that with their tools and coaching program, I was going to be making way more than $30,000 and that I would be able to pay off any loans I took out to pay for the program within a year. Brett told me that signing up for Air AI would be the difference of transforming my life and my businesses. He said $30,000 was nothing compared to all the money I was going to make implementing their system. He also told me that the coaching program would give me one-on-one time every single day with their founders and coaches.

11.      At the time, I had just lost a big client, so I had to replace that business and was looking for something that I could do that was scalable. Air AI promised to help me with that. I was also really impressed by the Air AI sales funnel. I figured if they could teach me how to do that, then I could make a lot of money. And the price made more sense since they told me I would get one-on-one time with their founders.

12.     I decided to move forward with purchasing Air AI. On March 3, 2023, I signed the sales contract to buy the Air AI program.

13.     The contract included a refund guarantee which said:

> Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to double or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.

A true and correct copy of the contract I signed with the refund guarantee on page 2 is attached as Attachment A.[1] This refund guarantee was super important to me because it made me

---

[1] For privacy reasons, my contact information and sensitive financial information are redacted in the attachments to this declaration.

*Declaration of Laura Kamrath*

FTC-000129

feel more confident about spending the money since I wasn't really risking anything. It was one of Air AI's big selling points.

14.     I didn't have $30,000 to spend, but Brett told me I could get financing through their Midas system. I filled out an application and was matched with the lender Upstart. I did not qualify for the full $30,000, but I did qualify for a $15,000 personal loan.

15.     Upstart deposited the money in my personal account. They deposited $13,200, because they held back $1,800 in loan origination fees. I transferred the $13,200 to my business account and paid Air AI. I wired money to their account. A true and correct copy of my bank statement showing the payment on April 5, 2023, at page 3 is attached as Attachment B.

16.     A few weeks after I made the first payment, I got another call from Brett. He told me that I could get more funding through a credit card that had no fees and zero interest. He told me I qualified for a $4,500 credit limit that I could use to pay another portion of the Air AI cost. I wanted to have a bit more liquidity for my businesses, so I applied for the credit card. Brett seemed to know the minute my application was approved because he called me and told me to use the full $4,500 credit card limit to pay Air AI. I refused to do that, and he was frustrated with me. He tried to negotiate with me and told me that we could compromise, and I could pay them $2,000. I did end up paying Air AI an additional $1,000 on May 20, 2023, but did not pay them the full amount of the credit limit. The name of the company that showed up on my credit card bill was "The Apex Holdings Group LLC." A true and correct copy of my credit card statement with the $1,000 payment on page 2 is attached as Attachment C.

17.     After I signed the Air AI contract, I got access to their platform. I started reviewing their training modules. The first module instructed me that I needed a highly scalable, high-ticket offer. The module said that the best option for that was an online training course because you only build it once and then can resell it infinitely. But the module did not offer much guidance beyond that, and I didn't know where to start building such an offer.

18.     Part of the Air AI program was that they hosted daily coaching calls, for example on how to build an offer, on advertising your offer, and a tech call about their AI features.

19.     I decided to look for guidance on how to build my "offer" by attending the daily "offer" call. But it was just a group call with a bunch of other people, and I didn't have much of a chance to ask questions. At most, I would get five or so minutes to ask my questions.

*Declaration of Laura Kamrath*

FTC-000130

20.     There was no other support from Air AI about how to actually build my offer, and I didn't receive any practical advice or the one-on-one time that I had been promised during the sales pitch.

21.     I still wanted to try to make it work though, so I decided to go off on my own to build my highly scalable offer, a training program, as the Air AI module had instructed.

22.     I spent around six months building my training program, sometimes recording videos for up to eight hours a day. I spent so much time doing it! I realized that I would have to dedicate all my time to building my course, so I paused my small business activity to build my course. I even took out an SBA loan of $40,000 to cover start-up costs and my expenses while I got my offer ready to sell. I recorded over 80 videos for my online course.

23.     I felt ok taking out the SBA loan because I had been told by Air AI that once I had the course built, there would be a system on the other side to advertise and monetize it. I thought that Air AI would help me market my course so that I could make all that money back.

24.     Once I had finished building my course, I was running out of money. I went back to Air AI to get guidance on how to sell the course.

25.     I went back to the Air AI training modules on how to build out an ad campaign. They had guidance about how to build an ad campaign, so I followed what the module told me. After I had done that, I got on another group call to get more guidance about advertising. The person running the call told me not to build my ad campaigns the way Air AI had told me to. He explained how to do it differently. That was really confusing and frustrating, especially after I had spent time working on it and following the Air AI module.

26.     Overall, the person they had running the advertising calls for a while was good. He made sure to let us know though that he was not really affiliated with Air AI, and told us he was not allowed to give us his contact details because he was just a consultant. I set up the ad campaign the way he recommended, which was different than what the training module had told me to do. That actually worked, and I started getting interest in my course. But I couldn't afford to keep running the campaign. I also ran into some health issues and we experienced a hurricane around the same time, so I had a hard time keeping up with the calls. I decided to turn the ad campaign off for a little while.

27.     Around the same time that I was working on my ad campaign, I also tried other ways to sell my course. Because running an ad campaign was expensive, I was interested in

*Declaration of Laura Kamrath*

FTC-000131

trying to do affiliate marketing, which was something the Air AI coaching program said we could do. Air AI had said they would build an affiliate marketing campaign for me, that all I had to do was fill out a form, and they would have something going within 3-4 weeks. I filled out the form and waited. Nothing happened. I reached out to Air AI about it repeatedly, but they kept making excuses about why they had not built out my affiliate marketing campaign. After two months, Air AI finally told me that their partner for the affiliate marketing program had fallen through and they weren't offering it anymore.

28.     I decided to try to build out my own affiliate marketing program through the Air AI platform and spent about a week on it. My plan was to integrate the Midas financing tool into that campaign to make it easier for customers to pay for my course. But for affiliate marketing, it is important to be able to automate tracking and paying commissions to the individuals that are doing the marketing on my behalf. I asked Air AI about how the Midas financing tool would keep track of that, but I kept getting blown off, and eventually was told that they couldn't answer business specific questions during the group coaching calls. That was really frustrating, because I had been sold a coaching program that was supposed to help me with my specific business needs.

29.     There were other instances where Air AI blew me off or didn't answer my questions. For example, there were times I had technical questions about their tools. They would tell me to get on the group tech call, but there were too many people and I wasn't able to get an answer to my question. They then told me to post my question in the Slack instant messenger channel the company used to communicate, but when I did, nobody answered that either.

30.     At one point I decided I wanted to try to use their AI bot to make phone calls for me, but Air AI told me that in order to use the bot, I would have to spend at least a few months making my own calls so that I could anticipate what kind of questions people might ask, to help script answers for the bot. Because of that, I was never able to get the bot to work for me.

31.     I finally realized that the only way to get anything to work with the Air AI program was if you have enough money to run ads. That had not been clear to me when I paid for their program, and I didn't have the money to continue running a digital ad campaign. And even when I was able to get some people to show interest in my course, I was not actually able to make any sales because the sales funnel I learned from Air AI did not work well on businesses, which were the audience for my training course.

Page **5** of **7**

*Declaration of Laura Kamrath*

32.     At some point while I was trying to use Air AI, I filled out a survey for them and let them know that I thought they had misrepresented what their program could do and how much one-on-one time I was going to get to help me with my businesses. In fact, there was zero one on one time. I told them to talk to their sales representatives so that they could be more truthful in sales pitches. I never heard anything back from them in response to my survey.

33.     When I first started working with Air AI, based on the pre-call video they made me watch, I thought it was co-created or co-founded by Russell Brunson, but over the months of trying to work with them, I realized that he is not affiliated with the company.

34.     Recently, I received a call from someone called Victor Cardinal, who said he had been a consultant for Air AI, and that his company had helped Air AI do some of their onboarding. He told me that Air AI was failing, and that he was calling around to Air AI customers to offer them his own conversational AI software called Echo Ex. I did not buy anything from him.

35.     Looking back, it felt to me like Air AI didn't want any of the people who bought their program talking to each other or knowing who the coaches on the group coaching calls were. The coaches would often sign into the calls without giving their names, and there really wasn't a good way to see how other people were working through the training modules or making the program work. It was very isolating.

36.     If I had known what my experience with Air AI was going to be like I would have never paid for it. I feel like I am starting again from zero, but with so much debt. I'm paying over $400 a month for the next three years on the loans I took out to pay for Air AI. It's lucky I didn't get approved for the full $30,000.

37.     I also have to make payments on my SBA loan. I am struggling financially at the moment and had to borrow money from my dad and even take money out of my IRA. This has been financially devastating for me.

38.     I feel like Air AI lied to me and did not give me the training and support they promised. It felt like they didn't care and that they were just trying to sell their tools. Their contract said I would make double my money in 6 months or get my money back, but I never made money. I have asked for a refund, but never received a response. It's now been a year and a half and I'm just more in debt.

I declare under penalty of perjury that the foregoing is true and correct.

*Declaration of Laura Kamrath*

FTC-000133

Executed on $\underline{\text{Nov. 26}}$, 2024.

Laura Kamrath

*Declaration of Laura Kamrath*

**FTC-000134**



# AIR AI SALES AGREEMENT

NOTICE TO THE CLIENT: DO NOT ACCEPT THIS AGREEMENT BEFORE YOU READ IT. BY ACCESSING THE AIR AI PROGRAM, YOU ACKNOWLEDGE: YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT, AND YOU ACCEPT AND AGREE TO BE BOUND BY ITS TERMS. PLEASE KEEP A COPY OF THIS AGREEMENT FOR YOUR RECORDS. IF YOU HAVE ANY QUESTIONS OR CONCERNS, PLEASE CONTACT AIR AI BEFORE ACCEPTING THIS AGREEMENT.

Air AI hereby sells to Client ("Client" or "you") the goods and services comprising the Air AI Program ("Program") for $30,000 (the "Base Cost"). Client agrees to pay for the Program in full upon Client's acceptance. This Agreement shall be binding upon and take effect to the benefit of the parties, only if Client receives an acceptable financing offer to purchase the Program, hereto their respective heirs, successors, assigns, executors, and administrators. This Agreement constitutes the entire understanding of the parties unless modified in writing executed by both parties. Client understands that outside of this Agreement, no other agreements or promises have been made. Except as described below, this Agreement cannot be terminated except upon the express written agreement of both parties hereto and the Client agrees that their liability under the Agreement terms shall begin upon authorization of this Agreement and shall not terminate unless Air AI consents in writing.

