IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>Plaintiff,<br><br>v.<br><br>Air Ai Technologies, Inc., et al.,<br><br>Defendants. | No. 2:25-cv-03068-SMB<br><br>[Proposed] **STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint for Permanent Injunction, Monetary Judgment and Other Relief ("Complaint") in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) & 57b. The Commission and Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

**FINDINGS**

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that Defendants participated in deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the

1

Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Business Opportunity Rule, 16 C.F.R., Part 437, in the marketing and sale of Air AI Access Cards and Licensing.

3.    Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4.    Defendants waive and release any claims that they may have against the Commission that relate to this action through the date of this Order and agree to bear their own costs and attorney fees.

5.    Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.    "**Air AI Access Card(s)**" means the business coaching materials, platform, and support sold by Defendants no earlier than February 9, 2023, including those referred to as "Scale 13"; and that may include the Air Software Suite, a conversational AI product sometimes called "Odin," a checkout and financing platform sometimes called "Midas," a constraint finder sometimes called "Sherlock," and lead maximizer and dialing platform sometimes called "Max"; and accompanying support and services.

B.    "**Asset**" means any legal or equitable interest in, right to, or claim to, any property, wherever located and by whomever held.

2

C.    "**Assisting Others**" means providing assistance or support to any Person, including providing any of the following services:

1.    Performing customer service functions, including receiving or responding to consumer complaints;

2.    Formulating or providing, or arranging for the formulation or provision of, any advertising, promotional, or marketing material;

3.    Formulating or providing, or arranging for the formulation or provision of, any marketing support material or service, including web or Internet Protocol addresses or domain name registration for any Internet websites, affiliate marketing services, or media placement services;

4.    Hiring or recruiting personnel or others;

5.    Providing names of, or assisting others in, the generation of, potential customers;

6.    Performing promotional, marketing, billing, payment processing, or payments services of any kind; or

7.    Acting or serving as an owner, officer, director, manager, or principal of any entity.

D.    "**Business Opportunity**" means a commercial arrangement in which:

1.    A seller solicits a prospective purchaser to enter into a new business; and

2.    The prospective purchaser makes a required payment; and

3

3.    The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will:

a.    Provide locations for the use or operation of equipment, displays, vending machines, or similar devices owned, leased, controlled, or paid for by the purchaser; or

b.    Provide outlets, accounts, or customers, including Internet outlets, accounts, or customers, for the purchaser's good or services; or

c.    Buy back any or all of the goods or services that the purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

For purposes of this Order, Business Opportunity shall not include conduct and arrangement covered by the FTC's Franchise Rule, 16 CFR Part 436.

E.    **"Clear(ly) and Conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the

communication even if the representation requiring the disclosure is made in only one means.

2.      A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.      An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.      In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.      The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.      The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.       The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.      This disclosure must not be presented to the consumer through a hyperlink.

9.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

F.     "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

1.     "**Corporate Defendants**" means Air Ai Technologies, Inc. (also d/b/a Air AI, Air.AI, Scale 13), Apex Holdings Group LLC, Apex Scaling LLC (also d/b/a Air AI, Scale 13), Apex 4 Kids LLC, New Life Capital LLC, and Onyx Capital LLC, and each of their subsidiaries, affiliates, successors, and assigns.

2.     "**Individual Defendants**" means Caleb M. Maddix, Ryan P. O'Donnell, and Thomas M. Lancer.

G.     "**Document**" is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Federal Rule of Civil Procedure 34(a), Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, web pages, websites, electronic correspondence, including e-mail and instant messages, contracts, accounting data, advertisements, FTP Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained

directly or, if necessary, after translation into a reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

H.      "**Earnings Claim(s)**" means any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, business growth, or gross or net income or profits. Earnings Claims include, but are not limited to: (1) any chart, table, or mathematical calculation that demonstrates possible financial results based upon a combination of variables; (2) any statements from which a prospective purchaser can reasonably infer that he or she will earn a minimum level of income or achieve a certain level of sales or business growth; and (3) any statements, claims, success stories, endorsements, or testimonials about the performance or profitability of representatives, endorsers, instructors, or customers.

I.      "**Licensing**" means the right to access, distribute and resell Defendants' conversational AI products or technology, which can include revenue sharing, discounts, priority support, early access, educational and training materials, and accompanying products and services, as outlined in Defendants' advertising and sales contracts with consumers.

J.      "**Person**" means a natural person, organization, or other legal entity, including a corporation, limited liability company, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or combination acting as an entity.

7

K.    "**Telemarketing**" means any plan, program, or campaign that is conducted to induce the purchase of goods or services by use of one or more telephone calls.

## ORDER

### I.    PROHIBITION REGARDING TELEMARKETING

IT IS ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly or Assisting Others, in connection with Telemarketing of any good or service, including any business or money-making opportunity not banned in Section III, are hereby permanently restrained and enjoined from:

A.    Initiating, or causing others to initiate, an outbound telephone call:

1.    That makes a false or misleading statement to induce any person to pay for goods or services;

2.    That misrepresents, directly or by implication, any material aspect of a business or investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability; and

3.    That misrepresents, directly or by implication, any material aspects of the nature or terms and conditions of any refund, cancellation, or repurchase policies, including the ability to obtain a refund (*e.g.*, promising or guaranteeing a refund but failing to provide it when requested).

B.    Violating any provision of the TSR, 16 C.F.R. Part 310, attached as **Attachment A.**

8

## II.   PROHIBITED BUSINESS ACTIVITIES

IT IS THEREFORE FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale of any goods or services, including any business or money making opportunity not banned in Section III, are permanently restrained and enjoined from:

A.   Misrepresenting or Assisting Others in misrepresenting, expressly or by implication, any material fact, including, but not limited to:

1.   The nature or terms and conditions of any refund, cancellation, or repurchase policies, including the ability to obtain a refund (*e.g.*, promising or guaranteeing a refund but failing to provide it when requested);

2.   The risk, earnings potential, or profitability of any good or service;

3.    Refund, cancellation, or repurchase policies;

4.   The sales, income, or profits consumers could earn; and

5.   Any other fact material to consumers concerning any good or service, such as the performance, efficacy, nature, or central characteristics of any good or service, or the total costs and any material restrictions, limitations, or conditions.