1. **The Air AI Program consists of:**

   1. The Air Software Suite (the "Software Suite")
        a. Access to Max: Lead maximizer and dialing platform
        b. Access to Midas: Checkout and financing platform. Midas will be fully white-labeled and branded in accordance with Client's business.
        c. Access to Sherlock: Analytics platform and constraint finder
        d. First notice upon the release of Odin: Our conversational AI product 2. The Air AI training platform which includes a library of internal processes and systems for operating and scaling a high-ticket business. **You have the full right to use our IP to grow your business and use it for any purpose.** 3. Direct access and group training calls with Air AI's internal team
   4. Live sales training with Air AI's sales team for you or your team
   5. Our vault of best-performing consulting calls
   6. A pool of 100 sales reps for you to interview and hire
   7. Complimentary PR package across a variety of publications
   8. Bonuses lessons:
        a. How we'd recoup our Air investment in 14 days
        b. Advertising Academy

    c. Media Masterclass
    d. Ultimate Author Accelerator
    e. How to Blow up Your Book
    f. CMX Social Media Plan

2. **THE AIR AI GUARANTEE**:

Air AI is backed by the industry's boldest guarantee. Within 6 months of joining the program (the 'Starting Term'), the Client will have used Air AI to generate revenue equal to double or more of the initial cost of the Air Access Card. If not, Client will have the option to cancel their Air Access Card and forgo the Air platform upon which they will be refunded the full amount of their initial cost. Furthermore, Client may receive an unconditional refund within 72 hours of purchase for any reason.

3. **Content Ownership and Confidentiality.**

Client acknowledges that certain information or know-how relating to the information, documents, products, models or business of Air AI ("Confidential Information") obtained from this Program, including, without limitation processes, systems, contacts, documents, scripts, trade secrets, intellectual property is the exclusive property of Air AI and may comprise confidential and proprietary information or trade secrets that is not readily ascertainable and which derives economic value, actual or potential, from not being generally known.

For purposes of this Agreement, the Confidential Information provided through this Program shall be deemed confidential unless expressly indicated otherwise. Client agrees to hold the Information in the strictest confidence, not to make use thereof except as permitted by AIR AI, and not to directly or indirectly copy, reproduce, distribute, release or disclose the Information, in whole or in part, to any third party without the prior written consent of AIR AI.

You agree to use all reasonable measures to ensure that the confidentiality of the Confidential Information is not impaired. You further agree that your obligations of confidentiality of the Confidential Information survive the expiration or termination of this Agreement.

4. **DISCLAIMER OF WARRANTY**. NO WARRANTY IS MADE BY AIR AI REGARDING ANY INFORMATION, SERVICES OR PRODUCTS PROVIDED IN CONNECTION WITH THE PROGRAM, OR RESULTS FROM USE OF SAME. AIR AIi EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES AS TO THE ACCURACY, COMPLETENESS OR CONTENT OF INFORMATION, PRODUCTS OR SERVICES AND ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT TO THE EXTENT THE EXCLUSION OF IMPLIED WARRANTIES IS NOT PERMITTED BY LAW.

5. **LIMITATION OF LIABILITY AND DAMAGES.** YOU AGREE THAT AIR AI'S LEGAL LIABILITY, INCLUDING THE LIABILITY OF ITS AFFILIATES, OFFICERS, DIRECTORS,

SHAREHOLDERS, EMPLOYEES OR AGENTS, FOR ANY CLAIM MADE BY YOU
ARISING OUT OF YOUR USE OF THE WEBSITE OR PURCHASE OF PRODUCTS OR
SERVICES OFFERED THEREON SHALL BE LIMITED TO THE AMOUNT YOU PAID TO
AIR AI EXCEPT AS PROVIDED IN THE ARBITRATION AGREEMENT IN SECTION 11
HEREINBELOW, UNDER NO CIRCUMSTANCES WILL SPECIAL, INCIDENTAL,
CONSEQUENTIAL OR PUNITIVE DAMAGES BE AWARDED, EVEN IF WE HAVE BEEN
ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME STATES DO NOT ALLOW
THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES,
SO THIS EXCLUSION MAY NOT APPLY TO YOU.

6. **Indemnity.** You agree to defend, indemnify and hold Air.ai , its affiliates, officers,
subsidiaries, affiliates, successors, assigns, directors, officers, agents, service providers,
attorneys, suppliers and employees, harmless from any claim or demand, including
reasonable attorneys' fees and court costs, made by any third party due to or arising
out of your use of the Air.ai Products and Services, your violation of this Agreement,
or your breach of any of your acknowledgements, agreements, representations,
warranties and obligations herein.

YOU ACKNOWLEDGE THAT AIR AI HAS SET ITS PRICES AND HAS PROVIDED ACCESS
TO ITS PRODUCTS AND SERVICES IN RELIANCE ON THESE LIMITATIONS OF
LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT, AND THAT
THOSE LIMITATIONS ARE AN ESSENTIAL BASIS UPON WHICH AIR AI OFFERS ITS
PRODUCTS AND SERVICES. YOU AGREE THAT THE LIMITATIONS OF LIABILITY AND
DAMAGES AND THE INDEMNITY IN THIS AGREEMENT SURVIVE AND APPLY EVEN IF
FOUND TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

7. **Governing Law, Jurisdiction and Venue.** This Agreement shall be construed in
accordance with and governed by the laws of the State of Arizona.

8. **Dispute Resolution and Class Action Waiver.** Most or your concerns can be
resolved quickly to your satisfaction by contacting our Client Service Center via
concierge@air.ai In the unlikely event that Client Service cannot resolve your
complaint to your satisfaction, or if we have not been able to resolve a dispute with
you after trying to do so informally, then except for collection claims and petitions for
injunctive relief, we each agree to resolve all other disputes through binding
arbitration rather than in court. Arbitration is less formal than a lawsuit. Arbitration
uses a neutral arbitrator instead of a judge or jury, allows less discovery than courts,
and is subject to very limited court review. The American Arbitration Association
(AAA) will serve as the arbitration provider. We agree that any arbitration under these
Terms will take place on an individual basis. Representative, group, collective or class
actions are not permitted.
You may speak with your own lawyer before purchasing any product or service
offered by Air AI, but your purchase of any such product or service constitutes your
acceptance of this Agreement, including this provision.

You agree that, by entering into this Agreement, you and Air AI are each WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A REPRESENTATIVE, GROUP, COLLECTIVE OR CLASS ACTION OR ARBITRATION. YOU AND AIR AI AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITIES AND NOT AS PLAINTIFFS OR CLASS MEMBERS IN ANY PURPORTED REPRESENTATIVE, GROUP OR CLASS ACTION OR ARBITRATION, OR IN THE CAPACITY OF A PRIVATE ATTORNEY GENERAL.

9. **Severability of Agreement.** If any provision of the Agreement is found by a court or other binding authority to be invalid, you agree that every attempt shall be made to give effect to the parties' intentions as reflected in that provision, and remaining provisions contained in this Agreement shall continue in full force and effect.

By electronic authorization, the Client accepts the terms and conditions of this Agreement and authorizes Air AI to immediately charge the credit card and/or debit the bank account provided in payment for the purchase of the Program.

IN WITNESS WHEREOF, the Client below executes this Sales Agreement between them and Air AI:

**CLIENT**

Name _Laura Kamrath_____

Email █████████████████_____

Phone ████████_____

Entity (optional) _Zebra Marketing Solutions_____

Date _03/03/2023_____

Signature _Laura E Kamrath_____



**JPMorgan Chase Bank, N.A.**
P O Box 182051
Columbus, OH 43218 - 2051

April 01, 2023 through April 28, 2023

Account Number:

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-242-7338 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |
| We accept operator relay calls | |

ZEBRA MARKETING SOLUTIONS, LLC





## DEPOSITS AND ADDITIONS

| 04/04 | Online Transfer From Chk | Transaction#: 17006551883 | 13,200.00 |
|---|---|---|---|

**Attachment B**
**Declaration of Laura Kamrath**

**FTC-000139**



# CHASE ◎

April 01, 2023 through April 28, 2023
Account Number:

## DEPOSITS AND ADDITIONS *(continued)*

DATE    DESCRIPTION                                                          AMOUNT

## ATM & DEBIT CARD WITHDRAWALS

DATE    DESCRIPTION                                                          AMOUNT

## ATM & DEBIT CARD SUMMARY

Page 2 of 6



CHASE ⬡

April 01, 2023 through April 28, 2023

Account Number:

Laura E Kamrath  Card

ATM & Debit Card Tota



## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|



| 04/05 | Orig CO Name:Air Ai          Orig ID:4270465600 Desc Date:     CO Entry Descr:Air Ai<br>Sec:Web  Trace#:111000021705303 Eed:230405  Ind ID:SI-Z1R4H2A9Q6R5          Ind<br>Name:Laura Kamrath Trn: 0951705303Tc | 13,200.00 |

Page 3 of 6

CHASE ○

April 01, 2023 through April 28, 2023
Account Number: ███████████

**ELECTRONIC WITHDRAWALS** *(continued)*

DATE    DESCRIPTION                                                AMOUNT

**Attachment B**
**Declaration of Laura Kamrath**

**FTC-000142**



April 01, 2023 through April 28, 2023

Account Number: ▮▮▮▮▮▮▮



**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

Call us at 1-866-564-2262 or write us at the address on the front of this statement immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

**For personal accounts only:** We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**For business accounts,** see your deposit account agreement or other applicable agreements that govern your account for details.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC FUNDS TRANSFERS:** Contact us immediately if your statement is incorrect or if you need more information about any non-electronic funds transfers on this statement. For more details, see your deposit account agreement or other applicable agreements that govern your account.

JPMorgan Chase Bank, N.A. Member FDIC

**Attachment B**
**Declaration of Laura Kamrath**

**FTC-000143**



April 01, 2023 through April 28, 2023

Account Number: ██████████

This Page Intentionally Left Blank

**Attachment B**
**Declaration of Laura Kamrath**                    **FTC-000144**

**Eve Financial**
55 N Merchant St.
PO Box 948
American Fork, UT 84003

For customer support, please use
the chat feature in the mobile app
or call us at 855-383-1331



**Laura Kamrath**

**Account Number**

**Statement**
May 20 - Jun 19, 2023

**Pay by check**
Mail a check along with this sl
using the envelope provided.

**Pay by phone**
Call us at 1-855-383-1331.

**Pay in App**
Visit eve.co/download to get t
Eve Mobile Banking App.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Detach on the dotted line and return this slip with a check payable to Eve Financial

**Laura Kamrath**
**Account Number**

Mail to:
55 N. Merchant St.
PO Box 948
American Fork, UT 84003



Eve Card is issued by First Pryority Bank, Member FDIC, pursuant to a license from Mastercard

**Attachment C**          **FTC-000145**
**Declaration of Laura Kamrath**



For customer support, please visit your
customer support section in the mobile
app.

**Laura Kamrath**

■■■■■■

Account Number ■■■■■■■

**Statement**
May 20 - Jun 19, 2023

---

# Account Summary



# Transactions

| Date | Description | 0% APR Until | Amount |
|------|-------------|--------------|--------|
| 05/20/2023 | The Apex Holdings Group LLC | Oct 21, 2023 | $1,000.00 |



| | |
|---|---|
| Total interest for this month | $0.00 |

# Payments / Credits

| Date | Description | Amount |
|------|-------------|--------|
| Total Payments / Credits | | $0.00 |

**Attachment C**
**Declaration of Laura Kamrath**

**FTC-000146**



For customer support, please visit your
customer support section in the mobile
app.