B.   Making any Earnings Claims to a prospective purchaser, unless:

1.   The Earnings Claim is non-misleading;

2.      At the time the Earnings Claim is made, Defendants have a reasonable basis for the claim and have in their possession written materials that substantiate the claimed earnings;

3.      Defendants Clearly and Conspicuously disclose typical customer results, and have written substantiation for such typical results;

4.      Defendants make the written substantiation for Earnings Claims available upon request to the consumer, potential purchaser, and the FTC; and

5.      Any earnings that form the basis for the Earnings Claims were achieved in compliance with the law.

**III.      BAN ON BUSINESS OPPORTUNITIES**

IT IS FURTHER ORDERED that Defendants are permanently restrained and enjoined from creating, advertising, marketing, distributing, promoting, offering for sale, or selling, or Assisting Others in creating, advertising, marketing, distributing, promoting, offering for sale, or selling of, any Business Opportunity.

**IV.      MONETARY JUDGMENT AND PARTIAL SUSPENSION**

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of Eighteen Million Dollars ($18,000,000) is entered in favor of the Commission against Individual Defendants and Corporate Defendants, jointly and severally, as monetary relief.

B.      Defendants are ordered to pay to the Commission $50,000. Such payment must be made within 60 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

10

C.    Upon such payment, the remainder of the judgment is suspended, subject to the Subsections below.

D.    The Commission's agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of Defendants' sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:

1.    the Financial Statement of Individual Defendant Maddix, signed on September 10, 2025, including the attachments and supporting documents;

2.    the Financial Statement of Individual Defendant O'Donnell, signed on September 10, 2025, including the attachments and supporting documents;

3.    the Financial Statement of Individual Defendant Lancer, signed on September 21, 2025, including attachments and supporting documents;

4.    the Financial Statements of Corporate Defendants Air Ai Technologies, Inc, Apex Holdings Group LLC, Apex Scaling LLC, Apex 4 Kids LLC, Onyx Capital LLC (dba Onyx Experiences), and New Life Capital LLC, signed by Defendant O'Donnell, co-founder, on September 19, 2025, including the attachments;

5.    the additional documentation and corporate records submitted by Defendants' counsel Leonard Gordon and Eden Caliendo to Commission counsel Rebecca Plett and Lauren Rivard on September 24, 2025, including bank and payment processor records for Corporate Defendants, customer sales and refund logs, and sales contract templates;

6. the sworn testimony provided in the December 10, 2025 deposition of Defendant Lancer in his individual capacity;

7. the sworn testimony provided in the December 10, 2025 deposition of Defendant Lancer, testifying on behalf of Defendants Air Ai Technologies, Inc. and Apex Holdings Group LLC;

8. the sworn testimony provided in the December 18, 2025 deposition of Defendant O'Donnell in his individual capacity;

9. the sworn testimony provided in the December 18, 2025 deposition of Defendant O'Donnell, testifying on behalf of Defendants Apex 4 Kids LLC, Apex Scaling LLC, Onyx Capital LLC, and New Life Capital LLC; and

10. the sworn testimony provided in the December 18, 2025 deposition of Defendant Maddix in his individual capacity.

E. The suspension of the judgment will be lifted as to any Defendant if, upon motion by the Commission, the Court finds that:

1. Defendant failed to disclose any material Asset, materially misstated the value of any Asset, or made any other material misstatement or omission in the financial representations identified above; or

2. Defendant is in default on any obligation under this Section.

F. If the suspension of the judgment is lifted, the judgment becomes immediately due as to that Defendant in the amount specified in Subsection A above (which the parties stipulate only for purposes of this Section represents the consumer

injury alleged in the Complaint, less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order).

## V.      ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Defendants relinquish dominion and all legal and equitable right, title, and interest in all Assets transferred pursuant to this Order and may not seek the return of any Assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Each Defendant acknowledges that Defendants' Employer Identification Number, Social Security Number, or other Taxpayer Identification Number ("TIN"), including all TINs that Defendants previously provided, may be used by the Commission for reporting and other lawful purposes, including collecting on any delinquent amount arising out of this Order in accordance with 31 U.S.C. §7701.

E.      All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for

13

consumer relief, such as redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for relief is to be deposited to the U.S. Treasury. Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VI.       CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.       Failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. Defendants represent that they have provided this redress information to the Commission. If a representative of the Commission requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Commission, within 14 days.

B.       Disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant

14

obtained prior to entry of this Order in connection with the marketing and sale of Air AI Access Cards and Licensing; and

C.      Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

**VII.      ORDER ACKNOWLEDGMENTS**

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.      Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, each Individual Defendant for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and each Corporate Defendant, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel.  For all

others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

**VIII.      COMPLIANCE REPORTING**

IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

A.      One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

1.      Each Defendant must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendants must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.      Additionally, each Individual Defendant must:  (a) identify all

telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.      For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.      Each Defendant must report any change in:  (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.      Additionally, each Individual Defendant must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

17

C.      Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin: FTC v. Air Ai Technologies, Inc., et al., X250039.

**IX.      RECORDKEEPING**

IT IS FURTHER ORDERED that Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate Defendants and each Individual Defendant for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.      accounting records showing the revenues from all goods or services sold;

B.      personnel records showing, for each Person providing services, whether as

an employee or otherwise, that Person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.     records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response, including whether the refund was granted and why;

D.     all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.     a copy of each unique advertisement or other marketing material.

## X.     COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order, including the financial representations upon which part of the judgment was suspended and any failure to transfer any Assets as required by this Order:

A.     Within 14 days of receipt of a written request from a representative of the Commission, each Defendant must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce Documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including depositions by remote means), 31, 33, 34, 36, 45, and 69.

B.     For matters concerning this Order, the Commission is authorized to communicate directly with each Defendant.  Defendants must permit representatives of

19

the Commission to interview any employee or other Person affiliated with any Defendant who has agreed to such an interview.  The Person interviewed may have counsel present.