**Laura Kamrath**

Account Number

**Statement**
May 20 - Jun 19, 2023

# Cashback

| Date | Amount |
|------|--------|
| **Total Cashback Rewards** | $0.00 |

# Interest

| Date | Amount |
|------|--------|
| **Total Interest Paid** | $0.00 |

For customer support, please visit your
customer support section in the mobile
app.

**Laura Kamrath**

Account Number

**Statement**
May 20 - Jun 19, 2023

---

**How can I avoid being charged interest?**
We will not charge you any interest on purchases which are paid in full within the four billing cycles after the billing cycle in which they posted, so long as you pay the minimum payment due by the due date in each intervening month.

**How do you calculate the balance subject to interest charge?**
We use a method called "average daily balance" (including new purchases not paid within the four billing cycles after the billing cycle in which they posted.)

For use in calculating the average daily balance, we compute at the end of the Billing Cycle each day's balance as follows:

- We begin with the prior day's closing balance of purchases, if any; then
- If it is the first day of the Billing Cycle, we add any unpaid Purchases that were not paid off within four Billing Cycles of the Billing Cycle in which they posted; then
- We subtract any payments or credits applied to the Purchases balance; then
- We add to the Purchases balance any Annual Fee on the day it posted to the Account.

If any daily balance is less than zero, we treat it as zero.

**How can I earn cashback rewards?**
You are entitled to a reward of 1.50% of all Purchases made in a Billing Cycle if you pay all such Purchases and all prior Purchases in full by the Payment Due Date in the next Billing Cycle. Rewards will be accessible via the mobile app and may be applied to unpaid purchases or may be paid via another method we may offer upon your request after the cycle in which they accrue but not more frequently than quarterly.  In the event any Purchase is reversed in whole or in part, the related credit will also be reversed.

 The "Prime Rate" in effect for a given month is the highest U.S. Prime Rate published in the print edition of The Wall Street Journal (WSJ) on the last day of the prior month that the Prime Rate was published. If the WSJ does not publish the Prime Rate on that day, then we will look to the last day before then that such a rate was published.

**How do I make payments?**
You may make electronic payments on your account through the Eve Mobile Banking app. If you pay by check, you authorize us to use the information on your check to make an electronic fund transfer from your account at the financial institution indicated on your check or to process the payment as a check transaction. If the payment is processed as a electronic fund transfer, the transfer will be for the amount of the check, funds will be withdrawn from your account as soon as the same day we receive your check, and you will not receive your check back. When paying by check insure that: "Eve Financial" is the payee, your Eve account number is written on the check and the detachable slip on this statement is returned to sender. Eve Financial does not accept cash payments.

**When will you credit my payments?**
Normally, payments made in accordance with this Agreement and our instructions are credited as of the date of receipt. However, conforming payments received on a non-Business Day and payments received after 11:59 pm Mountain Standard Time on a Business Day will be credited as of the next Business Day. Also, we may reject or delay for up to five (5) days crediting payments that do not follow our instructions. For example, there may be a delay of up to five (5) days in crediting a payment by mail if it is received at an address other than the address we specify for payments on your monthly statement or if it is received without the required payment stub. Additionally, your available credit under the Agreement may not reflect a payment for up to 15 days after we have credited a payment to your Account.

**What if my card is lost or stolen?**
Mark your card as lost or stolen in the Eve Mobile Banking app, or contact us immediately using the support chat found in the Eve app or call us at +1 (855) 383-1331.

**Do you report my information to the credit bureaus?**
We may report information about your account to the credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report. If you believe that there is an error in the information we have reported about you to a credit bureau, contact us at +1 (855) 383-1331, or use the support chat in the Eve Mobile Banking app. Please include any copy of the information you believe is incorrect. We report credit data to the following credit bureaus: Experian, Equifax, and TransUnion. You may contact Experian at Central Source, LLC P.O. Box 105283 Atlanta, GA 30348-5283

**See your Eve Cardmember Agreement for definitions and other important information.**

**Billing Rights Summary**

If you think there is an error on your statement, contact us through the Eve Mobile Banking app support chat, or contact us at +1 (855) 383-1331.

You must contact us within 60 days after the error appeared on your statement. While we investigate whether or not there has been an error, the following are true:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Purchase:**
If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

**To use this right, all of the following must be true:**

1. The purchase must have been made in your home state within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase.
3. You must not yet have fully paid for the purchase.

 If all of the criteria above are met and you are still dissatisfied with the purchase, contact us through support chat in the Eve Mobile Banking app, or contact us at +1 (855) 383-1331.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

---

PLAINTIFF'S
EXHIBIT

**7**

_____

DECLARATION OF DYLAN ORMS
PURSUANT TO 28 U.S.C. § 1746

I, Dylan Orms, hereby state that I have personal knowledge of the facts set forth below.

If called as a witness, I could and would testify as follows:

1.      I am over the age of 18 and live in Littleton, Colorado.

2.      I work in a corporate job and have been working in corporate jobs for a while, but I have been looking for an opportunity to start my own businesses.

3.      In or around February 2023, I saw a social media ad about a company called Air AI that was selling a framework for a business plan that I could use to get my own business off the ground. I was curious, so I clicked on the ad and provided my contact information.

4.      After providing my contact information, I received a call from someone at Air AI who asked me some questions and set up a follow-up call with an account executive.

5.      I then had a call with account executive called Levi who made a sales pitch for Air AI. The sales pitch discussed online training course work that would include training on how to create funnels and a sales process for an "offer" that I could develop. The sales pitch also talked about an auto dialer that my sales representatives could use to make outbound sales calls faster, a conversational AI product that could talk to my customers for me, and a funding process that would allow my potential clients to get financing to pay for my services. The financing process would allow my customers to get a loan so that I would get payment in full right away.

6.      The program was being promoted by a person called Caleb Maddix. He was one of the people who was supposed to be teaching the training course for Air AI. I looked him up and found out that he had some credibility because he had built some education brands and had experience with online marketing tools. That gave me more confidence in the Air AI program.

7.      I decided to move forward with purchasing Air AI. One of the things that convinced me to move forward was a refund guarantee in the contract. Per the guarantee, if I didn't double my investment in revenue within six months after purchasing their services I would get a full refund. That pushed me over the edge, since I figured that if it didn't work, I could just get my money back.

8.      The program was really expensive - $30,000. I ended up spreading the cost across several credit cards.

*Declaration of Dylan Orms*

9.      Right after I paid Air AI, I did not feel comfortable with my purchase, so I reached back out to them to cancel my transaction. The contract had a provision that would allow me to back out within 72 hours of purchase. But they called me back and convinced me to stick with it and really sold me on the fact that they would refund me if it didn't work.

10.      Once I got started, some of the content offered by Air AI was good and I was able to implement it. But other features were never actually available or didn't work for me. For example, I was never able to take advantage of the financing tool because none of my customers qualified for loans. The conversational AI feature was also never available to me, and I was never able to implement the auto dialer.

11.      I expected a program that would be more tried-and-true, but instead, I got really broad directions to go create something that I could sell to people. But I didn't have any ideas about what to create and there wasn't a lot of guidance. The program was not what I thought it would be.

12.      Still, I decided to hang in there and try to make the program work. I tried for six months but was not able to hit the mark of doubling my investment that Air AI had guaranteed.

13.      After six months, around October 2023, because they did not fulfill their guarantee, I reached out to Air AI about a refund. I was told I would get a refund within four weeks, but that never happened.

14.       I kept getting strung along by Air AI. I was never sure if I was talking to a real person or an AI bot. At some point I was told that I was on a waitlist for a refund, but nothing ever happened.

15.      I tried to stay cordial with them for the first four to five months, but it was really frustrating to just keep getting the same response about being on their refund wait list.

16.      At one point, I got an email from Ryan at Air AI from the following email address: r@air.ai. Ryan is supposed to be one of the executives of the company. In the email, he let me know that the company was trying to raise money and once they did, they would be able to pay me back. But I felt like there was something weird going on. I was concerned that they would just be raising money from other people like me to pay out my refund and I didn't want that.

*Declaration of Dylan Orms*

FTC-000150

17.     I was also recently called by another person called Victor who was trying to sell me a different conversational AI program. I'm not sure how they got my contact information. That seemed pretty weird.

18.     It's been almost a year since I asked for my refund, and I still haven't gotten it. I would have never made a significant investment like this without that kind of guarantee, I just don't have the money for it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___12·17___, 2024.

Dylan Orms

*Declaration of Dylan Orms*

FTC-000151

PLAINTIFF'S
EXHIBIT

8
_____

## DECLARATION OF SCOTT PATTERSON
## PURSUANT TO 28 U.S.C. § 1746

I, Scott Patterson, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.      I am over the age of 18 and live in Newbury Park, California.

2.      I run my own home services company and am a small business owner.

3.      In or around January of 2024, I saw an advertisement on Instagram for a company called Air AI. The ad was for their conversational AI product. According to the ad, the AI would be able to handle customer service calls. It included a demo that showed the AI handling an Apple tech support call. This video ad showed how dynamic the AI was.

4.      As a small business owner, that was really interesting to me. It was kind of hard to believe that the technology would be that advanced, but I thought maybe there was something there. I clicked on the ad and provided my contact information to learn more about it.

5.      I then got a call from a salesperson at Air AI. I talked to him about my concerns with Air AI and whether it would work for my business. I receive a lot of incoming calls, and finding people to answer the phones for my business is hard. I wanted to know if I could maybe get this system to work for me. The person at Air AI reassured me that their program was set up to deal with those kinds of calls.

6.      I was primarily interested in getting the system to work for my businesses, but the salesperson started telling me about licensing opportunities. According to him, I could buy a license from Air AI, which would allow me to resell their AI system to others.

7.      I asked if I could buy the AI system without buying the license, but the Air AI salesperson explained that if I did not buy their license, I would have to pay someone to set up my Air AI. According to him, with a license, I could set it up myself without paying anyone. He said either I could get a license, or I would have to go through someone who was a licensee. He said if I got a license, I could then resell Air AI to other people.  At some point he also said that people were making hundreds of thousands from the Air AI licensing.

8.      I decided to go with the license because I didn't want to have to pay someone else to get set up. I also figured that if the system worked for me, I would be able to resell it to others in my industry and actually make some money. I also wanted to take a shot at setting the AI up myself. I'm pretty tech savvy, and that aspect interested me.

*Declaration of Scott Patterson*
**FTC-000152**

9.      I wasn't sure the system was going to work for me, it really seemed like a long shot. I told the Air AI salesperson this, but he told me not to worry because they had a money-back guarantee. According to him, if the Air AI system didn't work for me, there was a 100% money back guarantee.

10.      Air AI sent me their contract. It included a money back guarantee that said:

> Guarantee: The License is backed by a results satisfaction guarantee. If Client is not satisfied with the performance of their agent or for any other reason at all, Client can receive a full buy back of the amount paid, but no sooner than 120 days after signing this Agreement. Eligibility for a buy back is conditioned on completion of the steps set forth in subsection c.i.1-4 below. This guarantee rests upon the premise that Air AI's conversational AI will deliver results for the client, and is offered to remove any risk that it will not work for Client.