C.    The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.    Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Individual Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

**XI.    RETENTION OF JURISDICTION**

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

**FEDERAL TRADE COMMISSION**

Date: 3-24-26

Rebecca Plett (VA Bar No. 90988, NC Bar No. 63273)
Lauren Rivard (NY Reg. No. 5308192)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-6316
Washington, DC 20580
(202) 326-3664 / rplett@ftc.gov
(202) 326-2450 / lrivard@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

**FOR ALL DEFENDANTS:**

Date: 2-4-26

Leonard L. Gordon
Venable LLP
151 W 42nd Street
New York, NY 10036
LLGordon@Venable.com

Kevin D. Quigley
Kevin.Quigley@quarles.com
Edward A. Salanga
Edward.Salanga@quarles.com
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Suite 600
Phoenix, AZ 85004-2322

*Attorneys for All Defendants*

21

DEFENDANT THOMAS M. LANCER

*Thomas Lancer*     Date: Feb 4ᵗʰ, 2026
_____
*Individually*


DEFENDANT RYAN P. O'DONNELL


_____     Date: _____
*Individually*


DEFENDANT CALEB M. MADDIX


_____     Date: _____
*Individually*


DEFENDANT AIR AI TECHNOLOGIES, INC.
also d/b/a Air Ai and Scale 13


_____     Date: _____
By: Caleb M. Maddix
*Owner, Officer, and/or Manager*


DEFENDANT APEX HOLDINGS GROUP LLC


_____     Date: _____
By: Caleb M. Maddix
*Owner, Officer, and/or Manager*

22

**DEFENDANT THOMAS M. LANCER**

_____    Date: _____
_Individually_

**DEFENDANT RYAN P. O'DONNELL**

_____    Date: _____
_Individually_

**DEFENDANT CALEB M. MADDIX**

_____CMX_____    Date: February 11th, 2026
_Individually_

**DEFENDANT AIR AI TECHNOLOGIES, INC.**
**also d/b/a Air Ai and Scale 13**

_____CMX_____    Date: February 11th, 2026
By: Caleb M. Maddix
_Owner, Officer, and/or Manager_

**DEFENDANT APEX HOLDINGS GROUP LLC**

_____CMX_____    Date: February 11th, 2026
By: Caleb M. Maddix
_Owner, Officer, and/or Manager_

22

**DEFENDANT THOMAS M. LANCER**

_____     Date: _____
*Individually*


**DEFENDANT RYAN P. O'DONNELL**

_____     Date: 2/9/26
*Individually*


**DEFENDANT CALEB M. MADDIX**

_____     Date: _____
*Individually*


**DEFENDANT AIR AI TECHNOLOGIES, INC.**
**also d/b/a Air Ai and Scale 13**

_____     Date: _____
By: Caleb M. Maddix
*Owner, Officer, and/or Manager*


**DEFENDANT APEX HOLDINGS GROUP LLC**

_____     Date: _____
By: Caleb M. Maddix
*Owner, Officer, and/or Manager*

22

**DEFENDANT APEX SCALING LLC**
**also d/b/a/ Air AI and Scale 13**

By: Ryan P. O'Donnell
*Owner, Officer, and/or Manager*

Date: 2/9/26

**DEFENDANT APEX 4 KIDS LLC**

By: Ryan P. O'Donnell
*Owner, Officer, and/or Manager*

Date: 2/9/26

**DEFENDANT NEW LIFE CAPITAL LLC**

By: Ryan P. O'Donnell
*Owner, Officer, and/or Manager*

Date: 2/9/26

**DEFENDANT ONYX CAPITAL LLC**

By: Ryan P. O'Donnell
*Owner, Officer, and/or Manager*

Date: 2/9/26

23

# ATTACHMENT A

# PART 310—TELEMARKETING SALES RULE

Sec.

310.1  Scope of regulations in this part.
310.2  Definitions.
310.3  Deceptive telemarketing acts or practices.
310.4  Abusive telemarketing acts or practices.
310.5  Recordkeeping requirements.
310.6  Exemptions.
310.7  Actions by states and private persons.
310.8  Fee for access to the National Do Not Call Registry.
310.9  Severability.

AUTHORITY: 15 U.S.C. 6101–6108.

§ 310.1  **Scope of regulations in this part.**

This part implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108, as amended.

§ 310.2  **Definitions.**

(a) *Acquirer* means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system to authorize merchants to accept, transmit, or process payment by credit card

412

**Federal Trade Commission** §310.2

through the credit card system for money, goods or services, or anything else of value.

(b) *Attorney General* means the chief legal officer of a state.

(c) *Billing information* means any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(d) *Caller identification service* means a service that allows a telephone subscriber to have the telephone number, and, where available, name of the calling party transmitted contemporaneously with the telephone call, and displayed on a device in or connected to the subscriber's telephone.

(e) *Cardholder* means a person to whom a credit card is issued or who is authorized to use a credit card on behalf of or in addition to the person to whom the credit card is issued.

(f) *Cash-to-cash money transfer* means the electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) transfer of the value of cash received from one person to another person in a different location that is sent by a money transfer provider and received in the form of cash. For purposes of this definition, *money transfer provider* means any person or financial institution that provides cash-to-cash money transfers for a person in the normal course of its business, whether or not the person holds an account with such person or financial institution. The term *cash-to-cash money transfer* includes a remittance transfer, as defined in section 919(g)(2) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693a, that is a cash-to-cash transaction; however it does not include any transaction that is:

(1) An electronic fund transfer as defined in section 903 of the EFTA;

(2) Covered by Regulation E, 12 CFR 1005.20, pertaining to gift cards; or

(3) Subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq*.

(g) *Cash reload mechanism* is a device, authorization code, personal identification number, or other security measure that makes it possible for a person to convert cash into an electronic (as de-

fined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) form that can be used to add funds to a general-use prepaid card, as defined in Regulation E, 12 CFR 1005.2, or an account with a payment intermediary. For purposes of this definition, a cash reload mechanism is not itself a general-use prepaid debit card or a swipe reload process or similar method in which funds are added directly onto a person's own general-use prepaid card or account with a payment intermediary.

(h) *Charitable contribution* means any donation or gift of money or any other thing of value.

(i) *Commission* means the Federal Trade Commission.

(j) *Credit* means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(k) *Credit card* means any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

(l) *Credit card sales draft* means any record or evidence of a credit card transaction.

(m) *Credit card system* means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

(n) *Customer* means any person who is or may be required to pay for goods or services offered through telemarketing.

(o) *Debt relief service* means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

(p) *Donor* means any person solicited to make a charitable contribution.