A true and correct copy of the contract with the guarantee appearing on page 2 is attached as Attachment A.[1]

11.      The contract said that in order to qualify for the money back guarantee, I had to take a number of steps:

> Guarantee Eligibility: In order to be eligible for a buy back, Client must complete 3 "test cycles" with their agent with Air AI's team, providing the agent feedback and advice between each round.
> i. To complete a full test cycle, the following steps must take place:
> 1. Client's agent gets 100 pickups to ensure the test is statistically significant;
> 2. Client advises Air AI as to which script Client is using and the campaign details that produced the 100 pickups so that Air AI's team can conduct a meaningful review;
> 3. Air AI will analyze the call recordings, script, and other components related to Client's agent and provide feedback and suggestions for implementation to improve the performance of the agent;
> 4. Client must implement all the suggestions Air AI provides including, but not limited to, script changes, knowledge base updates, action changes, etc.

*Id.* at 2-3.

12.      Because of the guarantee, I decided to move forward with purchasing the license and signed the contract on January 24, 2024. The cost for the license was $25,000. I paid for Air

---

[1] In several attachments to this declaration, personal and sensitive information is redacted for privacy reasons.

*Declaration of Scott Patterson*

**FTC-000153**

AI through a loan. Air AI set me up with the financing company that gave me the loan. I signed the Air AI contract and the financing documents on the same day.

13.    The loan financing process was odd. It was a three-way transaction with Air AI and a company called Special Finance Company, LLC ("Special Finance"). I signed the loan agreement and someone called Austin Higgins signed for Air AI. The loan was then assigned to Special Finance. A true and correct copy of the loan agreement is attached as Attachment B.

14.    Even though the loan interest seemed really high, with an APR of 24.99%, I was ok with signing up for the loan because it had a provision that if I pay the loan off within a year, I would not have to pay any interest so it would be treated essentially like cash. I figured that if Air AI worked for me, I would be able to pay the loan off within a year, and if it did not, I would get a refund from Air AI and pay the loan off that way. I would be able to mitigate risk that way. In particular, the contract said:

> 12-Months Same As Cash Option ("SAC"): If you pay the Amount Financed disclosed in the TILA Box within 12 months of the date of this Contract, you will receive a 100% rebate of the Finance Charge paid. However, you must pay each installment payment on time, and there can be no default under this Contract. If any installment shown in the Payment Schedule is not paid on time, the SAC Option is no longer available. If another type of default occurred under the Contract, the SAC Option is no longer available.

Attachment B at 2.

15.    Months later, someone at Air AI told me that Air AI has an arrangement with Special Finance. Under that arrangement Special Finance would give loans to people even if they have bad credit. Special Finance would then collect from borrowers, passing on only 40% of the money they collected to Air AI, and keeping the remaining 60%.

16.    After I got access to the Air AI platform, I tried to make it work for my business. I spent a lot of time doing the backend programing to use the AI phone agents for my business. I also did some test calls. But as I was working on it, I realized that the AI agent would not work well for my type of business, and that using an AI agent could be business suicide if my customers realized they were not talking to a real person. In my line of work, you need the human touch. The types of questions I get from people are very personal, and my customers are

often very vulnerable, so it is important that they feel comfortable with us. Anything artificial is not going to work for that.

17.    After a few months, I realized that trying to work with Air AI was like fitting a square peg in a round hole, so on April 22, 2024, I reached out to them to ask for a refund on Slack, the messaging platform that Air AI used. A true and correct screenshot of my April 22, 2024, Slack message is attached as Attachment C.

18.    An Air AI representative called Dana Smith responded to my message and asked me whether I had done some of the things set out in the contract, for example run my test cycle calls. I let her know that I didn't want to waste their time with test cycles, that the program just wasn't going to work for me. She ended up tagging the Slack message with the Air AI founders Caleb, Thomas, and Ryan (the "founders channel") so that they could respond to me.

19.    I went back and forth with the founders channel several times in the next few months. They kept asking me questions about my business and about how I could integrate Air AI.  I responded at length about why it wasn't going to work for my business. Eventually, on June 12, 2024, I let them know that "when I spoke with the sale[s] [sic] person I shared all my hesitations. He sold me on it with the 'if it doesn't work just let us know and no questions asked you can get out' clause." I asked them how to take advantage of that. I wasn't interested in going back and forth with them anymore, I just wanted my money back. A true and correct copy of my June 12, 2024, Slack message is attached as Attachment D.

20.    On June 18, 2024, the founders channel sent me a long message. In their message they let me know that "[y]ou were sold on the guarantee that is it didn't work for your needs, you could get a refund – no questions asked." They also told me "we are admittedly in a difficult financial position at the moment that is impacting our ability to process refunds as quickly as we'd like." At the same time, they said "your refund is absolutely still guaranteed and we are working tirelessly to improve our financial standing so that we can process it as soon as humanly possible." The message went on to say that they were "actively pursuing promising new revenue streams and have made significant cost cuts internally to expedite our path to being able to fulfill the refunds we owe." They ended the message with "would you be completely against hanging tight before coming to a final decision given you might want to use Air for other potential ventures?" A true and correct copy of the June 18, 2024, Slack message is attached as Attachment E.

*Declaration of Scott Patterson*

**FTC-000155**

21.     I was not interested in dragging things out with Air AI, so on June 19, 2024, I let them know I wanted my refund immediately. *Id.*

22.     I didn't hear back from the founders channel until June 27, 2024. When they did message me back, they said "I know it sucks" and told me that "[t]he stuff we're working on in the insurance space is really promising right now – and I think we'll be in a position really soon to refund you asap." A true and correct copy of the June 27, 2024 Slack message is attached as Attachment F.

23.     I had the feeling like I might not get my money back. It was super frustrating because I was still paying almost $1,000 a month on the loan for a program that wasn't going to work for me. I wanted to pay that loan off with the refund as soon as possible, so I really pressed them.

24.     The next message I got from the founders channel acknowledged that "we have a contractual obligation to honor the 100% refund provision." They went on to say that if I took legal actions against them, that "would likely be costly for both parties and could potentially delay your refund even further by diverting our limited resources." They also said "[w]e're making significant progress on new revenue streams, particularly in the insurance space, which we believe will put us in a position to honor refunds very soon." A true and correct copy of the Slack message is attached as Attachment G.

25.     At some point in July, the founders channel offered to get on a call with me to discuss a path forward on my refund, but when I tried to follow up on whether the call was actually happening, they didn't respond. A true and correct of the July 2024 Slack message from the founders channel is attached as Attachment H. At that point, I had my friend who is an attorney write to Air AI, but that didn't do anything.

26.     After I realized that I wasn't going to get my money back, I went online and looked up reviews for Air AI. I saw that a lot of people were having the same experience I was.

27.     I have tried to resolve the issue with Special Finance, but they have told me that any cancellation of the contract has to come from Air AI, not from me. I finally stopped making payments on the loan with Special Finance. In total, I have paid them $7,950.88.

28.     At some point Air AI sent me a contract to deal with the refund issue that would have offered a personal guarantee for the refund that is owed to me. But I wasn't going to take

*Declaration of Scott Patterson*

**FTC-000156**

them up on that, because there is no point in getting a personal guarantee from some young person without any assets.

29.    The whole Air AI operation feels like a Ponzi scheme, like they are literally robbing Peter to pay Paul.

30.    I would have never signed up for Air AI without the refund guarantee.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **NOVEMBER 24**, 2024.

Scott Patterson

*Declaration of Scott Patterson*

**FTC-000157**



# Air Agency License

THIS AGENCY LICENSE AGREEMENT ("Agreement") is made as of __01/24/2024__ (the "Effective Date") by and between Air AI, LLC ("Air AI"), an Arizona Limited Liability Company  with its principal place of business at 4742 N. 24th St., Suite 300, Phoenix, Arizona 85016, and __Scott Patterson_____ with its principal place of business at ███████████████ Agoura Hills, CA 91301_____ ("Client").

NOTICE TO THE CLIENT: DO NOT ACCEPT THIS AGREEMENT BEFORE YOU READ IT. BY ACCESSING THE AIR AI LICENSE, YOU ACKNOWLEDGE: YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT, AND YOU ACCEPT AND AGREE TO BE BOUND BY ITS TERMS. PLEASE KEEP A COPY OF THIS AGREEMENT FOR YOUR RECORDS. IF YOU HAVE ANY QUESTIONS OR CONCERNS, PLEASE CONTACT AIR AI BEFORE ACCEPTING THIS AGREEMENT.

1. **LICENSE OFFER & TERMS.** Air AI hereby offers and Client purchases Air AI's goods and services constituting the Air Agency License ("License") pursuant to the following terms:

    a. Pricing & Deliverables: The "Client" agrees to pay $25,000 for a License and in return will receive the following:

        i. A 30% revenue share of Client's Air usage that Client directly refers to Air AI until Client is paid $50,000 in revenue sharing. Thereafter, Client shall receive an 5% revenue share according to the terms of the license agreement.

        ii. Revenue share will be calculated and distributed on a monthly basis with net 30-day terms. (ex: August 1 to August 31  revenue share would be calculated and distributed by September 30)

        iii. Client will receive an 5% discount on the purchase price of all Air usage purchased directly from Air AI that is consumed by Client.

        iv. Priority capacity beyond general capacity on Air AI's servers for Client and Client's customers.

        v. Priority support from Air AI's team for Client and Client's customers.

        vi. Early access to new features for both Client and Client's customers.

        vii. Early Application Programming Interface ("API") access for both Client and Client's customers.

        viii. Air Certification: Hands on training to become one of the best in the

world at conversational AI & implementing it for Client's customers.

ix. Curriculum on how to price, package & position your conversational AI agency.

x. Done For You ("DFY") demos, funnel templates, automations, Air scripts & agents to get customers for your agency to sell Licenses.

xi. BONUS: AirU - Our proprietary client acquisition system (that we sell every day for $30k).

xii. BONUS: Access to the Advertising Academy video series.

xiii. This License is transferable to another person or company at Client's discretion with consent of Air AI, which consent will not be unreasonably withheld.

xiv. Usage fees are as follows:

1. Outbound Campaigns: The usage fee is $0.11 per minute of output on outbound campaigns which includes agent dial time and agent talk time plus Twilio fees. Twilio fees are billed separately and can be found here: https://www.twilio.com/pricing

2. Inbound Campaigns: The usage fee is $0.32 per minute of talk time plus Twilio fees. Twilio fees are billed separately and can be found here: https://www.twilio.com/pricing

b. Guarantee: The License is backed by a results satisfaction guarantee. If Client is not satisfied with the performance of their agent or for any other reason at all, Client can receive a full buy back of the amount paid, but no sooner than 120 days after signing this Agreement. Eligibility for a buy back is conditioned on completion of the steps set forth in subsection c.i.1-4 below. This guarantee rests upon the premise that Air AI's conversational AI will deliver results for the client, and is offered to remove any risk that it will not work for Client.