(q) *Established business relationship* means a relationship between a seller and a person based on:

(1) The person's purchase, rental, or lease of the seller's goods or services or

413

a financial transaction between the person and seller, within the 540 days immediately preceding the date of a telemarketing call; or

(2) The person's inquiry or application regarding a good or service offered by the seller, within the 90 days immediately preceding the date of a telemarketing call.

(r) *Free-to-pay conversion* means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period.

(s) *Investment opportunity* means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

(t) *Material* means likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution.

(u) *Merchant* means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(v) *Merchant agreement* means a written contract between a merchant and an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(w) *Negative option feature* means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

(x) *Outbound telephone call* means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

(y) *Person* means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

(z) *Preacquired account information* means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.

(aa) *Previous donor* means any person who has made a charitable contribution to a particular charitable organization within the 2-year period immediately preceding the date of the telemarketing call soliciting on behalf of that charitable organization.

(bb) *Prize* means anything offered, or purportedly offered, and given, or purportedly given, to a person by chance. For purposes of this definition, chance exists if a person is guaranteed to receive an item and, at the time of the offer or purported offer, the telemarketer does not identify the specific item that the person will receive.

(cc) *Prize promotion* means:

(1) A sweepstakes or other game of chance; or

(2) An oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize.

(dd) *Remotely created payment order* means any payment instruction or order drawn on a person's account that is created by the payee or the payee's agent and deposited into or cleared through the check clearing system. The term includes, without limitation, a ''remotely created check,'' as defined in Regulation CC, Availability of Funds and Collection of Checks, 12 CFR 229.2(fff), but does not include a payment order cleared through an Automated Clearinghouse (ACH) Network or subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR part 1026.

(ee) *Seller* means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

**Federal Trade Commission**

**§ 310.3**

(ff) *State* means any state of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, and any territory or possession of the United States.

(gg) *Telemarketer* means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(hh) *Telemarketing* means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

(ii) *Upselling* means soliciting the purchase of goods or services following an initial transaction during a single telephone call. The upsell is a separate telemarketing transaction, not a continuation of the initial transaction. An "external upsell" is a solicitation made by or on behalf of a seller different from the seller in the initial transaction, regardless of whether the initial transaction and the subsequent solicitation are made by the same telemarketer. An "internal upsell" is a solicitation made by or on behalf of the same seller as in the initial transaction, regardless of whether the initial transaction and subsequent solicitation are made by the same telemarketer.

[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77557, Dec. 14, 2015; 89 FR 26783, Apr. 16, 2024]

EFFECTIVE DATE NOTE: At 89 FR 99075, Dec. 10, 2024, § 310.2 was amended by redesignating paragraphs (gg) through (ii) as paragraphs (hh) through (jj), and adding new paragraph (gg), effective Jan. 9, 2025. For the convenience of the user, the added text is set forth as follows:

**§ 310.2    Definitions.**

\*        \*        \*        \*        \*

(gg) *Technical support service* means any plan, program, software, or service that is marketed to repair, maintain, or improve the performance or security of any device on which code can be downloaded, installed, run, or otherwise used, such as a computer, smartphone, tablet, or smart home product, including any software or application run on such device. Technical support service does not include any plan, program, software, or service in which the person providing the repair, maintenance, or improvement obtains physical possession of the device being repaired.

\*        \*        \*        \*        \*

**§ 310.3    Deceptive telemarketing acts or practices.**

(a) *Prohibited deceptive telemarketing acts or practices.* It is a deceptive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct:

(1) Before a customer consents to pay[1] for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any

---

[1] When a seller or telemarketer uses, or directs a customer to use, a courier to transport payment, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before sending a courier to pick up payment or authorization for payment, or directing a customer to have a courier pick up payment or authorization for payment. In the case of debt relief services, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before the consumer enrolls in an offered program.

**§ 310.3**  16 CFR Ch. I (1–1–25 Edition)

goods or services that are the subject of the sales offer;[2]

(ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

(iii) If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or, if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy;

(iv) In any prize promotion, the odds of being able to receive the prize, and, if the odds are not calculable in advance, the factors used in calculating the odds; that no purchase or payment is required to win a prize or to participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate;

(v) All material costs or conditions to receive or redeem a prize that is the subject of the prize promotion;

(vi) In the sale of any goods or services represented to protect, insure, or otherwise limit a customer's liability in the event of unauthorized use of the customer's credit card, the limits on a cardholder's liability for unauthorized use of a credit card pursuant to 15 U.S.C. 1643;

(vii) If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the spe-

cific steps the customer must take to avoid the charge(s); and

(viii) In the sale of any debt relief service:

(A) the amount of time necessary to achieve the represented results, and to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the time by which the debt relief service provider will make a bona fide settlement offer to each of them;

(B) to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the amount of money or the percentage of each outstanding debt that the customer must accumulate before the debt relief service provider will make a bona fide settlement offer to each of them;

(C) to the extent that any aspect of the debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the customer owes due to the accrual of fees and interest; and

(D) to the extent that the debt relief service requests or requires the customer to place funds in an account at an insured financial institution, that the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and, if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C).

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

(ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer;

---

[2] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR 226, compliance with the disclosure requirements under the Truth in Lending Act and Regulation Z shall constitute compliance with § 310.3(a)(1)(i) of this part.

**Federal Trade Commission** §310.3

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

(v) Any material aspect of a prize promotion including, but not limited to, the odds of being able to receive a prize, the nature or value of a prize, or that a purchase or payment is required to win a prize or to participate in a prize promotion;

(vi) Any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability;

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity;

(viii) That any customer needs offered goods or services to provide protections a customer already has pursuant to 15 U.S.C. 1643;

(ix) Any material aspect of a negative option feature including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); or

(x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and

whether a debt relief service is offered or provided by a non-profit entity.

(3) Causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act and Regulation Z,[3] or a debit card subject to the protections of the Electronic Fund Transfer Act and Regulation E.[4] Such authorization shall be deemed verifiable if any of the following means is employed:

(i) Express written authorization by the customer or donor, which includes the customer's or donor's signature;[5]

(ii) Express oral authorization which is audio-recorded and made available upon request to the customer or donor, and the customer's or donor's bank or other billing entity, and which evidences clearly both the customer's or donor's authorization of payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction and the customer's or donor's receipt of all of the following information:

(A) An accurate description, clearly and conspicuously stated, of the goods or services or charitable contribution for which payment authorization is sought;

(B) The number of debits, charges, or payments (if more than one);

(C) The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

(D) The amount(s) of the debit(s), charge(s), or payment(s);

(E) The customer's or donor's name;

(F) The customer's or donor's billing information, identified with sufficient

---

[3] Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR part 226.