c. Guarantee Eligibility: In order to be eligible for a buy back, Client must complete 3 "test cycles" with their agent with Air AI's team, providing the agent feedback and advice between each round.

i. To complete a full test cycle, the following steps must take place:

1. Client's agent gets 100 pickups to ensure the test is statistically significant;

2. Client advises Air AI as to which script Client is using and the campaign details that produced the 100 pickups so that Air AI's team can conduct a meaningful review;

3. Air AI will analyze the call recordings, script, and other components related to Client's agent and provide feedback and suggestions for implementation to improve the performance of the agent;

4. Client must implement all the suggestions Air AI provides

including, but not limited to, script changes, knowledge base updates, action changes, etc.

    ii.    If client remains unsatisfied with the performance of the agent after completing 3 test cycles, then Client may receive a full buy back of the amount paid for the License.

    iii.    If Client elects a buy back after completing the 3 test cycles, Client will immediately forfeit its License and the payouts associated with the License.

d.  Client agrees to fulfill all payment obligations for the License upon acceptance of this Agreement.

e.  Terms & Termination: This Agreement is binding both parties and their respective heirs, successors, assigns, executors, and administrators. This Agreement sets forth the complete understanding of the parties and supersedes all previous discussions, negotiations and terms not expressly set forth herein. Client acknowledges that no promises or agreements outside of this Agreement have been established. This Agreement may be modified only upon further written agreement signed by both parties. Client agrees that its obligations under this Agreement commence upon the Effective Date and continue without termination unless consented by Air AI in writing and pursuant to the terms hereof. This Agreement may be terminated by Air AI at any time in the event of a breach by the other party of any of the following conditions:

    i.    The terms and conditions of this Agreement, specifically including Air AI's terms of use, and failure to remedy such breach within 72 hours of receipt of written notice of the breach;

    ii.    Execution of any illegal operations, including but not limited to scams or fraudulent activities, through the use of the License. Upon termination of this Agreement for any of the reasons stated above, no refund of any fees paid to Air AI will be issued and all privileges granted under this Agreement will be immediately revoked.

2. **CONFIDENTIALITY AND PROPRIETARY INFORMATION.** Client acknowledges that all proprietary information related to the usage structure, pricing schema, product models, algorithms, and business strategies – including the structure of this Agreement and this License ("Confidential Information") is the exclusive property of Air AI. Such Confidential Information is not readily available to the public and Client acknowledges that the Confidential Information holds inherent economic value for derived in part from its unavailability to the public.

Under this Agreement, Client agrees to treat such Confidential Information as confidential unless expressly indicated otherwise by Air AI. Client is obligated to maintain strict confidentiality and may utilize this knowledge exclusively for the

**FTC-000160**

purpose permitted by Ai AI. If Client has any questions regarding those permitted uses, Client is obligated to inquire with Air AI. The reproduction, distribution, or disclosure of any part or the whole of the Confidential Information to any third party, without the prior written consent of Air AI, is strictly prohibited.

Client also agrees to take all necessary measures to protect the confidentiality of the Confidential Information. This obligation remains even after the expiration or termination of this Agreement.

3. **DISCLAIMER OF WARRANTY**. OTHER THAN THE GUARANTY TERMS SET FORTH ABOVE, NO WARRANTY IS MADE BY AIR AI REGARDING ANY INFORMATION, SERVICES OR PRODUCTS PROVIDED IN CONNECTION WITH THE LICENSE, OR RESULTS FROM USE OF SAME. AIR AI EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES AS TO THE ACCURACY, COMPLETENESS OR CONTENT OF INFORMATION, PRODUCTS OR SERVICES AND ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT TO THE EXTENT THE EXCLUSION OF IMPLIED WARRANTIES IS NOT PERMITTED BY LAW.

4. **LIMITATION OF LIABILITY AND DAMAGES.** YOU AGREE THAT AIR AI'S LEGAL LIABILITY, INCLUDING THE LIABILITY OF ITS AFFILIATES, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES OR AGENTS, FOR ANY CLAIM MADE BY YOU ARISING OUT OF YOUR USE OF AIR AI's PRODUCTS OR SERVICES OFFERED TO YOU AS AN AIR AI AGENCY LICENSE HOLDER PURSUANT TO THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT YOU PAID TO AIR AI PURSUANT TO THIS AGREEMENT EXCEPT AS PROVIDED IN THE ARBITRATION AGREEMENT IN SECTION 7 HEREINBELOW. UNDER NO CIRCUMSTANCES WILL SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES BE AWARDED, EVEN IF AIR AI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, IN WHICH CASE THIS EXCLUSION MAY NOT APPLY.

5. **MUTUAL INDEMNITY.** The parties agree to defend, indemnify and hold harmless, each other and each other's affiliates, officers, subsidiaries, successors, assigns, directors, officers, agents, service providers, attorneys, suppliers and employees, from any claim or demand, including reasonable attorneys' fees and court costs, made by any third party due to or arising out of the indemnifying party's misuse of the Air.ai Products and Services, violation of this Agreement, or breach of any of acknowledgements, agreements, representations, warranties and obligations herein, or the indemnifying party's negligent, reckless or willful acts

YOU ACKNOWLEDGE THAT AIR AI HAS SET ITS PRICES AND HAS PROVIDED ACCESS TO ITS PRODUCTS AND SERVICES IN RELIANCE ON THESE LIMITATIONS OF LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT, AND THAT THOSE LIMITATIONS ARE AN ESSENTIAL BASIS UPON WHICH AIR AI OFFERS ITS PRODUCTS AND SERVICES. YOU AGREE THAT THE LIMITATIONS OF LIABILITY AND DAMAGES AND THE INDEMNITY IN THIS AGREEMENT SURVIVE AND APPLY EVEN IF FOUND TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

6. **GOVERNING LAW, JURISDICTION AND VENUE.** This Agreement shall be construed in accordance with and governed by the laws of the State of Arizona.

7. **DISPUTE RESOLUTION AND CLASS ACTION WAIVER.** Most concerns can be resolved quickly by contacting Air AI's Client Service Center via concierge@air.ai In the unlikely event that Client Service cannot resolve Client's complaint to Client's satisfaction, or if Air AI has not been able to resolve a dispute after attempting to do so informally, then, except for collection claims and petitions for injunctive relief, the parties agree to resolve all other disputes through binding arbitration rather than in court. Arbitration is less formal than a lawsuit and uses a neutral arbitrator instead of a judge or jury, allowing less discovery than judicial proceedings, and is subject to very limited court review. Here, the American Arbitration Association (AAA) will serve as the arbitration provider to take place in Maricopa County, Arizona. The parties agree that any arbitration hereunder will take place on an individual basis and Client waives any right to pursue a dispute on a representative, group, collective or class action basis.

You may, and are encouraged, to speak with your own attorney before entering into this Agreement or purchasing any product or service offered by Air AI, but your execution of this Agreement or purchase of any Air AI product or service constitutes your acceptance of this Agreement, including this provision.

YOU AGREE THAT, BY ENTERING INTO THIS AGREEMENT, YOU AND AIR AI ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A REPRESENTATIVE, GROUP, COLLECTIVE OR CLASS ACTION OR ARBITRATION. YOU AND AIR AI AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT AS PLAINTIFFS OR CLASS MEMBERS IN ANY PURPORTED REPRESENTATIVE, GROUP OR CLASS ACTION OR ARBITRATION, OR IN THE CAPACITY OF A PRIVATE ATTORNEY GENERAL.

8. **SEVERABILITY OF AGREEMENT.** If any provision of the Agreement is found by a court or other binding authority to be invalid, Client agrees that every attempt shall be made to give effect to the parties' intentions as reflected in that provision, and remaining provisions contained in this Agreement shall continue in full force and

effect.

By electronic authorization, the Client accepts the terms and conditions of this Agreement and authorizes Air AI to immediately charge the credit card and/or debit the bank account provided in payment for the purchase of the License.

9. **FORCE MAJEURE:** Neither party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) for causes occurring without that party's fault or negligence, including, but not limited to, acts of God, acts of government, flood, fire, civil unrest, acts of terror, pandemics, epidemics, strikes or other labor problems (other than those involving Air AI or the Client's employees), computer attacks or malicious acts, such as attacks on or through the internet, any internet service provider, telecommunications or hosting facility. Dates by which performance obligations are scheduled to be met will be extended for a period of time equivalent to the time lost due to any delay so caused.

10. **REPRESENTATIONS AND WARRANTIES:** Each party represents and warrants that it has the legal power and authority to enter into this Agreement. Air AI represents and warrants that it will provide the License in a manner consistent with general industry standards reasonably applicable to the provision thereof and that the License will perform substantially in accordance with its documentation under normal use and circumstances. The Client represents and warrants that they have not falsely identified themselves nor provided any false information to gain access to the License and that their billing information is correct.

IN WITNESS WHEREOF, the Client below executes this Licensing Agreement between them and AIR AI:

**Air Ai LLC**

By: _____Caleb Maddix_____

Signature: _____Caleb Maddix_____

Its: _____Co Founder_____

Date: _____01/24/2024_____

**CLIENT**

Name _____Scott Patterson_____

Email _____████_____

Phone _____███_____

Entity (optional) _____NA_____

Date _____01/24/2024_____

Signature _____

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

## RETAIL INSTALLMENT SALES CONTRACT (with ARBITRATION CLAUSE)

| | |
|---|---|
| **Name of Buyer:** SCOTT PATTERSON<br>**Address:** ▮▮▮▮▮▮▮<br>**Apt./No.:**<br>**City, State Zip:** NEWBURY PARK, CA 91320<br>**Home Phone:**<br>**Mobile Phone:** ▮▮▮▮▮▮<br>**Work Phone:** | **Seller of Services (Creditor):**<br>AIR.AI,LLC-30K PROGRAM<br>PO BOX 111<br>PHOENIX, AZ 85016<br><br>PHONE: 602-962-2573 |

| Quantity | Description of Services | Amount |
|---|---|---|
| 1 | AIR AGENCY LICENSE | $25,000.00 |
| | | |
| | | |
| | | |
| | **Total:** | $25,000.00 |

"We", "our" and "us" refer to the Seller/Creditor. "You" and "your" refer to the Buyer of services. If there is a Co-Signer, then "you" and "your" refer to both the Buyer, and Co-Signer.

You may buy the services described above ("Services") for cash or credit. By agreeing to this contract ("Contract") you choose to buy the Services on credit under the terms and conditions of this Contract. You agree to pay the Seller/Creditor the Amount Financed as shown in the Truth in Lending Disclosures Box on page 1 of this Contract ("TILA Box"), plus finance charge. Buyer and Co-Signer agree to be jointly and severally liable. A Co-Signer is any person who is not receiving the Services, but is contractually obligated under this Contract.

<u>Services Agreement</u>: The Services you purchased under this Contract may have a separate agreement. Consult the separate agreement for the terms and conditions applicable to the Services.