[4] Electronic Fund Transfer Act, 15 U.S.C. 1693 *et seq.,* and Regulation E, 12 CFR part 205.

[5] For purposes of this part, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

417

specificity such that the customer or donor understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

(G) A telephone number for customer or donor inquiry that is answered during normal business hours; and

(H) The date of the customer's or donor's oral authorization; or

(iii) Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the customer or donor via first class mail prior to the submission for payment of the customer's or donor's billing information, and that includes all of the information contained in §§ 310.3(a)(3)(ii)(A)-(G) and a clear and conspicuous statement of the procedures by which the customer or donor can obtain a refund from the seller or telemarketer or charitable organization in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which goods or services are offered in a transaction involving a free-to-pay conversion and preacquired account information.

(4) Making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.

(b) *Assisting and facilitating.* It is a deceptive telemarketing act or practice and a violation of this part for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this part.

(c) *Credit card laundering.* Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this part for:

(1) A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction

between the cardholder and the merchant;

(2) Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

(3) Any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

(d) *Prohibited deceptive acts or practices in the solicitation of charitable contributions.* It is a fraudulent charitable solicitation, a deceptive telemarketing act or practice, and a violation of this part for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

(1) The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;

(2) That any charitable contribution is tax deductible in whole or in part;

(3) The purpose for which any charitable contribution will be used;

(4) The percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program;

(5) Any material aspect of a prize promotion including, but not limited to: the odds of being able to receive a prize; the nature or value of a prize; or that a charitable contribution is required to win a prize or to participate in a prize promotion; or

(6) A charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77558, Dec. 14, 2015; 89 FR 26784, 26785, Apr. 16, 2024]

### § 310.4　Abusive telemarketing acts or practices.

(a) *Abusive conduct generally.* It is an abusive telemarketing act or practice

**Federal Trade Commission**                                               **§ 310.4**

and a violation of this part for any seller or telemarketer to engage in the following conduct:

(1) Threats, intimidation, or the use of profane or obscene language;

(2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this part should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose;

(3) Requesting or receiving payment of any fee or consideration from a person for goods or services represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous transaction, until seven (7) business days after such money or other item is delivered to that person. This provision shall not apply to goods or services provided to a person by a licensed attorney;

(4) Requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person;

(5)(i) Requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

(A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

(B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

(C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

(*1*) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

(*2*) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

(ii) Nothing in § 310.4(a)(5)(i) prohibits requesting or requiring the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt, provided that:

(A) The funds are held in an account at an insured financial institution;

(B) The customer owns the funds held in the account and is paid accrued interest on the account, if any;

(C) The entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service;

(D) The entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and

(E) The customer may withdraw from the debt relief service at any time without penalty, and must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A)

through (C), within seven (7) business days of the customer's request.

(6) Disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing; provided, however, that this paragraph shall not apply to the disclosure or receipt of a customer's or donor's billing information to process a payment for goods or services or a charitable contribution pursuant to a transaction;

(7) Causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor. In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the goods or services or charitable contribution and to be charged using the identified account. In any telemarketing transaction involving preacquired account information, the requirements in paragraphs (a)(7)(i) through (ii) of this section must be met to evidence express informed consent.

(i) In any telemarketing transaction involving preacquired account information and a free-to-pay conversion feature, the seller or telemarketer must:

(A) Obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged;

(B) Obtain from the customer his or her express agreement to be charged for the goods or services and to be charged using the account number pursuant to paragraph (a)(7)(i)(A) of this section; and,

(C) Make and maintain an audio recording of the entire telemarketing transaction.

(ii) In any other telemarketing transaction involving preacquired account information not described in paragraph (a)(7)(i) of this section, the seller or telemarketer must:

(A) At a minimum, identify the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; and

(B) Obtain from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the account

number identified pursuant to paragraph (a)(7)(ii)(A) of this section;

(8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; provided that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours;

(9) Creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing or as a charitable contribution solicited or sought through telemarketing; or

(10) Accepting from a customer or donor, directly or indirectly, a cash-to-cash money transfer or cash reload mechanism as payment for goods or services offered or sold through telemarketing or as a charitable contribution solicited or sought through telemarketing.

(b) *Pattern of calls.* (1) It is an abusive telemarketing act or practice and a violation of this part for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

(i) Causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number;

(ii) Denying or interfering in any way, directly or indirectly, with a person's right to be placed on any registry of names and/or telephone numbers of persons who do not wish to receive outbound telephone calls established to comply with paragraph (b)(1)(iii)(A) of this section, including, but not limited to, harassing any person who makes such a request; hanging up on that person; failing to honor the request; requiring the person to listen to a sales pitch before accepting the request; assessing a charge or fee for honoring the

420

**Federal Trade Commission** §310.4

request; requiring a person to call a different number to submit the request; and requiring the person to identify the seller making the call or on whose behalf the call is made;

(iii) Initiating any outbound telephone call to a person when:

(A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) That person's telephone number is on the ''do-not-call'' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller or telemarketer:

(*1*) Can demonstrate that the seller has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature[1] of that person; or

(*2*) Can demonstrate that the seller has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call. An outbound telephone call is ''abandoned'' under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in §310.4(b)(4)(iii), unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

(i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

(ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv) Includes such person's telephone number and signature;[2] and

(B) In any such call to induce the purchase of any good or service, or to induce a charitable contribution from a member of, or previous donor to, a non-profit charitable organization on whose behalf the call is made, the seller or telemarketer:

(i) Allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

(ii) Within two (2) seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by §310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(A) In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to §310.4(b)(1)(iii)(A) at any time during the message. The mechanism must:

(1) Automatically add the number called to the seller's entity-specific Do Not Call list;

(2) Once invoked, immediately disconnect the call; and

(3) Be available for use at any time during the message; and

---

[1] For purposes of this part, the term ''signature'' shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

[2] For purposes of this part, the term ''signature'' shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(B) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

(1) Automatically adds the number called to the seller's entity-specific Do Not Call list;

(2) Immediately thereafter disconnects the call; and

(3) Is accessible at any time throughout the duration of the telemarketing campaign; and

(iii) Complies with all other requirements of this part and other applicable federal and state laws.