### TRUTH-IN-LENDING DISCLOSURE STATEMENT ("TILA Box")

| ANNUAL PERCENTAGE RATE<br>The cost of your credit at a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. | TOTAL SALE PRICE<br>The total cost of your purchase on credit, including your down payment of <u>$0.00</u> |
|---|---|---|---|---|
| **24.99 %** | **$ 9712.54 (e)** | **$ 25000** | **$ 34712.54 (e)** | **$ 34712.54 (e)** |

**Your Payment Schedule will be:**

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 35 | $993.86 | Monthly Beginning on 1/24/2024 |
| 1 | ($72.56) (e) | Final Payment on 12/24/2026 |

<u>Prepayment</u>: If you pay the Amount Financed early, in whole or in part, you will not have to pay a penalty.

<u>Late Fees</u>: If a payment is not received in full within 10 days after it is due, you will be charged a late charge of $10.00.

<u>Security</u>: You are providing a security interest in the Optional Recurring Payment Authorization and the Optional Credit and Debit Card Payment Authorization, if you signed these documents.

<u>Additional Information</u>: See your contract documents, and the remaining pages of this contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment, refunds and penalties.

**(e) means an estimate.**

Other-2016

Application Number: 617952

**Attachment B**
**Declaration of Scott Patterson**

**FTC-000165**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

**12-Months Same As Cash Option ("SAC"):** If you pay the Amount Financed disclosed in the TILA Box within 12 months of the date of this Contract, you will receive a 100% rebate of the Finance Charge paid. **However, you must pay each installment payment on time, and there can be no default under this Contract.** If any installment shown in the Payment Schedule is not paid on time, the SAC Option is no longer available. If another type of default occurred under the Contract, the SAC Option is no longer available.

**I understand that this Contract contains a 12 Months Same as Cash Option, and that I must satisfy certain conditions to exercise the option.**

Buyer: *Scott Patterson*
9CD1F50D3E2342C...                                                   Co-Signer:_____

| Itemization of Amount Financed | |
|---|---|
| 1. Cash Price | $25,000.00 |
| 2. | |
| 3. Sales Tax | $0.00 |
| 4. Total Cash Price (#1 + #2 + #3) | $25,000.00 |
| **Less**   5. Cash Down Payment | $0.00 |
| 6. Amount Financed (#4 - #5) | $25,000.00 |

You acknowledge that this Contract contains an Arbitration Clause. See Section entitled"Additional Disclosures and Contract Terms"

Notice to Buyer:
    **1. Do not sign this agreement before you read it or if it contains any blank spaces to be filled in.**
    **2. You are entitled to a completely filled-in copy of this agreement.**
    **3. You can prepay the full amount due under this agreement at any time.**
    **4. If you desire to pay off in advance the full amount due, the amount which is outstanding will be furnished upon request.**

**Acknowledgement:** By signing below you acknowledge that you had the opportunity to read this completely filled in Contract and to leave with a copy of it. You also acknowledge that you signed a completely filled-in copy of this Contract.

Buyer: *Scott Patterson*
9CD1F50D3E2342C...                                                   Date: _1/24/2024_

Co-Signer: _____                          Date: _____

Seller: *AUSTIN HIGGINS*
3790F44ECC9F44D...                                                   Date: _1/24/2024_

☐ If this box is checked, the Services purchased are primarily for business or commercial purposes, and the notice below does not apply.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Other-2016                                          Application Number: 617952

**Attachment B**
**Declaration of Scott Patterson**                  **FTC-000166**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

Additional Disclosures and Contract Terms

1. <u>Consent to Contract By Mail/Telephone/Text Message/Email</u>. For each address, email address and telephone number you provide to us, you agree that we may contact you by mail, telephone and email, to the extent not prohibited by law. We may contact you via voice calls or text messages to your cell phone and/or landline using a prerecorded/artificial voice message or an automatic telephone dialing system, for servicing and collection purposes, to the extent not prohibited by law. We may do so even if the telephone number is a mobile number and results in a charge to you.

You also understand and agree that if we contact you by telephone and we do not speak with you, we may leave a message for you with the person answering the telephone or on a voicemail or other answering machine device, to the extent not prohibited by law.



Buyer's Initials:    _SP_    Co-Signer's Initial: _____

<u>ARBITRATION</u>. This arbitration Clause significantly affects your rights in any dispute with us. Please read it carefully before you sign this Contract. You have the right to have this Contract, including the Arbitration Clause, reviewed by a lawyer before you sign it. If either you or we elect to arbitrate a dispute:

- AN ARBITRATOR, AND NOT A COURT, WILL DECIDE THE DISPUTE.
- YOU AND WE EACH GIVE UP OUR RIGHT TO A COURT TRIAL OR A JURY TRIAL.
- YOU GIVE UP YOUR RIGHT TO ACT AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU HAVE AGAINST US.
- INFORMATION YOU AND WE MAY OBTAIN IN DISCOVERY FROM EACH OTHER IN ARBITRATION IS GENERALLY MORE LIMITED THAN IN COURT.
- OTHER RIGHTS YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE.
- WE MAY STILL SEEK PROVISIONAL REMEDIES FROM A COURT.

This Arbitration Clause applies to disputes between you and us. Disputes may arise from contracts, torts or otherwise. A dispute may involve the interpretation and scope of this clause and the arbitrability of any issue.

A dispute may be between you and us or our employees, agents, successors or assigns, which arise out of or relate to this Contract or any resulting transaction or relationship (including any relationship with third parties who do not sign this Contract).

Any dispute shall, at you or our election (or the election of any party entitled to elect to arbitrate), be resolved by neutral, binding arbitration and not by a court action. Any dispute is to be arbitrated on an individual basis and not as a class action. You waive any right you may have to arbitrate a class action. This is referred to below as the "waiver of class relief."

You may choose the applicable rules of the American Aribtration Association or JAMS. You may obtain a copy of the rules of these organizations by visiting their websites. If you cannot access their web sites, we will provide the rules to you upon request.

The arbitrator shall be an attorney or retired judge selected in accordance with the applicable rules. The arbitration award shall be in writing, but without a supporting opinion. The arbitration hearing shall be conducted in the federal district in which you reside.

We will pay the arbitration filing fee. We will pay the arbitration costs and the fees for the first day of arbitration, up to a maximum of eight hours. We will pay any additional costs and fees of arbitration if the arbitrator determines that applicable law or the arbitration organization's rules require us to do so or that we must do so to make this arbitration clause enforceable. Otherwise, the arbitrator shall decide who shall pay any additional costs and fees.

The arbitrator's award shall be final and binding on all parties, except that in the event of a "take nothing" award or an award in excess of $100,000, the losing party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel.

The Federal Arbitration Act shall govern any arbitration under this Arbitration Clause notwithstanding any election of state law in this Contract or in any other document you sign.

You and we retain the right to seek provisional remedies from a court. Neither you nor we waive the right to arbitrate by filing suit, or seeking or obtaining provisional remedies from a court. Either you or we may enter judgment on the award rendered by the arbitrator in any court with jurisdiction.

If any part of this Arbitration Clause other than the waiver of class relief is held or deemed to be unenforceable, the rest of the clause shall be enforceable. If the waiver of class relief is held or deemed to be unenforceable, this entire Arbitration Clause shall be unenforceable.

You may opt out of this Arbitration Clause by sending us a notice stating that you do not want it to apply. You must send the notice not more than 15 days after the date of this Contract. You and all parties to the Contract other than us must sign it. You must send it by registered mail to Special Financing Company, LLC at 2504 BuildAmerica Drive, Hampton, Virginia 23666. The notice will be effective when we receive it.

3. <u>Promise to Pay</u>: You jointly and severally agree to pay us the "Amount Financed" shown in the TILA Box ("Amount Financed") and finance charge on the Amount Financed at a rate equal to the APR (defined below in Section 7). You agree to make all installment payments set forth in the "Payment Schedule," in the amounts and by the dates shown in the TILA Box ("Installments"). You also agree to pay additional amounts that may be assessed as provided in this Contract, such as late fees and NSF fees. "Jointly and severally" means that each person agrees to keep all the promises in this Contract even if the other person(s), if there is one, does not.

Other-2016

Application Number: 617952

**Attachment B
Declaration of Scott Patterson**

**FTC-000167**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

4. <u>Security</u>.

    [X]  If this box is checked, you have chosen to sign and provide an Optional Recurring Payments Authorization ("Recurring Payment Authorization"). The Recurring Payment Authorization is on a separate piece of paper so that you can clearly and prominently see what you are agreeing to provide. The Recurring Payment Authorization is not required to obtain credit. If you provide it, the Recurring Payment Authorization is a part of this Contract. The Recurring Payment Authorization gives us permission to automatically debit your bank account. You may revoke the Recurring Payment Authorization at any time. See the Recurring Payment Authorization for details.

| Buyer's Initial: _SP_ | Co-Signer's Initial: |
|---|---|

    [X]  If this box is checked, you have chosen to sign and provide an Optional Credit and Debit Card Payment Authorization ("Authorization"). The Authorization is on a separate piece of paper so that you can clearly and prominently see what you are agreeing to provide. The Authorization is not required to obtain credit. If you provide it, the Authorization is a part of this Contract. The Authorization gives us permission to charge your credit or debit card. You may revoke the Authorization at any time. See the Authorization for details.

| Buyer's Initial: _SP_ | Co-Signer's Initial: |
|---|---|

    For the box(es) checked, pursuant to Official Staff Comment 1 of the Bureau of Consumer Financial Protection Official Staff Commentary to Regulation Z § 1026.2(a)(25), where state law is silent or unclear as to whether a particular interest is a security interest, a creditor may disclose the interest as a security interest for Truth in Lending purposes. It is unclear whether an Optional Recurring Payment Authorization and/or an Optional Credit and Debit Card Payment Authorization are a security interest under state law. Because of this, we are disclosing in the TILA Box our right to initiate electronic debits and/or charge a credit or debit card as a "security interest" for Truth in Lending purposes. This disclosure is not intended to create, and shall not evidence, a security interest under state law.

5. <u>Application of Payments</u>. Unless otherwise required by law, we will apply payments we receive as follows: (1) first to unpaid finance charges; (2) second to any fees and other permissible costs (including a late fee) and (3) third to the declining balance of the Amount Financed.

6. <u>Final Payment</u>. If you do not pay the installments as required in the Payment Schedule, your final payment may be higher than what is shown in the TILA Box. All amounts that are owed under this Contract and that have not been paid will become due and payable on the date of your final paymnet ("Maturity").

7. <u>Finance Charge</u>. You agree to pay a finance charge on the Amount Financed until this Contract has been paid in full. We will calculate the finance charge on a daily basis based upon a 365-day year by applying a daily periodic rate to the declining balance of the Amount Financed. The daily periodic rate is equal to the "Annual Percentage Rate" ("APR") shown in the TILA Box, divided by 365. The amount of finance charge you pay depends upon when you make your payments. Early payments or paying more than the scheduled installment may decrease the amount of finance charge that you will pay. Late payments may increase the amount of finance charge that you will pay.

The Finance Charge you pay may be more than the Finance Charge shown in the TILA Box if you make your payments late or in an amount less than the scheduled installment.

If any of the Amount Financed is unpaid after Maturity or a deferred Maturity, the Amount Financed will continue to accrue Finance Charge at the APR shown in the TILA Box, to the extent not prohibited by law.