(C) Any call that complies with all applicable requirements of this paragraph (v) shall not be deemed to violate § 310.4(b)(1)(iv) of this part.

(D) This paragraph (v) shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.P≤(2) It is an abusive telemarketing act or practice and a violation of this part for any person to sell, rent, lease, purchase, or use any list established to comply with § 310.4(b)(1)(iii)(A) or § 310.5, or maintained by the Commission pursuant to § 310.4(b)(1)(iii)(B), for any purpose except compliance with the provisions of this part or otherwise to prevent telephone calls to telephone numbers on such lists.

(3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:

(i) It has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to § 310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with § 310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the ''do-not-call'' registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;

(v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to § 310.4(b)(3)(i); and

(vi) Any subsequent call otherwise violating paragraph (b)(1)(ii) or (iii) of this section is the result of error and not of failure to obtain any information necessary to comply with a request pursuant to paragraph (b)(1)(iii)(A) of this section not to receive further calls by or on behalf of a seller or charitable organization.

(4) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(iv) if:

(i) The seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues.

(ii) The seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call;

(iii) Whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed[3]; and

---

[3] This provision does not affect any seller's or telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

**Federal Trade Commission** §310.5

(iv) The seller or telemarketer, in accordance with §310.5(b)-(d), retains records establishing compliance with §310.4(b)(4)(i)-(iii).

(c) *Calling time restrictions.* Without the prior consent of a person, it is an abusive telemarketing act or practice and a violation of this part for a telemarketer to engage in outbound telephone calls to a person's residence at any time other than between 8:00 a.m. and 9:00 p.m. local time at the called person's location.

(d) *Required oral disclosures in the sale of goods or services.* It is an abusive telemarketing act or practice and a violation of this part for a telemarketer in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the seller;

(2) That the purpose of the call is to sell goods or services;

(3) The nature of the goods or services; and

(4) That no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered and that any purchase or payment will not increase the person's chances of winning. This disclosure must be made before or in conjunction with the description of the prize to the person called. If requested by that person, the telemarketer must disclose the no-purchase/no-payment entry method for the prize promotion; provided, however, that, in any internal upsell for the sale of goods or services, the seller or telemarketer must provide the disclosures listed in this section only to the extent that the information in the upsell differs from the disclosures provided in the initial telemarketing transaction.

(e) *Required oral disclosures in charitable solicitations.* It is an abusive telemarketing act or practice and a violation of this part for a telemarketer, in an outbound telephone call to induce a charitable contribution, to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the charitable organization on behalf of which the request is being made; and

(2) That the purpose of the call is to solicit a charitable contribution.

[75 FR 48516, Aug. 10, 2010, as amended at 76 FR 58716, Sept. 22, 2011; 80 FR 77559, Dec. 14, 2015; 89 FR 26784, 26785, Apr. 16, 2024]

**§310.5  Recordkeeping requirements.**

(a) Any seller or telemarketer must keep, for a period of 5 years from the date the record is produced unless specified otherwise, the following records relating to its telemarketing activities:

(1) A copy of each substantially different advertising, brochure, telemarketing script, and promotional material, and a copy of each unique prerecorded message. Such records must be kept for a period of 5 years from the date that they are no longer used in telemarketing;

(2) A record of each telemarketing call, which must include:

(i) The telemarketer that placed or received the call;

(ii) The seller or person for which the telemarketing call is placed or received;

(iii) The good, service, or charitable purpose that is the subject of the telemarketing call;

(iv) Whether the telemarketing call is to an individual consumer or a business consumer;

(v) Whether the telemarketing call is an outbound telephone call;

(vi) Whether the telemarketing call utilizes a prerecorded message;

(vii) The calling number, called number, date, time, and duration of the telemarketing call;

(viii) The telemarketing script(s) and prerecorded message, if any, used during the call;

(ix) The caller identification telephone number, and if it is transmitted, the caller identification name that is transmitted in an outbound telephone call to the recipient of the call, and any contracts or other proof of authorization for the telemarketer to use that telephone number and name, and the time period for which such authorization or contract applies; and

(x) The disposition of the call, including but not limited to, whether the call

423

was answered, connected, dropped, or transferred. If the call was transferred, the record must also include the telephone number or IP address that the call was transferred to as well as the company name, if the call was transferred to a company different from the seller or telemarketer that placed the call; provided, however, that for calls that an individual telemarketer makes by manually entering a single telephone number to initiate the call to that number, a seller or telemarketer need not retain the records specified in paragraphs (a)(2)(vii) and (a)(2)(x) of this section.

(3) For each prize recipient, a record of the name, last known telephone number, and last known physical or email address of that prize recipient, and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(4) For each customer, a record of the name, last known telephone number, and last known physical or email address of that customer, the goods or services purchased, the date such goods or services were purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;[1]

(5) For each person with whom a seller intends to assert it has an established business relationship under § 310.2(q)(2), a record of the name and last known telephone number of that person, the date that person submitted an inquiry or application regarding the seller's goods or services, and the goods or services inquired about;

(6) For each person that a telemarketer intends to assert is a previous donor to a particular charitable organization under § 310.2(aa), a record of the name and last known telephone number of that person, and the last date that person donated to that particular charitable organization;

(7) For each current or former employee directly involved in telephone sales or solicitations, a record of the

name, any fictitious name used, the last known home address and telephone number, and the job title(s) of that employee; provided, however, that if the seller or telemarketer permits fictitious names to be used by employees, each fictitious name must be traceable to only one specific employee;

(8) All verifiable authorizations or records of express informed consent or express agreement (collectively, "Consent") required to be provided or received under this part. A complete record of Consent includes the following:

(i) The name and telephone number of the person providing Consent;

(ii) A copy of the request for Consent in the same manner and format in which it was presented to the person providing Consent;

(iii) The purpose for which Consent is requested and given;

(iv) A copy of the Consent provided;

(v) The date Consent was given; and

(vi) For the copy of Consent provided under § 310.3(a)(3), § 310.4(a)(7), § 310.4(b)(1)(iii)(B)(*1*), or § 310.4(b)(1)(v)(A), a complete record must also include all information specified in those respective sections of this part;

(9) A record of each service provider a telemarketer used to deliver an outbound telephone call to a person on behalf of a seller for each good or service the seller offers for sale through telemarketing. For each such service provider, a complete record includes the contract for the service provided, the date the contract was signed, and the time period the contract is in effect. Such contracts must be kept for 5 years from the date the contract expires;

(10) A record of each person who has stated she does not wish to receive any outbound telephone calls made on behalf of a seller or charitable organization pursuant to § 310.4(b)(1)(iii)(A) including: the name of the person, the telephone number(s) associated with the request, the seller or charitable organization from which the person does not wish to receive calls, the telemarketer that called the person, the date the person requested that she cease receiving such calls, and the goods or services the seller was offering

---

[1] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR pt. 226, compliance with the recordkeeping requirements under the Truth in Lending Act, and Regulation Z, will constitute compliance with § 310.5(a)(4) of this part.