When a payment is received, the amount credited to the finance charge is computed as of the day the payment is received.

8. <u>Deferral of an Installment</u>. If any Installment(s) is deferred, you will pay more finance charge because the Amount Financed does not decline during the period of deferral and Finance Charge continues to accrue.

9. <u>Prepayment</u>. You may prepay this Contract, in full or in part, at any time without penalty. If you prepay in part -- meaning that you pay more than the amount of the scheduled Installment and there are no other amounts due -- you are still required to pay your next Installment on the date scheduled. Prepaying in part does not eliminate the obligation to pay Installments as they come due.

10. <u>Late Charge</u>. If an installment is not paid in full within 10 days after its scheduled due date, you agree to pay a late charge as shown in the TILA Box.

11. <u>NSF Charge</u>. If a payment in whatever form, including, but not limited to, a check, electronic funds transfer, electronic debit, or ACH ("Payment Instrument") is not honored or is returned unpaid, you agree to pay a NSF charge of $15.00, to the extent not prohibited by law. We may re-present the Payment Instrument to be paid, for a maximum presentment of 2 times.

If the Payment Instrument is a check and it is re-presented, in the ordinary course of business, the check will not be provided to you with your bank statement, but a copy can be received by contacting your financial institution.

12. <u>Back-Up Payment</u>. If an Installment is not paid when due and you have provided the Authorization described in Section 4 above (and it has not been revoked), we will charge your credit/debit card (as applicable under the terms of the Authorization) in the amount of the Installment ("Back-Up Payment"). We will submit a Back-Up Payment only once for each installment that is not paid when due.

13. <u>Check Conversion</u>. If your Payment Instrument is a check, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. In the event a check is not honored or is returned unpaid, we may re-present the check electronically as described here. For questions, please contact us at 1-757-825-0450.

14. <u>Default</u>. You will be in default: (1) if you fail to pay an installment when due; (2) you fail to keep your promises under this Contract; (3) any information you furnished us in connection with this Contract is false or materially misleading; or (4) any proceeding is begun or petition is filed under any bankruptcy or insolvency law by or against you.

Other-2016

Application Number: 617952

**Attachment B**
**Declaration of Scott Patterson**

FTC-000168

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

15. <u>Our Rights and Remedies upon Default</u>. If you default under this Contract, we may, in our sole discretion, demand that you pay all amounts owed under this Contract immediately (this is known as "to accelerate" or "accelerator"), subject to any state requirements to provide you with notice and/or a right to cure. If you default, you agree that we have all rights and remedies available to us under applicable law and this Contract. You agree to pay all costs and expenses we incur in enforcing this Contract, including, but not limited to, attorney's fees for an attorney who is not our salaried employee and court costs, to the extent not prohibited by law.

16. <u>No Waivers</u>. We may delay enforcing any of our rights or elect not to enforce our rights without losing them. Our acceptance of partial payments does not modify the terms of this Contract and does not constitute a waiver of any subsequent default. You waive the rights of demand, presentment, protest, and notice of dishonor, to the extent not prohibited by law. "Presentment" means the right to have us make demand for payment of amounts due. "Notice of Dishonor" means the right to require us to give notice that amounts due have not been paid. You also waive any common law right to receive a notice of our intent to accelerate and a notice of acceleration.

17. <u>Entire Agreement</u>. This Contract constitutes the entire agreement between you and us about the credit sale of the Services. There may be other agreements that relate solely to the Services (and not the financing of the Services). This Contract is binding on you, your heirs, personal representatives, successors and assigns. It is also binding on us and our sucessors and assigns.

18. <u>Modification</u>. This Contract may not be amended or modified except in a writing signed by you and us.

---

This Contract contains the entire agreement between you and us relating to this Contract.  Any change to this Contract must be in writing and we must sign it. ~~You may~~ ~~binding.~~

Buyer: _Scott Patterson_ _____    Co-Signer: ___ _____
9CD1F50D3E2342C...

---

    <u>Assignment and Binding</u>. We may assign this Contract without your permission, but you may not assign or transfer your rights or obligations without your prior written permission.

20. <u>Governing Law</u>. This Contract is governed by the laws of the State in which the Seller/Creditor is located and Services are provided.

---

Assignment: This Contract is assigned to Special Financing Company, LLC according to the terms of the dealer agreement between the parties.

Seller/Creditor Name: _~~AUTOXXXXXX PROGRAM~~_____

Authorized Signature: _AUSTIN HIGGINS_____
3790F44ECC9F44D...

Title: __Authorized Signer_____    Date: _1/24/2024_____

---

Application Number: 617952

**Attachment B
Declaration of Scott Patterson**

**FTC-000169**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

**Special Financing Company, LLC**
**2504 BuildAmerica Drive**
**Hampton, Virginia 23666**
**757-825-0450**

**Optional Recurring Payment Authorization**

In this Optional Recurring Payment Authorization ("Recurring Payment Authorization") "you" and "your" mean the Account Holder(s) who sign this Authorization. "We," "us," and "our" mean Special Financing Company, LLC, or any assignee. This Authorization is an addendum to, and made a part of, the Retail Installment Sales Contract dated 1/24/2024 that you signed for the purchase of services on credit ("Contract").

**YOU ARE NOT REQUIRED TO COMPLETE THIS RECURRING PAYMENT AUTHORIZATION TO OBTAIN CREDIT. IF YOU ELECT TO AUTHORIZE RECURRING PAYMENTS PROVIDED FOR IN THIS RECURRING PAYMENT AUTHORIZATION, YOU MAY CANCEL IT AT ANY TIME, AS EXPLAINED BELOW.**

**Please select the type of payment you wish to choose (ACH debit to your deposit account, or payment by credit or debit card) and complete the information below.**

[X] **ACH Payment.** Please provide the following deposit account information for ACH payments:

Bank Name: ███_____    Account Type: [X] Checking    [ ] Savings
City: _____    State: _____    Zip: _____
Routing Number: _███_____    Account Number: ███_____

**Attach a Voided Check or Deposit Slip to this Form**

[ ] **Credit or Debit Card Payment.** Please provide the following card account information for card payments:

Card Brand: [ ] Visa   [ ] MasterCard   [ ] American Express   [ ] Discover
Card Type: [ ] Credit Card   [ ] Debit Card
Card Issuer Name: _____
Cardholder Name: _____
Card Account Number: _____
Card Expiration Date: _____
CVV (3 digit number on back of Visa/MC, 4 digits on front of AMEX: _____
Cardholder Billing Address:
    Address: _____
    City: _____
    State: _____
    Zip Code: _____

**Recurring Payments Authorization:**

By signing below, you authorize us to initiate regularly scheduled recurring electronic debits ("ACHs" or "ACH debits") from your bank account identified above, or credit or debit card payments with your credit or debit card identified above, and to apply the payments when received by us to your Contract, as follows:

Recurring Payment Amount **$993.86**_____    Recurring Payment Start Date: **1/24/2024**_____

Recurring Payment Frequency: [ ] Weekly    [ ] Bi-Weekly    [X] Monthly

Page 6 of 9

Other-2016                                    Application Number: 617952

**Attachment B**
**Declaration of Scott Patterson**

**FTC-000170**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

Payments will occur on the date that payment is due.  If any payment due date falls on a weekend or holiday, the payment will occur on the next business day after the payment due date.

If any payment is not paid, and is returned for non-sufficient funds, closed-account or otherwise (other than as a result of cancellation of this Recurring Payment Authorization), we may charge you a NSF fee as provided in your Contract and to the extent not prohibited by applicable law, and you may be charged a NSF fee by your financial institution and/or other affected parties.  You are solely responsible for any resulting fees, charges or other amounts.  The NSF fee we may charge is **$15.00**_____ (or the amount specified in your Contract, if less), and you authorize us to make a one-time electronic debit from your bank account identified above or a one-time charge to your credit or debit card identified above in the amount of the NSF fee.

If any ACH debit is returned unpaid, we may attempt to process the payment again, up to two (2) times.

As necessary, you also authorize us to initiate transactions to correct any erroneous payment transaction.

If your payment amount or date changes, you will receive notice from us at least 10 days prior to the payment being collected.

**You may cancel this Recurring Payment Authorization by writing to us at 2504 BuildAmerica Drive, Hampton, Virginia 23666 or calling us at 757-825-0450. Note that it may take up to 3 business days to process the cancellation. You may also be able to prevent charges under this Recurring Payment Authorization by contacting your bank.** If you cancel this Recurring Payment Authorization, we will not initiate any further payments under this Recurring Payment Authorization.

You are not required to complete this Recurring Payment Authorization to obtain credit, and you can cancel this Recurring Payment Authorization at any time. You also understand that this Recurring Payment Authorization will remain in effect until your Contract is paid in full, unless you terminate it. You may terminate this Recurring Payment Authorization by sending us written notice at the address provided above or calling us at the phone number above at least three (3) business days prior to the next payment due date or payoff of the Contract. If you close your deposit account or your credit or debit card, you must provide us with any new account or card information within ten (10) business days. You understand that all payment transactions must comply with applicable law, and ACH debits must comply with the Rules of NACHA (formerly known as the National Automated Clearing House Association). You certify that you are a named depositor on the account identified above, or an authorized user of the credit or debit card identified above.

Buyer Name: **SCOTT PATTERSON**_____

Signature: _Scott Patterson_ _____ Date: **1/24/2024**_____

DocuSigned by:
9CD1F50D3E2342C...

A copy of this Recurring Payment Authorization will be provided to you for your records.

Other-2016

Application Number: 617952

**Attachment B
Declaration of Scott Patterson**

**FTC-000171**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

**Special Financing Company, LLC**
**2504 BuildAmerica Drive**
**Hampton, Virginia 23666**
**757-825-0450**

**Optional Credit and Debit Card Payment Authorization**

In this Optional Credit and Debit Card Payment Authorization ("Authorization"), "you" and "your" mean the Account Holder(s) who sign this Authorization. "We," "us," and "our" mean Special Financing Company, LLC, or any assignee. This Authorization is an addendum to, and made a part of, the Retail Installment Sales Contract dated 1/24/2024 that you signed for the purchase of services on credit ("Contract").

**YOU ARE NOT REQUIRED TO COMPLETE THIS AUTHORIZATION TO OBTAIN CREDIT. IF YOU ELECT TO AUTHORIZE THE PAYMENTS PROVIDED FOR IN THIS AUTHORIZATION, YOU MAY CANCEL THIS AUTHORIZATION AT ANY TIME, AS EXPLAINED BELOW.**

By signing below, you authorize us to initiate one or more one-time charge(s) against your credit card or debit card account identified below as follows:

We will initiate a one-time charge under this Authorization if (1) you fail to make any individual payment by or on the scheduled payment date in your Contract ("Missed Payment"), or (2) any payment is returned unpaid by your financial institution for any reason (other than cancellation of any authorization for the payment) ("Returned Payment"). You authorize and request us to initiate a one-time charge against your credit card or debit card account for the amount of the Missed Payment or Returned Payment. We will linitiate the one-time charge on the first business day following the Missed Payment's/Returned Payment's due date, or on the first business day following such date. We will do this for **each** Missed Payment and/or Returned Payment. If you cancel this Authorization as provided below, we will not initiate any firther payments under this authorization. If necessary, you also authorize us to initiate transactions to correct any erroneous payment transaction.