**Federal Trade Commission**                                    **§ 310.5**

for sale or the charitable purpose for which a charitable contribution was being solicited; and

(11) A record of which version of the Commission's "do-not-call" registry was used to ensure compliance with § 310.4(b)(1)(iii)(B). Such record must include:

(i) The name of the entity which accessed the registry;

(ii) The date the "do-not-call" registry was accessed;

(iii) The subscription account number that was used to access the registry; and

(iv) The telemarketing campaign for which it was accessed.

(b) A seller or telemarketer may keep the records required by paragraph (a) of this section in the same manner, format, or place as they keep such records in the ordinary course of business. The format for records required by paragraph (a)(2)(vii) of this section, and any other records that include a time or telephone number, must also comply with the following:

(1) The format for domestic telephone numbers must comport with the North American Numbering plan;

(2) The format for international telephone numbers must comport with the standard established in the International Telecommunications Union's Recommendation ITU–T E.164: Series E: Overall Network Operation, Telephone Service, Service Operation and Human Factors, published 11/2010 (incorporated by reference, see paragraph (g)(1) of this section);

(3) The time and duration of a call must be kept to the closest second; and

(4) Time must be recorded in Coordinated Universal Time (UTC).

(c) Failure to keep each record required by paragraph (a) of this section in a complete and accurate manner, and in compliance with paragraph (b) of this section, as applicable, is a violation of this part.

(d) For records kept pursuant to paragraph (a)(2) of this section, the seller or telemarketer will not be liable for failure to keep complete and accurate records pursuant to this part if it can demonstrate, with documentation, that as part of its routine business practice:

(1) It has established and implemented procedures to ensure completeness and accuracy of its records;

(2) It has trained its personnel, and any entity assisting it in its compliance, in such procedures;

(3) It monitors compliance with and enforces such procedures, and maintains records documenting such monitoring and enforcement; and

(4) Any failure to keep complete and accurate records was temporary, due to inadvertent error, and corrected within 30 days of discovery.

(e) The seller and the telemarketer calling on behalf of the seller may, by written agreement, allocate responsibility between themselves for the recordkeeping required by this section. When a seller and telemarketer have entered into such an agreement, the terms of that agreement will govern, and the seller or telemarketer, as the case may be, need not keep records that duplicate those of the other. If by written agreement the telemarketer bears the responsibility for the recordkeeping requirements of this section, the seller must establish and implement practices and procedures to ensure the telemarketer is complying with the requirements of this section. These practices and procedures include retaining access to any record the telemarketer creates under this section on the seller's behalf. If the agreement is unclear as to who must maintain any required record(s), or if no such agreement exists, both the telemarketer and the seller are responsible for complying with this section.

(f) In the event of any dissolution or termination of the seller's or telemarketer's business, the principal of that seller or telemarketer must maintain all records required under this section. In the event of any sale, assignment, or other change in ownership of the seller's or telemarketer's business, the successor business must maintain all records required under this section.

(g) The material required in this section is incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All

425

approved material is available for inspection at the Federal Trade Commission (FTC) and at the National Archives and Records Administration (NARA). Contact FTC at: FTC Library, (202) 326–2395, Federal Trade Commission, Room H–630, 600 Pennsylvania Avenue NW, Washington, DC 20580, or by email at *Library@ftc.gov*. For information on the availability of this material at NARA, email *fr.inspection@nara.gov* or go to *www.archives.gov/federal-register/cfr/ibr-locations.html*. It is available from: The International Telecommunications Union, Telecommunications Standardization Bureau, Place des Nations, CH–1211 Geneva 20; (+41 22 730 5852); *https://www.itu.int/en/pages/default.aspx*.

(1) Recommendation ITU–T E.164: Series E: Overall Network Operation, Telephone Service, Service Operation and Human Factors, published 11/2010.

(2) [Reserved]

[89 FR 26784, Apr. 16, 2024]

### § 310.6  Exemptions.

(a) Solicitations to induce charitable contributions via outbound telephone calls are not covered by § 310.4(b)(1)(iii)(B) of this part.

(b) The following acts or practices are exempt from this part:

(1) The sale of pay-per-call services subject to the Commission's Rule entitled "Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992," 16 CFR part 308, *provided*, however, that this exemption does not apply to the requirements of § 310.4(a)(1), (a)(8), (b), and (c);

(2) The sale of franchises subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," ("Franchise Rule") 16 CFR part 436, and the sale of business opportunities subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," ("Business Opportunity Rule") 16 CFR part 437, *provided*, however, that this exemption does not apply to the requirements of § 310.4(a)(1), (a)(8), (b), and (c);

(3) Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization, *provided*, however, that this exemption does not apply to the requirements of § 310.4(a)(1), (a)(8), (b), and (c);

(4) Telephone calls initiated by a customer or donor that are not the result of any solicitation by a seller, charitable organization, or telemarketer, *provided*, however, that this exemption does not apply to any instances of upselling included in such telephone calls;

(5) Telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, *provided*, however, that this exemption does not apply to:

(i) Calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

(ii) The requirements of § 310.4(a)(9) or (10); or

(iii) Any instances of upselling included in such telephone calls;

(6) Telephone calls initiated by a customer or donor in response to a direct mail solicitation, including solicitations via the U.S. Postal Service, facsimile transmission, electronic mail, and other similar methods of delivery in which a solicitation is directed to specific address(es) or person(s), that clearly, conspicuously, and truthfully discloses all material information listed in § 310.3(a)(1), for any goods or services offered in the direct mail solicitation, and that contains no material misrepresentation regarding any item contained in § 310.3(d) for any requested charitable contribution; *provided*, however, that this exemption does not apply to:

(i) Calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, debt relief services, business opportunities other than business arrangements covered by the

**Federal Trade Commission**                                      **§ 310.8**

Franchise Rule or Business Opportunity Rule, or goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

(ii) The requirements of § 310.4(a)(9) or (10); or

(iii) Any instances of upselling included in such telephone calls; and

(7) Telephone calls between a telemarketer and any business to induce the purchase of goods or services or a charitable contribution by the business, *provided,* however that this exemption does not apply to:

(i) The requirements of § 310.3(a)(2) and (4); or

(ii) Calls to induce the retail sale of nondurable office or cleaning supplies; *provided,* however, that §§ 310.4(b)(1)(iii)(B) and 310.5 shall not apply to sellers or telemarketers of nondurable office or cleaning supplies.