**You understand that we may use this Authorization days, weeks, months or even a year or more after you give it. Is we use this Authorization, we will charge your credit card or debit card, as applicable. If we charge your credit card, you will be responsible for paying the amount of the charge to your credit card company. This could result in you paying interest on the amount of the charge, and if the charge exceeds your credit limit, paying an over the limit fee to your credit card company. The credit card charge should appear on your credit crad statement. If we charge your debit card, the amount of our charge will be debited from your bank account. This could result in you paying an overdraft charge if you do not have sufficient funds to cover the amount of the debit. The debit card charge should appear on your bank account statement.**

**You can prevent a charge to your credit card or debit card under this Authorization by making your payments on time and by making sure that you have sufficient funds in your bank account to cover payments made to us. You may cancel this Authorization by writing to us at 2504 BuilkdAmerica Drive, Hampton, Virginia 23666 or calling us at 757-825-0450. Note that it may take up to 3 business days to process the cancellation. You may also be able to prevent the charge by calling your credit card company or your bank, as applicable.**

Other-2016

Application Number: 617952

**Attachment B**
**Declaration of Scott Patterson**

**FTC-000172**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

Card Brand: ☐ Visa    ☐ MasterCard    ☐ American Express    ☐ Discover

Card Type: ☐ Credit Card    ☐ Debit Card

Card Issuer Name: _____

Cardholder Name: **SCOTT PATTERSON** _____

Card Account Number: ██████████ _____

Card Expiration Date: __███____ _____

CVV (3 digit number on back of Visa/MC, 4 digits on front of AMEX): ███ _____

Cardholder Billing Address:
Address: ██████████████
City: **NEWBURY PARK** _____
State: **CA** _____
Zip Code: **91320** _____

You authorize us to charge the credit or debit card indicated in this Authorization according to the terms outlined above and in your Contract. You understand that you are not required to complete this Authorization to obtain credit, and that you can cancel this Authorization at any time. You also understand that this Authorization will remain in effect until your Contract is paid in full, unless you cancel it by writing to us at 2504 BuildAmerica Drive, Hampton, Virginia 23666 or calling us at 757-825-0450, and you agree to notify us in writing of any changes in your account information or termination of this Authorization at least 3 business days prior to the next payment due date, You certify that you are an authorized user of the credit or debit card described above.

SIGNATURE: *Scott Patterson* _____ DATE: **1/24/2024** _____

Other-2016                                                                 Application Number: 617952

**Attachment B**
**Declaration of Scott Patterson**                    **FTC-000173**

DocuSign Envelope ID: 43AB3AFC-4877-419A-A4FF-C15A7B8E298E

## Customer Information

Application Number: 617952
AIR.AI,LLC-30K PROGRAM

24 JAN 2024

Name:  **SCOTT PATTERSON**                                         SSN: ███████
          █████████████████████                                  DOB: ███████
          **NEWBURY PARK, CA 91320**
      ███████████████████

Work:
      ███████████████████████
      **AGOURA HILLS, CA 91301**

SINGLE ☐      MARRIED ☐      SEPARATED ☐      DIVORCED ☐      WIDOWED ☐

SPOUSE NAME:

---

REFERENCES

1:    ███████████████████

      ███████████
      Relationship: **OTHER**

2:    ███████████

      ███████████
      Relationship: **OTHER**

**CONFIRMATION OF INFORMATION ACCURACY AND RELEASE OF AUTHORITY TO VERIFY**
I (we) hereby certify that the information in the application is correct. I (we) authorize AIR.AI,LLC-30K PROGRAM
or their agents/assigns to investigate my credit records and to verify the information given above.

DocuSigned by:

*Scott Patterson*
9CD1F50D3E2342C...
Applicant Signature                                          Co-Applicant Signature

**Attachment B**
**Declaration of Scott Patterson**

**FTC-000174**



Monday, April 22nd ⌄

**Scott Patterson**  12:30 PM
Hey Air team, as much as I wish I could implement it, an Air Agency license just doesn't make sense for me. I underestimated how much time I would have to invest in order to be able to really get it cranking. I unfortunately have to ask for Air to buy the license back from me. Please let me know how to move forward with that and happy to talk.

**Dana Smith**  1:25 PM
Hey @Scott Patterson I went ahead and pulled your contract. 120 days after your sign date is on May 23, 2024
We can begin the test cycles. Do you have 100 pick ups on your account?

PDF ⌄

Air Agency Agreement Scott (1).pdf
PDF

Air Agency License

THIS AGENCY LICENSE AGREEMENT ("Agreement") is made as of 01/24/2024 (the "Effective Date") by and between Air AI, LLC ("Air AI"), an Arizona Limited Liability Company  with its principal place of business at 4742 N. 24th St., Suite 300, Phoenix, Arizona 85016, and Scott Patterson                with its principal place of business at ▓▓▓▓▓▓▓▓▓▓ Agoura Hills, CA 91301                  ("Client").

NOTICE TO THE CLIENT: DO NOT ACCEPT THIS AGREEMENT BEFORE YOU READ IT. BY ACCESSING THE AIR AI LICENSE, YOU ACKNOWLEDGE: YOU HAVE READ THIS AGREEMENT, YOU UNDERSTAND IT, AND YOU

**Scott Patterson**  2:40 PM
I have not completed 100 pickups.

I bought the license on a flyer ideally for use with my own home services business. I didn't have much intention to sell it beyond getting it to work for my own business. But I thought if I could get it to work for myself I could probably get other junk removal businesses to buy into it. After the last couple months of taking calls for my business myself I've realized that our clientele needs a few intangibles that I can't deliver with an Air agent.



From a business standpoint we have more to lose from taking away a human than to gain.

I've talked to 7-8 different companies in my industry and they do not know anybody using AI for phones.

Unfortunately for our current business model of STUFF Junk Removal my decision is final and I have to call on the clause that allows me to back out of the contract for a refund of the license fee.

That being said I am in the process of working on 2 other businesses that I may end up coming back to you as a customer on. Your support, platform, technology, and team have all been amazing.

**Kiara Smith**  2:12 PM
Tagging @Caleb, Thomas, And Ryan to make sure they see your response.

Wednesday, June 12th ⌄

**Caleb, Thomas, And Ryan**  12:48 AM
How many human reps do you have currently doing this type of process? And what's their avg production?

@scott

**scott**  11:58 AM
Right now 1 human rep talking to about 250 unique leads each month. Low volume. High value leads. Expecting to be closer to 1,000 monthly unique callers within 2.5 years which will be near tipping point of needing a 2nd rep.

Look, I appreciate you trying to find a way around it but when I spoke with the sale person I shared all my hesitations. He sold me on it with the "if it doesn't work just let us know and no questions asked you can get out" clause. Please let me know what I have to do to complete this. Thanks

**Kiara Smith**  12:20 PM
Tagging @Caleb, Thomas, And Ryan here on your response.

1 reply  21 days ago

Friday, June 14th ⌄



**Caleb, Thomas, And Ryan**  10:39 PM
Hey Scott,

First off, I completely understand and respect your decision. You were sold on the guarantee that if it didn't work for your needs, you could get a refund - no questions asked. I appreciate you giving it a solid try and providing your candid feedback. The intricacies and judgment calls required in your business are great insights for us to factor in as we continue to evolve our AI capabilities.

I do want to be fully transparent with you though. As a bootstrapped startup, we are admittedly in a difficult financial position at the moment that is impacting our ability to process refunds as quickly as we'd like. I know that's not your problem, but it's the honest reality we're contending with as we work to right the ship.

Please know that your refund is absolutely still guaranteed and we are working tirelessly to improve our financial standing so that we can process it as soon as humanly possible. It pains me deeply to not be able to honor it immediately, as I would want nothing more than to do right by you today if we were able.

We are actively pursuing promising new revenue streams and have made significant cost cuts internally to expedite our path to being able to fulfill the refunds we owe. I give you my word that we will notify you the moment we are able to process yours. Again, I'm genuinely sorry for the position this puts you in and I appreciate your understanding during this time more than you know.

In the meantime, please don't hesitate to reach out if there is anything else I can assist with. And I sincerely appreciate you leaving the door open for potential future business. As our technology advances, I'd be more than happy to revisit how we might be able to support your new business ventures down the line.

Also would you be completely against hanging tight before coming to a final decision given you might want to use Air for other potential ventures? (edited)

Wednesday, June 19th ⌄



**scott**  10:23 AM
No. I am also a startup that is cash strapped. You're contractually obligated to return the $25k that I put up. I took out a personal loan from your referred company Special Finance. You can do the same. You can find $25k. Please return it immediately. I do not want to have to pursue legal action to force it to be returned.



 **Caleb, Thomas, And Ryan** 5:08 PM
replied to a thread: **That's not good enough. I signed up to be a license holder with 100% refund provision. If you cannot uphold that you have defraud...**

 @scott, I completely understand your frustration and the seriousness of your concerns. You're absolutely right that we have a contractual obligation to honor the 100% refund provision, and I want to assure you that we have every intention of fulfilling that commitment.

I appreciate you bringing up the legal aspect, and I want to address that directly. While you certainly have the right to pursue legal action, I want to be fully transparent about our current situation and why that route might not be in either of our best interests right now.

As a bootstrapped startup, we're currently facing some capital constraints that are temporarily preventing us from issuing immediate refunds. This is an embarrassing and difficult situation for us, and we're working tirelessly to resolve it. Legal action at this point would likely be costly for both parties and could potentially delay your refund even further by diverting our limited resources.

We're making significant progress on new revenue streams, particularly in the insurance space, which we believe will put us in a position to honor refunds very soon. Our entire team, including myself and the other founders, are working 16-hour days, 7 days a week to turn this situation around as quickly as possible.

I know this isn't the resolution you're looking for today, and I truly apologize for that. We value you as a client and want to make this right. While I can't provide an exact timeline, I can assure you that issuing your refund is a top priority for us as soon as we're financially able.

If you have any other concerns or questions, please don't hesitate to reach out here in Slack. We're committed to keeping an open line of communication with you throughout this process.

 Today ⌄

 **scott** 4:11 PM
To offer a 100% refund that you know you cannot honor is not only breach of contract but also fraud.
I know that my $25k license is smaller than most and a small price to pay to keep me off of the growing list of litigants against you.
Here's what you can do. Get some other person to agree to your contract and put up their money. You take a portion of that money and give it to me. Simply sell 1 more license and you will have the funds to become even with me.
I will be transparent too. I've got a meeting with my attorney Don Lanson of Manfredi, Levine, Eccles, Miller & Lanson on Friday regarding this matter. I am expecting a $25,000 payment prior to Friday. If not received I will be pursuing full legal action.
It will definitely be more costly for you than for me. And more costly than $25,000 for you so please do the right thing and find a way to get this done.