[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77559, Dec. 14, 2015; 89 FR 26785, Apr. 16, 2024]

EFFECTIVE DATE NOTE: At 89 FR 99075, Dec. 10, 2024, § 310.6 was amended by revising paragraphs (b)(5)(i) and (b)(6)(i), effective Jan. 9, 2025. For the convenience of the user, the revised text is set forth as follows:

**§ 310.6   Exemptions.**

\*      \*      \*      \*      \*

(b) * * *

(5) * * *

(i) Calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, technical support services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

\*      \*      \*      \*      \*

(6) * * *

(i) Calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, debt relief services, technical support services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

\*      \*      \*      \*      \*

**§ 310.7   Actions by states and private persons.**

(a) Any attorney general or other officer of a State authorized by the State to bring an action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, and any private person who brings an action under that Act, must serve written notice of its action on the Commission, if feasible, prior to its initiating an action under this part. The notice must be sent to the Office of the Director, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC 20580, at *tsrnotice@ftc.gov* and must include a copy of the State's or private person's complaint and any other pleadings to be filed with the court. If prior notice is not feasible, the State or private person must serve the Commission with the required notice immediately upon instituting its action.

(b) Nothing contained in this Section shall prohibit any attorney general or other authorized state official from proceeding in state court on the basis of an alleged violation of any civil or criminal statute of such state.

[75 FR 48516, Aug. 10, 2010, as amended at 89 FR 26785, Apr. 16, 2024]

**§ 310.8   Fee for access to the National Do Not Call Registry.**

(a) It is a violation of this part for any seller to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to telephone numbers within that area code that are included in the National Do Not Call Registry maintained by the Commission under § 310.4(b)(1)(iii)(B); provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§ 310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

(b) It is a violation of this part for any telemarketer, on behalf of any seller, to initiate an outbound telephone call to any person whose telephone

number is within a given area code unless that seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to the telephone numbers within that area code that are included in the National Do Not Call Registry; provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§ 310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

(c) The annual fee, which must be paid by any person prior to obtaining access to the National Do Not Call Registry, is $80 for each area code of data accessed, up to a maximum of $22,038; *provided*, however, that there shall be no charge to any person for accessing the first five area codes of data, and *provided further*, that there shall be no charge to any person engaging in or causing others to engage in outbound telephone calls to consumers and who is accessing area codes of data in the National Do Not Call Registry if the person is permitted to access, but is not required to access, the National Do Not Call Registry under 47 CFR 64.1200, or any other Federal regulation or law. No person may participate in any arrangement to share the cost of accessing the National Do Not Call Registry, including any arrangement with any telemarketer or service provider to divide the costs to access the registry among various clients of that telemarketer or service provider.

(d) Each person who pays, either directly or through another person, the annual fee set forth in paragraph (c) of this section, each person excepted under paragraph (c) from paying the annual fee, and each person excepted from paying an annual fee under § 310.4(b)(1)(iii)(B), will be provided a unique account number that will allow that person to access the registry data for the selected area codes at any time for the twelve month period beginning on the first day of the month in which the person paid the fee ("the annual period"). To obtain access to additional area codes of data during the first six months of the annual period, each person required to pay the fee under para-

graph (c) of this section must first pay $80 for each additional area code of data not initially selected. To obtain access to additional area codes of data during the second six months of the annual period, each person required to pay the fee under paragraph (c) of this section must first pay $40 for each additional area code of data not initially selected. The payment of the additional fee will permit the person to access the additional area codes of data for the remainder of the annual period.

(e) Access to the National Do Not Call Registry is limited to telemarketers, sellers, others engaged in or causing others to engage in telephone calls to consumers, service providers acting on behalf of such persons, and any government agency that has law enforcement authority. Prior to accessing the National Do Not Call Registry, a person must provide the identifying information required by the operator of the registry to collect the fee, and must certify, under penalty of law, that the person is accessing the registry solely to comply with the provisions of this part or to otherwise prevent telephone calls to telephone numbers on the registry. If the person is accessing the registry on behalf of sellers, that person also must identify each of the sellers on whose behalf it is accessing the registry, must provide each seller's unique account number for access to the national registry, and must certify, under penalty of law, that the sellers will be using the information gathered from the registry solely to comply with the provisions of this part or otherwise to prevent telephone calls to telephone numbers on the registry.

[75 FR 48516, Aug. 10, 2010; 75 FR 51934, Aug. 24, 2010, as amended at 77 FR 51697, Aug. 27, 2012; 78 FR 53643, Aug. 30, 2013; 79 FR 51478, Aug. 29, 2014; 80 FR 77560, Dec. 14, 2016; 81 FR 59845, Aug. 31, 2016; 82 FR 39534, Aug. 21, 2017; 83 FR 46640, Sept. 14, 2018; 84 FR 44687, Aug. 27, 2019; 85 FR 62597, Oct. 5, 2020; 86 FR 48301, Aug. 30, 2021; 87 FR 53373, Aug. 31, 2022; 88 FR 57334, Aug. 23, 2023; 89 FR 26785, Apr. 16, 2024; 89 FR 70095, Aug. 29, 2024]

## § 310.9  Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined

**Federal Trade Commission**

to be invalid, it is the Commission's in-tention that the remaining provisions shall continue in effect.

[75 FR 48516, Aug. 10, 2010, as amended at 89 FR 26785, Apr. 16, 2024]

§ 311.3   Preemption.